## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN CONOR JACOBS, MD,
600 Oldershaw Avenue
Moorestown, NJ 08057

      Plaintiff,

   v.

KARL T. CLEBAK, MD,
Associate Dean for Graduate Medical Educ.
Penn State Health Milton S. Hershey
Medical Center and The Pennsylvania
State University College of Medicine
Office of Graduate Medical Education
500 University Drive
Hershey, PA 17033,

KEVIN P. BLACK, MD,
Interim Vice Dean for Educ. Affairs
Penn State Health Milton S. Hershey
Medical Center
500 University Drive
Hershey, PA 17033,

    AND

NASROLLAH GHAHRAMANI MD, MS,
FACP,
Interim Chair, Department of Medicine
The Pennsylvania State University
College of Medicine
500 University Drive
Hershey, PA 17033,

    Defendants.

Case No.

JURY TRIAL DEMANDED

## VERIFIED COMPLAINT

## INTRODUCTION

1.     Plaintiff Brian Conor Jacobs, M.D., brings this action for violation of his Fourteenth Amendment Due Process rights.

2.     Dr. Jacobs was a resident at Penn State Milton S. Hershey Medical Center ("PSHMC").  He was terminated from his position based on an allegation that he falsified an email.  In reality, the email had been sent by a bitter ex-girlfriend; she admitted to this in text messages.

3.     The process used by PSHMC relied on secret evidence and failed to give Dr. Jacobs a full and fair opportunity to show that the fabricated email had been sent by his ex-girlfriend.  Instead, PSHMC rushed to a pre-determined outcome.

## PARTIES

4.     Plaintiff Doctor Jacobs is a licensed physician.

a.     Plaintiff graduated from Robert Wood Johnson Medical School in 2023 and received his medical trainee license to practice as a physician in Pennsylvania on July 1, 2023.

b.     Plaintiff is a New Jersey resident with a residence at 600 Oldershaw Avenue, Moorestown, New Jersey  08057.

5.     Defendant Karl T. Clebak, MD MHA FAAFP is the Associate Dean for Graduate Medical Education at the Penn State Health Milton S. Hershey Medical

1

Center and the Pennsylvania State University College of Medicine. Dr. Klebak has a business address at the Office of Graduate Medical Education, 500 University Drive, H088/C1630, Hershey, PA 17033

    a.    Dr. Clebak is the "Designated Institutional Official" or "DIO" for PSHMC and The Pennsylvania State University College of Medicine. As the DIO, Dr. Clebak is responsible for the oversight of all Graduate Medical Education programs, including Dr. Jacobs' residency program. The DIO acts as the bridge between the medical center and the Accreditation Council for Graduate Medical Education ("ACGME"). The DIO's role includes ensuring all residency and fellowship programs follow the accreditation standards set by ACGME.[1] The DIO is also responsible for assuring that all residents receive a fair, safe, and rigorous education.

    b.    On information and belief, Dr. Clebak, as Associate Dean for Graduate Medical Education and DIO, is empowered to provide all of the injunctive relief sought in this Complaint.

---

[1]  The ACGME explicitly defines the DIO's role in its "Institutional Requirements" document. *See* https://www.acgme.org/globalassets/pfassets/programrequirements/2025-reformatted-requirements/institutionalrequirements_2025_reformatted.pdf

    c.    Dr. Clebak is sued in his official capacity for injunctive relief and in his individual capacity for damages.

6.    Defendant Kevin P. Black, MD is the Interim Vice Dean for Education Affairs at PSHMC. Dr. Black has a principal address at 500 University Drive, Hershey, PA 17033

    a.    On information and belief, Dr. Black, as the Interim Vice Dean for Education Affairs, is empowered to provide all of the injunctive relief sought in this Complaint.

    b.    Dr. Black is sued in his official capacity for injunctive relief.

7.    Nasrollah Ghahramani MD, MS, FACP, was the Interim Chair, Department of Medicine for Penn State College of Medicine. Dr. Ghahramani has a principal address at 500 University Drive, Hershey, PA 17033.

    a.    On information and belief, Dr. Ghahramani, as Interim Chair, Department of Medicine for Penn State College of Medicine, is empowered to provide all of the injunctive relief sought in this Complaint.

    b.    Dr. Ghahramani is sued in his official capacity for injunctive relief and in his individual capacity for damages.

**JURISDICTION AND VENUE**

8.     This case arises, in part, under the laws of the United States, specifically the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  Defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**FACTS**

***PENN STATE MILTON S. HERSHEY MEDICAL CENTER***

10.     PSHMC has a unique dual nature as an institution: the Medical Center functions as an employer and healthcare operation, while Penn State University provides academic credentials, titles, and scholarly standing.  This structure ensures that clinicians serving patients at Hershey are simultaneously integrated into Penn State's academic mission (teaching students, conducting research, and advancing the frontiers of medicine).

   a.     In 1963, Samuel L. Hinkle, President and Chairman of the Hershey Chocolate Corporation and a Penn State alumnus, contacted Dr. Eric E. Walker, then-President of The

4

Pennsylvania State University, with a proposal to use some of the Hershey chocolate fortune to establish a world-class medical school and teaching hospital. The M. S. Hershey Foundation formally offered the $50 million gift to Penn State, supplemented by an additional $21.3 million from the U.S. Public Health Service.

b.    Ground was broken on February 26, 1966, on a 318-acre campus in Hershey, Pennsylvania. The Penn State College of Medicine welcomed its inaugural class of students in 1967, and the institution graduated its first physicians in 1969. Penn State Health Milton S. Hershey Medical Center officially accepted its first patients on October 14, 1970.

11.    From its inception, PSHMC has been inseparably linked to Penn State University.

a.    While Penn State's main campus is located in State College, the Medical Center and the Penn State College of Medicine are both located in Hershey. The College of Medicine operates as Penn State's sole medical school, educating students in medicine, physician assistant studies, graduate sciences, and public health.

b.  In 2014, the Penn State Board of Trustees formally established Penn State Health as a multi-facility health system, further cementing the institutional relationship between the university and its medical enterprise. PSHMC and the College of Medicine share an integrated strategic plan and joint operations, ensuring that research discoveries, educational programs, and patient care remain unified under a single academic mission. The Medical Center also hosts nursing students from the Penn State College of Nursing and students from other health-related programs across the university.

c.  PSHMC and The Pennsylvania State University maintain a carefully structured governance relationship. While PSHMC operates as the flagship hospital of a legally distinct health system owned by the University, its academic and clinical missions are deeply intertwined with Penn State through the College of Medicine. PSHMC and the College of Medicine share an integrated strategic plan and joint leadership, with senior figures such as the Chief Clinical and Academic Integration Officer holding dual responsibilities that span both the health system and the University.

12. PSHMC holds itself out as part of the Penn State system.

    a.    The logo for Penn State, the Penn State College of Medicine, and PSHMC found on the webpage is identical, featuring the famous Nittany Lion.



    b.    The bookstore at PSHMC sells a large amount of Penn State merchandise including a sign that announces, "We are Penn State."



13. Physicians and healthcare providers employed by PSHMC are eligible to hold formal faculty appointments from Penn State University through the College of Medicine. This means that a clinician can be employed and paid by the Medical Center while simultaneously holding an academic title — such as Assistant Professor, Associate Professor, or Professor — conferred by Penn State.

a.   These faculty appointments are made without University employment for the purposes of compensation and benefits, yet they carry full Penn State faculty titles and enjoy the rights, privileges, and academic standing that accompany the designated rank. Physicians at PSHMC may hold tenure-line appointments through the College of Medicine without being considered University employees in the traditional sense. If a physician's employment at PSHMC ends for any reason, their Penn State faculty appointment is concurrently terminated; and conversely, if their academic appointment with the College of Medicine ends, their PSHMC employment is treated as terminated as well.

b.   The College of Medicine recognizes several categories of faculty appointment. Full-time clinical faculty are employed by the Medical Center and hold Penn State academic ranks on either tenure-line or non-tenure-line tracks. Non-tenure-line appointments are term-based, ranging from six months to five years, and may be renewed at the University's discretion. In 2024, the College of Medicine counted more than 1,500 faculty members across its 24 clinical and basic science departments.

8

c.    A separate category of "Adjunct" faculty covers individuals who provide educational or research services to the College of Medicine on a voluntary basis without remuneration from either Penn State or the Medical Center.

## DR. JACOBS ENTERS THE RESIDENCY PROGRAM AND DOES WELL

14.    In March 2023, Dr. Jacobs matched into the PSHMC Internal Medicine Residency Program.

15.    The PSHMC Internal Medicine Residency Program is an extension of medical education. The primary focus of the PSHMC residency program is education and every step in the life cycle of a resident, from selection to day-to-day experiences, is immersed in education and academics.

16.    The PSHMC residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. The primary purpose of the PSHMC residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas.

17.    The Residency Program offered by PSHMC is described in Dr. Jacobs' contract as a "graduate medical education program" accredited by ACGME.

9

a.  The Residency Program was for the initial period of July 1, 2023 through June 30, 2024, with the expectation that Dr. Jacobs would be renewed for two more years if he performed adequately.  Dr. Jacobs was subsequently renewed for the 2024-2025 and 2025-2026 academic years.

b.  Dr. Jacobs agreed to "perform such duties of [PSHMC] and its affiliated institutions which are part of the Residency Program conscientiously, to the best of Resident's ability, and under the highest standard of professional ethics."

c.  Dr. Jacobs was expected to follow all "Penn State Health and Hospital Graduate Medical Education and Human Resources policies."

d.  The contract provided that "In the event of an academic or disciplinary action that could result in suspension, dismissal, non-renewal of the Resident Agreement or non-promotion to the next year of the Residency Program, Resident may utilize the process outlined in the Graduate Medical Education Grievance and Due Process Policy, available on the Graduate Medical education website. https://residency.med.psu.edu/policies/"

18.    A copy of the Grievance and Due Process Policy is attached to this Complaint as Exhibit A.

19.    The Grievance and Due Process Policy referenced by Dr. Jacobs' contract is "utilized for academic or other disciplinary actions that could result in suspension, dismissal, non-renewal of contract, non-promotion to the next level of training or other action that could significantly affect a resident's intended career development."

  a. The Grievance and Due Process Policy states that it is "designed to provide appropriate review of actions that may adversely affect a resident's or fellow's status while at the same time ensure patient safety, quality of care and the proper conduct within the training programs."

  b. The Grievance and Due Process Policy, in accordance with accreditation requirements, is designed to ensure that career-altering decisions affecting the resident are based on reliable evidence and that residents are not deprived of procedural fairness or access to information necessary to defend themselves.

  c. The Grievance and Due Process Policy provides that residents are "NOT entitled to legal representation at any point in the Grievance Review Process." (Emphasis in original.)

11

d.    The Grievance and Due Process Policy provides that, following a decision resulting in the suspension or dismissal from the training program, non-promotion to the next level of training or the non-renewal of the Resident Agreement, the resident/fellow may request "Program Level Review."

    i.    Program Level Review includes the opportunity to present, in person, to the Clinical Competency Committee ("CCC"), their appeal of the decision.

    ii.    If the CCC upholds the initial decision and the Program Director is not a member of the CCC, the resident/fellow will have the option of making an appeal to the Program Director for the respective Program. If the Program Director is a member of the CCC or, upon review, the Program Director upholds the CCC decision, the resident/fellow will be given the opportunity to make the final Program Level Review appeal to the Department Chair.

e.    If the initial decision is upheld, the resident may request GME Level Review.

12

i.   In cases of dismissal for cause or suspension from the Training Program, the resident will meet with a Graduate Medical Education Appeals Board comprised of a senior resident/fellow, two senior faculty members, a program director, and a representative of the Dean's office (Vice Dean for Educational Affairs, Associate Dean for GME/DIO, Associate DIO) to hear the appeal.

ii.  The resident is "afforded the opportunity to present any relevant information in reference to the dismissal or suspension during this time frame, including oral and written statements in support of the appeal."

iii. The members of the Appeals Board will have access to all relevant documents, including formative and summative evaluations and other assessments of the trainee in question during their discussions and deliberations.

iv.  The Department Chair or designee shall be responsible for presenting evidence in support of the dismissal or suspension.

13

f.    The Grievance and Due Process Policy does not provide, at any time, the resident with the opportunity to review all evidence considered by decision-makers or cross-examine adverse witnesses.

20.    Dr. Jacobs has performed at a consistently strong level throughout his training. The Program's Clinical Competency Committee rated his overall clinical competence as "satisfactory," the second-highest possible category. Evaluations describe Dr. Jacobs as a resident who demonstrates maturity, sound clinical reasoning, and patient-centered communication. Faculty comments highlight Dr. Jacobs as an efficient and supportive team leader who fosters a positive learning environment for interns and students, demonstrates empathy toward patients, and manages workflow effectively. He was described as "reliable," "a joy to work with," and "an asset to any team."

***THE FAKE EMAIL THAT DR. JACOBS DID NOT SEND***

21.    Dr. Jacobs was terminated from PSHMC based on a claim that he fabricated an E-mail to make it appear to have been sent by his supervisor, Dr. Alia Chisty. This will be referred to as the "Chisty Email." Dr. Jacobs did not author or send the Chisty Email. Instead, his former girlfriend, a nurse manager at PSHMC, used his old cell phone and knowledge of his password to fabricate the Chisty Email in an effort to prevent Dr. Jacobs from attending his brother's wedding.

14

22.    On October 8, 2025, three days before Dr. Jacobs was supposed to serve as best man at his brother's wedding, Dr. Jacobs received an email that he initially believed was from his supervisor, Dr. Alia Chisty.

23.    The disputed email was sent to Dr. Jacobs' account stating he lost his paid time off and could not attend an upcoming wedding.

From: Chisty, Alia <achisty@pennstatehealth.psu.edu>
CC: IMCHIEFS <imchiefs@pennstatehealth.psu.edu>
Sent: Wednesday, October 8, 2025 7:01 PM
To: Brian Jacobs <bjacobs2@pennstatehealth.psu.edu>
Subject: URGENT: REVOCATION OF VACATION TIME

Dear Dr. Jacobs

We hope this email finds you well. In our ACGME this afternoon, you were found to be in violation of the number of work hours required of you for residency. As you know according to ACGME rule VD.6 detailed here: https://www.acgme.org/globalassets/pfassets/publicationspapers/dh_dutyhoursummary2003-04.pdf, you are required to work a certain number of days per year in order to be in compliance with residency requirements. Due to your EXCESSIVE use of vacation time in order to engage in fellowship interviews, you have fallen significantly below the required number of hours for this month. As a result, the Committee of Professional Development and Clinical Competence have no choice but to revoke the remainder of your vacation time from 10/9/2025 through 10/13/2025. We understand that this is a stressful time, but we encourage you to find other means of participating in fellowship interviews. You will be required to participate in night float during this time in order to cover for your colleagues who have been forced to cover for you during your excessive absences. If you have any questions or concerns about this policy please do not hesitate to reach out to the office of General Medical Education. Thank you for your attention to this matter.

Sincerely,
Dr. Chisty and Internal Medicine Chiefs

24.    The Chisty Email in the screenshot (above) indicates that it was sent from and has the signature block of Dr. Alia Chisty. However, Dr. Alia Chisty did not send the Chisty Email.

25.    After he received the Chisty Email, Dr. Jacobs contacted the wedding participants. He informed his brother that the hospital had attempted to revoke the leave he had scheduled and approved for approximately 6 months. Dr. Jacobs explained that he intended to resolve the matter and believed the hospital could not simply revoke his leave without justification. On additional reflection, because of

15

obvious errors in the email, Dr. Jacobs believed it was a phishing email that could be ignored. Dr. Jacobs attended the wedding as planned.

26.    The PSHMC Office of Cybersecurity reviewed the account of Dr. Chisty and confirmed the Chisty Email was not sent from Dr. Chisty's account.

a.    The Office of Cybersecurity also did not observe any sign of compromise or unauthorized access to Dr. Chisty's account. The Office of Cybersecurity reviewed logs for Dr. Jacobs' email account and observed emails matching the email screenshots being created and forwarded to the email account of Dr. Jacobs (and to an external email account "hrsolutions <conor@comcast.net>". Based on this review – and without the benefit of interviewing Dr. Jacobs —the Office of Cybersecurity concluded that the email screenshots were fabricated by the account of Dr. Jacobs.

b.    The Office of Cybersecurity created the following timeline:

i.    October 8, 2025, 6:54 PM -- Message with Subject: "Urgent: Revocation of vacation Time" created by the account of Dr. Jacobs.

16

ii.     October 8, 2025, 7:01 PM -- Message Sent from account

of Dr. Jacobs with subject and email body contents that

matches the suspected screenshot of the Chisty Email.

iii.    October 8, 2025, 7:05 PM -- Two emails matching the

screenshot of the Chisty Email were forwarded from the

account of Dr.  Jacobs (bjacobs2} to Dr. Jacobs' account

and "hrsolutions" account.



iv.     Notably, the Cybersecurity Report did not conclude that

Dr. Jacobs had written the fraudulent e-mail in question,

only that the emails had originated in Dr. Jacobs' account.

In other words, the Cybersecurity Report did not consider

the possibility that Dr. Jacobs' account had been hacked

or that Dr. Jacobs had no reason to create the Chisty email.

17

v.      There were a number of flaws in the Cybersecurity Report, which reached a pre-determined conclusion based on a minimal amount of investigative facts and lacked standard forensic steps, such as: analyzing Dr. Jacobs' email account for unauthorized access or intrusion; failing to analyze the full email header to extract the originating Internet Protocol (IP) number, which could have identified the geographical location and Internet Service Provider of the sender; failing to examine the Microsoft Outlook `.pst` backup file; failing to examine check system logons, user activity, running processes, or email artifacts on Dr. Jacobs' personal and work computers; and failing to include any statements or interviews from the individuals involved.

27.    In reality, the Chisty Email was part of a scheme by Dr. Jacobs' ex-girlfriend, Heather Zayas, a nurse manager at PSHMC, and others, to harass and embarrass Dr. Jacobs. Zayas had Dr. Jacobs' old iPhone, which she acquired without Dr. Jacobs' permission. Zayas was able to use the iPhone to access Dr. Jacobs' accounts because she remembered his password from when they were dating.

18

a. Zayas, with the assistance of another PSHMC employee, Cassandra Rodriguez, used the stolen iPhone to create fake conversations that they could screenshot and send to others to misrepresent Dr. Jacobs. Notably, someone sent an email to his leasing office attempting to sever his lease, harassed his ex-girlfriends, created a fraudulent USPS account to send his family HIV and cremation kits, and, even sent fake screenshots to Dr. Jacobs' mother to make her think Dr. Jacobs had killed himself. Zayas also used Dr. Jacobs' phone to make a fake Facebook post.

28. Zayas used Dr. Jacobs' phone to create the fake email from his supervisor – the Chisty email – in an effort to prevent Dr. Jacobs from attending his brother's wedding. On information and belief, Zayas was upset that Dr. Jacobs had invited Dr. Victoria Yin, another resident, as his guest.

29. Specific evidence supports Dr. Jacobs' belief that Zayas was behind the Chisty Email.

a. Using the FindMyPhone App, Dr. Jacobs was able to see that his old iPhone was active outside of Rodriguez's and Zayas' homes.

b. Following Dr. Jacobs' termination, Zayas admitted to Dr. Jacobs that she sent the email because she did not want him to go to his brother's wedding with someone else.

19

c.   Zayas contacted Dr. Jacobs' mother, an attorney in Philadelphia. Zayas admitted that she had access to Dr. Jacobs old phone and remembered his password. She also admitted that, in the week prior to the wedding, she accessed Dr. Jacobs' phone and retrieved the names and numbers of other women at Penn State. She arranged to meet with those women the week before the wedding to discuss a plan of action against Dr. Jacobs.

d.   After the wedding, Zayas also reached out to Dr. Victoria Yin whose name and number Zayas also retrieved from the stolen cell phone. Dr. Yin is a resident at another hospital and accompanied Dr. Jacobs to his brother's wedding. Zayas and Rodriguez admitted to the scheme in a series of text messages with Dr. Yin and another PSHMC employees, Cassandra Nichols.

i.   In a written statement, Dr. Yin indicated in that that she came to believe that Zayas and Nichols were seeking to "punish [Dr. Jacobs] for personal disputes independent of his professional duties." She indicated further that they sought to "manipulate testimony and shared knowledge of internal investigations" in order to improperly influence the investigation into the allegations against Dr. Jacobs.

Dr. Yin indicated that after she came forward, she received a message from an unknown number which she perceived a "threat" related to her willingness to provide information in this matter.

ii. Zayas indicated in the group chat that she had been contacted by someone in PSHMC HR about Dr. Jacobs' stolen phone. Dr. Yin asked, "You still have his phone, why?" Rodriguez responded that she "gave it back to [Zayas] a few weeks ago…"

> Heather
>
> Hey all. I don't know where to start. I talked to HR today and they confronted me with all this shit that conor had. I had no idea he was paying attention to his other phone. He sent them immediately my crash out from the end of November. He's got other texts from the group chat with Allie and Becca. They don't seem interested in them so I didn't rope them in here. I just wanted you to be aware in case questions come your way.
>
> You still have his phone? Why??
>
> Cassandra
>
> I gave it back to Heather a few weeks ago when HR said they were going to pull her in

iii. Zayas observed that "[Dr. Jacobs] has been keeping tabs on the phone apparently. I don't think they're [HR] taking him super serious." Dr. Yin then asked, "He's fired, that's it. What are you still trying to do?" Rodriguez responded,

21

"I think [Zayas's] just saying we have to make sure the story is straight."



iv.    Zayas and Rodriguez discussed being approached by HR investigators, but indicated that other PSHMC employees had "tried to keep them off their back." They still understood the need to get their stories straight, however. Zayas stated, "But just so everyone's on the same page I'm chalking all of that up to pregnancy and my emotional state. Our story is still good." Rodriguez responded, "If I end up talking to them I'll keep with the same."

22



I don't think that's that bad. Krystal has stopped them from saying much if anything to me. I prob won't even have to talk to them. Who did you talk to?

Shane Orick? Apparently the same guy who interviewed Conor and the lawyer for the hospital. Jeff has tried to keep them off my back I think it'll be fine from now on. But just so everyone's on the same page I'm chalking all of that up to pregnancy and my emotional state. Our story is still good

Ok ok slay

If I end up talking to them I'll keep with the same. We didn't talk until after the wedding.

v.      In one message Dr. Yin urged them to come clean. She wrote, "Guys this is fucked. It's one email if you just said you wrote it because you were emotionally distraught or pregnant or why ever I think it would be fine." Zayas responded, "I think it's too late for that unfortunately."



Guys this is fucked. It's one email if you just said you wrote it because you were emotionally distraught or pregnant or why ever I think it would be fine

I think it's too late for that unfortunately.

## DR. JACOBS IS TERMINATED

30.    On October 21, 2025, Dr. Jacobs was placed on administrative leave and required to leave the ICU. He was told that he had been placed on administrative leave for allegedly hacking into his program director's e-mail account and sending himself an e-mail that purported to take away his vacation time.

31.    Over the following week Dr. Jacobs was interviewed twice via telephone by PSHMC HR representative Shane Ulrich. Dr. Jacobs fully cooperated. During subsequent conversations with the PSHMC HR representative, Dr. Jacobs was told that PSHMC had what Ulrich characterized as "conclusive evidence" that showed that they could prove the e-mail was sent from Dr. Jacobs' personal iPhone and within "feet of [his] apartment."

32.    On October 30, 2025, Dr. Jacobs was terminated. He was never provided any written documentation substantiating the charges or evidence relied upon by PSHMC. He received a letter on November 6, 2025 (backdated to October 30, 2025) indicating that he had violated a policy about dishonesty in communication and was told that cybersecurity had concluded that he had written Chisty Email.

33.    No investigative report, metadata, or record of the alleged cybersecurity findings was shared with Dr. Jacobs before he was terminated. Dr. Jacobs was not informed of who conducted the technical analysis, what devices or logs were reviewed, or what methodology was used to conclude that his account was

24

uncompromised. The entire process occurred within a little over two weeks, without affording Dr. Jacobs any meaningful opportunity to respond before the decision to terminate him was finalized. Dr. Jacobs also was never told how PSHMC came into possession of, or first became aware of, the Chisty email.

## PSHMC USES A FLAWED APPEAL PROCESS TO DENY DR. JACOBS A MEANINGFUL HEARING

34. On November 11, 2025, Dr. Jacobs appeared for his "Program Level Review" before the Clinical Competency Committee.

     a. Prior to this hearing, Dr. Jacobs had requested the opportunity to review the information and other evidence that the Clinical Competency Committee would be relying upon, including the Cybersecurity Report. These requests were denied.

     b. Dr. Jacobs was not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Clinical Competency Committee.

     c. Dr. Jacobs was given 15 minutes to state his case without the assistance of counsel. All he could say at that time was that he did not write the e-mail and he had no other evidence to prove a negative.

35. The Clinical Competency Committee rejected Dr. Jacobs' appeal.

25

a.   Dr. Ghahramani, the Department Chair who oversaw Dr. Jacobs' Program-Level Appeal, stated that the Clinical Competency Committee had based the decision on two verbal assertions by PSHMC HR staff and counsel: (i) that Dr. Jacobs and his counsel had been given all the evidence in the case; and (ii) that the cybersecurity report shows that Dr. Jacobs used multi-factor authentication (including facial recognition) shortly before the fraudulent email was drafted. These assertions are false. Dr. Jacobs' counsel had tried to see the other evidence the hospital had to show the Department Chair. Counsel for PSHMC refused to provide any evidence in addition to the cybersecurity report, and the cybersecurity report does not mention MFA.

b.   Dr. Ghahramani, in a subsequent letter, indicated that Dr. Jacobs' denials were not accepted because he appeared to have been assisted by an attorney instead of speaking extemporaneously. Dr. Ghahramani wrote, "you did not provide any testimony or explanation in defense of the allegations against you, but rather, submitted an 11-page letter written by your attorneys which denied the allegations by stating that the fraudulent email at issue

26

(the "Email") was not drafted by you, and rather, an ex-girlfriend (who is also an employee)."

36.    On November 21, 2025, Dr. Jacobs' attorney emailed PSHMC's counsel.  She indicated that, "We are in receipt of additional information from a [PSHMC] employee leading us to believe the events relating to Dr. Jacobs' appeal may involve criminal behavior, possibly by multiple [PSHMC] employees."  She also noted the Chisty Email was "effectively incoherent, and written by someone who does not have a basic understanding of how programs operate."

a.    PSHMC's counsel responded a month later.  He indicated that "legal representation is not permitted in the appeal process" and expressed frustration that Dr. Jacobs' counsel only provided "selected screenshots of text messages" to prove his innocence.

b.    Dr. Jacobs' counsel replied and objected to PSHMC's continued "reliance on undisclosed evidence in the appeal process."

37.    On November 26, 2025, Dr. Rebecca Bascom, Dr. Jacobs' academic mentor, wrote a letter to Dr. Ghahramani "to alert you to a breach in our ability to provide a safe and constructive learning environment for our residents."

a.    She detailed a severe pattern of unprofessional behavior and sexual harassment directed at Dr. Jacobs by another PSHMC

27

employee, offering her opinion that this employee suffered from "erotomanic psychotic delusion."

b.    She described a conversation with Dr. Chisty about Dr. Jacobs in which she described this situation as "way above her paygrade" and advised Dr. Bascom not to continue to mentor Dr. Jacobs until the "situation was resolved."

c.    Dr. Bascom wrote in reference to Dr. Jacobs: "Being the victim of sexual harassment from someone with power over you is exceptionally difficult to endure. Gaslighting of victims by the institution compounds the injury." She also noted that "Identity theft is difficult to defend against" and urged PSHMC to "ask tough questions and show flexibility in seeking solutions."

38.    On December 22, 2025, Dr. Ghahramani wrote a letter to Dr. Jacobs indicating that the appeal process would proceed. Notably, in this letter Dr. Ghahramani admitted that PSHMC possessed the following evidence: witness statements; text message screenshots from witnesses; pictures from Instagram; the Cybersecurity Incident Report, and work schedules. Other than a redacted copy of the Cybersecurity Report, none of this evidence was ever provided to Dr. Jacobs.

39.    On December 27, 2025, almost two months after his termination and over a month after his Program Review Hearing, Dr. Jacobs finally received a

28

redacted copy of the Cybersecurity report. He did not receive any of the other evidence cited by Dr. Ghahramani.

40. On January 8, 2026, Dr. Jacobs, through his counsel, requested copies of witness statements, text messages, social media images, and other information that PSHMC had obtained but had not been provided. This request was refused.

41. On January 17, 2026, Dr. Yin provided a written statement detailing the group chat between herself, Cassandra Rodriguez, and Heather Zayas. She wrote, "I attest that the images are what they purport to be - screenshots of a text message conversation" showing an attempt to manipulate internal HR investigations.

42. On January 22, 2026, Dr. Jacobs had an appeal hearing with interim Department of Medicine chair Dr. Ghahramani.

    a. On information and belief, PSHMC's counsel again falsely told Dr. Ghahramani that Dr. Jacobs had been provided with all of the information he had requested and that there was evidence of use of multifactor authentication in the cyber security report.

    b. Similar to the prior hearing before the Clinical Competency Committee, Dr. Jacobs was not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Committee.

  c.  Dr. Jacobs was given a limited amount of time to present his case without the assistance of counsel.

43. On February 4, 2026, Dr. Jacobs agreed to participate in a polygraph exam administered by licensed investigator. The investigator tested whether Dr. Jacobs composed the October 8 email or accessed his supervisor's account. The results show "No reactions indicative of deception were recorded."

44. Dt. Ghahramani denied Dr. Jacobs' appeal. The next step was to the Appeal Board.

45. On February 8, 2026, Dr. Jacobs was provided a copy of the Appeal Board Agenda. Dr. Jacobs emailed the board's coordinator indicating that he objected to a number of "due process violations."

  a.  Dr. Jacobs indicated that he had been told he could not bring witnesses but that the PSHMC representative would present three witnesses. He wrote, "after previously being told I could not bring witnesses, this schedule provides me with insufficient time to prepare and present my own or to otherwise arrange to bring forth witnesses whose testimony is material to this case - including Heather Zayas and Cassandra Rodriguez."

  b.  Dr. Jacobs objected to the fact that the PSHMC representative would be allotted 40 minutes to present the evidence against him,

but he would be limited to only 15 minutes. He wrote, "15 minutes is insufficient to present all relevant information."

    c.    Dr. Jacobs objected that he had not been provided with all available evidence.

    d.    Dr. Jacobs objected that Dr. Clebak would be speaking on behalf of PSHMC "and yet will simultaneously function as a deciding member of the Appeal Board."

46.    On February 5, 2026, Dr. Jacobs received a report from an expert specializing in computer and mobile forensics. A copy of this report was provided to PSHMC. The expert had reviewed the Cybersecurity Report and identified several deficiencies. The report identified that several "investigative steps should have been conducted prior to arriving at the incident report conclusion" and that the investigator "failed to include basic necessary investigative and forensic steps to ensure a thorough and accurate investigation." These included:

    a.    The e-mail account of Dr. Jacobs should have been analyzed for possible intrusion or unauthorized access, not just the account of Dr. Alia Chisty.

    b.    The full E-mail header from the subject e-mail dated October 8, 2025 should have been analyzed for the extraction of the originating Internet Protocol Number (IP) to determine

31

geographical location and possible identification of the Internet Service Provider at the time the E-mail was sent.

c.    The .pst backup file created by Microsoft Outlook should have been analyzed for possible identification information.

d.    The personal/work computer of Dr. Jacobs should have been forensically examined for the possible recovery of pertinent information

47.    On February 9, 2026, Dr. Rebecca Bascom wrote a letter to Dr. Ghahramani about Dr. Jacobs.  Dr. Bascom had been providing academic mentorship to Dr. Jacobs.  She wrote, "My concern is that you, as well, have been provided with an incomplete understanding of the facts of his case … Put bluntly, I believe Dr. Jacobs has been framed…."

a.    Dr. Bascom suggested that PSHMC had failed to protect Dr. Jacobs from sexual harassment in a separate matter. Dr. Bascomb offered to "appear before the committee and provide additional documentation."

b.    Dr. Bascom subsequently received a letter from PSHMC requesting a meeting. Her attorney responded by questioning the purpose of the meeting and a list of questions or concerns that would be addressed.  A PSHMC HR representative

subsequently emailed Dr. Bascom, stating that due to her refusal to meet with them, "we presume you are withdrawing your letter and support for Dr. Jacobs in this matter . . . and it will not be included in the record evidence." Dr. Bascom's attorney responded by expressing concerns that threatening to consider Dr. Bascom's report withdrawn "could be construed as a violation of Pennsylvania's Whistleblower Law." Dr. Bascom later clarified, "First and foremost I am not withdrawing my letter. . . ."

48.    On February 9, 2026, fifteen minutes before the Zoom hearing was scheduled to begin, the hearing was cancelled.

49.    On March 19, 2026 Dr. Jacobs' counsel emailed the PSHMC General Counsel to warn that the matter is "spiraling out of control in a way I've not encountered before—now involving multiple criminal investigations and law firms." She details how Zayas and Rodriguez "stole Jacobs' old iPhone which they have been using to create fake conversations" and points out that "Zayas, has since confessed to drafting the email."

50.    On March 22, 2026, Dr. Jacobs appeared for his rescheduled final appeal hearing before Dr. Clebak.

a. Similar to the prior hearings Dr. Jacobs was not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Committee

b. Dr. Jacobs was given a limited amount of time to present his case without the assistance of counsel.

c. Dr. Jacobs was not permitted to call witnesses, including Zayas, Rodriguez, Yin, Bascom, or his forensic experts.

51. On March 24, 2026, Dr. Jacobs was informed by Dr. Clebak, the Associate Dean for Graduate Medical Education, that the Graduate Medical Education Appeals Board had upheld the prior decision to terminate his employment as a Resident. Dr. Jacobs was informed that "This decision is final and concludes the GME Level Review and Grievance Review Process pursuant to the Penn State Milton S. Hershey Medical Center Graduate Medical Education Grievance and Due Process Policy."

## COUNT I

## VIOLATION OF DUE PROCESS

## 42 U.S.C. § 1983

52. Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

34

53.     This Count is brought against all Defendants in their official capacity for declaratory and injunctive relief.

54.     This Count is brought against Defendants Clebak and Ghahramani in their individual capacities for damages.

55.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

56.     Penn State University is ultimately responsible for the disciplinary decisions that affected Dr. Jacobs.  PSHMC has insinuated itself into a position of interdependence with Penn State University that it must be recognized as a joint participant in the challenged activity.  The residency program is affiliated with Penn State University, rather than PSHMC as a private entity.  Penn State University remains responsible for academic coordination, clinical integration, and shared governance.   PSHMC, thus, has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

57.     Defendants were persons acting under color of state law when they deprived Dr. Jacobs of his constitutional due process rights.  Defendants are state officials due to their faculty appointments at Penn State.

58.     Dr. Jacobs has a constitutionally protected liberty or property interest in his continued enrollment in the residency program at PSHMC.

a. The precise nature of the interest involved in this case is the right to remain at a public institution of higher learning in which Dr. Jacobs was otherwise a resident in good standing. As a resident, Dr. Jacobs received both payment to work in a clinical setting and also received instruction. Dr. Jacobs' primary purpose in entering the Penn State residency program was not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The monetary benefits Dr. Jacobs received during his residency was conditioned on his continued enrollment in the academic program.

b. Discipline from PSHMC implicates Dr. Jacobs' property interest in interest in pursuing a medical education.

c. Discipline from PSHMC implicates Dr. Jacobs' liberty interest in his reputation and integrity.

59. Dr. Jacobs is entitled under the Constitution of the United States to the opportunity to be heard in a meaningful manner at the disciplinary hearing.

60. Dr. Jacobs was dismissed for disciplinary misconduct, not for academic underperformance. In deciding to dismiss Dr. Jacobs, PSHMC engaged in first-level factfinding to resolve a disputed, objective question about Dr. Jacobs' conduct –

36

whether he was responsible for the disputed email  The outcome of that inquiry led to Dr. Jacobs' dismissal.

61.    The Defendants have violated Dr. Jacobs' due process rights.  Dr. Jacobs, as a resident accused of misconduct, faced total exclusion from the educational process and, as a result, was entitled to an opportunity to effectively present his side of the story at a hearing where he would have been able to alert administrators to factual disputes and evidentiary deficiencies.

      a.    Dr. Jacobs, at a minimum, was entitled to sufficient notice, disclosure of the evidence used against him, the ability to present evidence, the ability to cross-examine adverse witnesses, and an opportunity to be heard before he was dismissed from the residency program.

      b.    Dr. Jacobs was entitled to a fundamentally fair hearing.  Dr. Jacobs received a number of 'hearings' and 'appeals' but none of them were fair for the following reasons:

            i.    Dr. Jacobs was not permitted the opportunity to review all of the evidence used against him.

            ii.    The decision-makers relied on forensic evidence that was not reliable and supported by sufficient expert testimony.

    iii.    Dr. Jacobs was not permitted in the room while PSHMC administrators presented the case against him to the various committees.

    iv.    Dr. Jacobs was not permitted to effectively cross-examine witnesses, with or without the assistance of counsel.

    v.    Dr. Jacobs was not permitted to present his own witnesses and evidence.

    vi.    The accumulation of errors outlined in this paragraph – even if each is not independently sufficient to create a due process violation – suggest a process that was biased and fundamentally unfair.

62.    Dr. Jacobs and Defendants acting in their official capacity have a dispute about whether the Grievance and Due Process Policy, as applied to the proceedings against Dr. Jacobs, violates the Due Process Clauses of the United States Constitution.

    a.    Defendants have a duty to enforce the provisions of the Grievance and Due Process Policy and have actually enforced those provisions against Dr. Jacobs.

b.  Dr. Jacobs is entitled to a declaration that the Grievance and Due Process Policy, as applied to Dr. Jacobs, violates the Due Process Clauses of the United States Constitution.

c.  Dr. Jacobs is entitled to an injunction prohibiting Defendants from enforcing the Grievance and Due Process Policy against him in a manner that violates the Due Process Clauses of the United States Constitution and reinstating him as a resident.

63.  Dr. Jacobs has been damaged by the Defendants acting in their individual capacity.  The failure of the Individual Defendant to comply with their constitutional obligations has caused Dr. Jacobs to be denied the benefits of education at his chosen school.  The conduct of Defendants has damaged Dr. Jacobs' academic and professional reputations and will affect his ability to find professional employment as a physician.  Dr. Jacobs' damages include economic damages such as diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, and loss of reputation.  Dr. Jacobs also suffered humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other non-economic damages.

64.  Pursuant to 42 U.S.C. §1988, Dr. Jacobs is entitled to his attorneys' fees incurred in bringing this action.

**JURY DEMAND**

65.     Pursuant to Fed. R. Civ. P. 58, Dr. Jacobs demands a jury trial on any issue triable of right by a jury.

WHEREFORE, Plaintiff Brian Conor Jacobs, MD seeks the following relief from the Court:

      a.     Judgment in his favor on all counts, including a declaration that the actions of the PSHMC are invalid under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

      b.     Pursuant to Fed. R. Civ. P. 65, a preliminary injunction prohibiting further acts in a manner that violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, expunging Dr. Jacobs' record, and restoring Dr. Jacobs to his position as a resident; and

      c.     Following trial:

            i.     A permanent injunction prohibiting further acts in a manner that violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, expunging Dr. Jacobs' record, and restoring Dr. Jacobs to his position as a resident;

40

ii.   Damages in an amount to be determined by the Court or a Jury, including, if applicable, punitive damages; and

iii.   Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorneys' fees as authorized by 42 U.S.C. §1988.

Respectfully submitted,

/s/ Joshua A. Engel
Joshua Adam Engel (Ohio 0075769)
*Pro hac vice forthcoming*
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH  45040
(513) 445-9600
engel@engelandmartin.com

/s/ Daniel T. Brier
Daniel T. Brier (PA 53248)
Frank J. Brier (PA 73044)
Richard L. Armezzani (PA 322804)
MYERS, BRIER & KELLY, LLP
425 Biden Street, Suite 200
Scranton, PA  18503
(570) 342-6100
dbrier@mbklaw.com
fbrier@mbklaw.com
rarmezzani@mbklaw.com

## **VERIFICATION**

I, Brian Conor Jacobs, have reviewed this Verified Complaint. I have personal knowledge of my actions and the action of Defendants in regard to the allegations described in this Verified Complaint. The averments of the Verified Complaint in regard to these matters within my personal knowledge are true and correct to the best of my knowledge.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of May 2026.

Brian Conor Jacobs