# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN CONOR JACOBS, MD,

*Plaintiff*

vs.

KARL T. CLEBAK, MD, *et al.*,

*Defendants*

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO: 1:26-CV-01167

JUDGE WILSON

**THE MEMORANDUM OF LAW OF DEFENDANTS', KARL T. CLEBAK, MD, KEVIN P. BLACK, MD, AND NASROLLAH GHAHRAMANI MD, MS, FACP, IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Dated: May 22, 2026

**BUCHANAN INGERSOLL & ROONEY PC**
Anthony (T.J.) Andrisano, Esq. (Pa ID 201231)
Geoffrey F. Sasso, Esq. (Pa. ID 202936)
Makenzie P. Leh, Esq. (PA. ID. 333895)
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
T: 215-665-8700
F: 215-665-8760
anthony.andrisano@bipc.com
geoffrey.sasso@bipc.com
makenzie.leh@bipc.com

*Attorneys for Defendants, Karl T. Clebak, MD, Kevin P. Black, MD, and Nasrollah Ghahramani MD, MS, FACP*

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................2

    I.     Factual Background.................................................................................2

    II.    Procedural History...............................................................................26

STATEMENT OF QUESTIONS INVOLVED....................................................26

LEGAL ARGUMENT ...........................................................................................27

    I.     Applicable Standards...........................................................................27

        A.    Motion to Dismiss under Federal Rule 12(b)(6)................................27

        B.    Fourteenth Amendment Procedural Due Process Claim.....................28

    II.    The Complaint's Procedural Due Process Claim Fails due to a Lack of State Action on the Part of the HMC Physicians.................................29

    III.   The Complaint's Procedural Due Process Claim Is Invalid....................35

    IV.   Granting Leave To Amend Would Be Futile ...........................................39

    V.    Conclusion ...........................................................................................40

CERTIFICATE OF COMPLIANCE....................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................33

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
    435 U.S. 78 (1978)................................................................................43

*Borrell v. Bloomsburg Univ.*,
    63 F.Supp.3d 418 (M.D. Pa. 2014)....................................37, 38, 39, 40

*Borrell v. Bloomsburg Univ.*,
    870 F.3d 154 (3d Cir. 2017), cert denied 584 U.S. 993 (2018)....................35, 38

*Borrell v. Bloomsburg Univ.*,
    955 F.Supp.2d 390 (M.D. Pa. 2013).................................. 36, 37, 39, 40, 41, 42

*Borrell v. Richer*,
    584 U.S. 993 (2018)................................................................................38

*Burton v. Wilmington Parking Auth.*,
    365 U.S. 715 (1961)................................................................................34

*Davis v. Mann*,
    882 F.2d 967 (5th Cir. 1989)................................................................................44

*Doe v. Miami Univ.*,
    882 F.3d 579 (6th Cir. 2018)................................................................................44

*Doe v. Pennsylvania State Univ.*,
    276 F.Supp.3d 300 (M.D. Pa. 2017)................................................................................44

*Doe v. Pennsylvania State Univ.*,
    336 F.Supp.3d 441 (M.D. Pa. 2018)................................................................................45

*Doe v. Univ. of Cincinnati*,
    872 F.3d 393 (6th Cir. 2017) ................................................................................45

*Flaim v. Med. Coll. Of Ohio*,
    418 F.3d 629 (6th Cir. 2005)................................................................................45

*Gati v. University of Pittsburgh of Com. System of Higher Educ.*,
91 A.3d 723 (Pa. Super. 2014) ...................................................................35

*Goss v. Lopez*,
419 U.S. 565 (1975)...............................................................................43, 44

*Hernandez v. Overlook Hospital*,
692 A.2d 971 (N.J. 1997) .......................................................................42, 43

*Jackson v. Metro Edison Co.*,
419 U.S. 345 (1974) ...................................................................................34

*Keles v. Bender*, No. 21-1497, 2022 WL 840311 (3d Cir. Mar. 18,
2022) ..........................................................................................................43

*Klavan v. Crozer-Chester Medical Center*,
60 F. Supp. 2d 436 (1999) ......................................................................33, 34

*LifeMD, Inc. v. Lamarco*,
Civil Action No. 2:21-cv-1273, 2022 WL 2118367 (W.D. Pa. June
13, 2022) ....................................................................................................33

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982).....................................................................................34

*Mahavongsanan v. Hall*,
529 F.2d 448 (5th Cir. 1976) .....................................................................44

*Philips v. Cnty. Of Allegheny*,
515 F.3d 224 (3d Cir. 2008) .......................................................................46

*Rendell-Baker v. Kohm*,
457 U.S. 830 (1982)....................................................................................34

*Steppling v. Presbyterian Univ. Hosp.*,
No. 94-401 (W.D. Pa. 1995)........................................................................40

*Terzian v. Montclair Hosp., LLC*,
No. 22-4396, 2024 U.S. Dist. LEXIS 41562 (D.N.J. Mar. 10, 2023) ...............42

*Untracht v. Fikri*,
454 F.Supp.2d 289 (W.D. Pa. 2006)............................................................40

*Williams v. Pennsylvania State Univ.*,
   697 F.Supp.3d 297 (M.D. Pa. 2023)..................................................................45

*Winnick v. Manning*,
   460 F.2d 545 (2d Cir. 1972) ............................................................................45

*Wright v. Texas Southern University*,
   392 F.2d 728 (5th Cir. 1968) ...........................................................................44

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................6, 32, 33

**Other Authorities**

https://residency.med.psu.edu/policies/ ......................................................13, 15, 16

https://www.lions-pride.com...........................................................................41

U.S. Const. Amend. XIV, § 1 ............................................................................33

Defendants, Karl T. Clebak, M.D., Kevin P. Black, M.D., and Nasrollah Ghahramani, M.D., M.S., F.A.C.P. (the "HMC Physicians"), hereby file this Memorandum of Law in Support of their Motion to Dismiss the Complaint of Plaintiff, Brian Conor Jacobs, M.D. ("Dr. Jacobs" or "Plaintiff"), for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This procedural due process lawsuit cannot survive the pleadings stage as the Complaint does not – and cannot – allege the threshold element of state action. Recognizing that he cannot affirmatively plead that employees of a private hospital are state actors, Dr. Jacobs dubiously claims the HMC Physicians are state actors because of their employer's relationship with The Pennsylvania State University ("Penn State"). To further this claim, Dr. Jacobs makes allegations that range from the irrelevant (dual academic appointments) to the absurd (a gift shop that sells Penn State teddy bears) in support of a theory that is invalidated by the very case law he uses to support that theory. Because the HMC Physicians are not state actors, the Complaint should be dismissed with prejudice.

Moreover, even if state action was present, Dr. Jacobs has failed to allege a deprivation of procedural due process. The Complaint does not allege he was not provided with an owed or promised form of process. Rather, the claim is based on his belief that the processes in place could have been (in his view) more

1

comprehensive. This is not a basis for a claim for procedural due process and, for this reason as well, the Complaint should be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    FACTUAL BACKGROUND[1]

According to the Complaint[2], Plaintiff was a medical resident at The Milton S. Hershey Medical Center ("PSHMC") from July 2023 until October 2025 when he was terminated from his position based on an allegation he falsified an email. Plaintiff alleges the email resulting in his termination was actually sent by a bitter ex-girlfriend who he claims admitted to sending this email in text messages. S*ee generally* Complaint (Dkt. No. 1 at ¶¶ 2, 4, 32).  Defendant, Dr. Clebak is the Associate Dean for Graduate Medical Education and Designated Institutional Official ("DIO") at PSHMC and the Pennsylvania State University College of Medicine ("PSCOM"). *See id.* at ¶ 5. As the DIO, Dr. Clebak is responsible for the oversight of all Graduate Medical Education programs, including Plaintiff's residency program. *See id.* at 5(a). The DIO acts as a bridge between the medical center and the Accreditation Council for Graduate Medical Education ("ACGME").

---

[1] The HMC Physicians recognize that a significant section of this Memorandum consists of the factual summary as pulled directly from the Complaint.

[2] While Moving Defendants take issue with the veracity, relevance, and completeness of the allegations contained in the Complaint, they recognize that those allegations (even if inaccurate) must be accepted as true for purposes of this Motion. Those allegations are recited herein largely verbatim from the Complaint.

*See id.* The DIO's role is to ensure all residency and fellowship programs follow the standards set by ACGME and to assure all residents receive a fair, safe and rigorous education. *See id.* Allegedly, Dr. Clebak, as Associate Dean for Graduate Medical Education and DIO, is empowered to provide the injunctive relief sought in the Complaint. *See id*. at 5(b).

Defendant, Dr. Black is the Interim Vice Dean for Education Affairs at PSHMC. *See id*. at ¶ 6. Allegedly, Dr. Black, as the Interim Vice Dean for Education Affairs, is empowered to provide the injunctive relief sought in this Complaint. *See id*. at 6(b). Defendant, Dr. Ghahramani was the Interim Chair, Department of Medicine for PSCOM. *See id*. at ¶ 7. Allegedly, Dr. Ghahramani, as Interim Chair, Department of Medicine for PSCOM, is empowered to provide the injunctive relief sought in this Complaint. *See id*. at 7(b).

Plaintiff brings claims against the HMC Physicians for alleged violation of his Fourteenth Amendment Due Process Rights. *See id*. at ¶ 1. PSHMC allegedly has a dual nature as an institution. *See id*. at ¶ 10. The Medical Center purportedly functions as an employer and healthcare operation while Penn State provides academic credentials, titles, and scholarly standing. *See id*. This allegedly ensures clinicians serving patients at the Medical Center are integrated into Penn State's academic mission (teaching students, conducting research, and advancing the frontiers of medicine). *See id.* In 1963, Samuel L. Hinkle, the President and

Chairman of Hershey Chocolate Corporation and a Penn State alumni, contacted Dr. Eric E. Walker, then-President of Penn State, with a proposal to establish a medical school and teaching hospital. *See id*. at ¶ 10(a). The M.S. Hershey Foundation formally offered a $50 million gift to Penn State, supplemented by an additional $21.3 million from the U.S. Public Health Service. *See id.* After a gift to Penn State from the M.S. Hershey Foundation and additional funding from the U.S. Public Health Service, ground was broken on February 26, 1966, and PSCOM celebrated its first class of students in 1967, with its first physicians graduating in 1969. *See id.* at ¶ 10(b). PSHMC accepted its first patients on October 14, 1970. *See id.*

Plaintiff alleges PSHMC has been inseparably linked to Penn State from its inception. *See id*. at ¶ 11. While Penn State's main campus is located in State College, PSHMC and PSCOM are both located in Hershey. *See id.* at ¶ 11(a). PSCOM operates as Penn State's sole medical school, educating students in medicine, physician assistant studies, graduate sciences, and public health. *See id.* In 2014, Penn State's Board of Trustees formally established Penn State Health as a multi-facility health system, allegedly further cementing the institutional relationship between the university and its medical enterprise. *See id.* at ¶ 11(b). PSHMC and PSCOM allegedly share an integrated strategic plan and joint operations, ensuring research discoveries, educational programs, and patient care

4

remain unified under a single academic mission. *See id.* PSHMC also hosts nursing students from PSCOM and from other health-related programs across the university. *See id.*

According to the Complaint, PSHMC and Penn State maintain a carefully structured governance relationship. *See id.* at ¶ 11(c). While PSHMC operates as the flagship hospital of a legally distinct health system owned by the University, its academic and clinical missions are allegedly deeply intertwined with Penn State through the College of Medicine. *See id.* PSHMC and the College of Medicine purportedly share an integrated strategic plan and joint leadership. *See id.* Senior figures such as the Chief Clinical and Academic Integration Officer allegedly hold dual responsibilities that span both the health system and the University. *See id.*

Plaintiff further alleges that PSHMC holds itself out as part of the Penn State system. *See id.* at ¶ 12. The logo for Penn State, the Penn State College of Medicine, and PSHMC found on the webpage are allegedly identical, featuring the famous Nittany Lion. *See id.* at ¶ 12(a). The bookstore at PSHMC allegedly sells a large amount of Penn State merchandise including a sign that announces, "We are Penn State." *See id.* at ¶ 12(b).

Physicians and healthcare providers employed by PSHMC are purportedly eligible to hold formal faculty appointments from Penn State University through the College of Medicine. *See id.* at ¶ 13. This means a clinician can allegedly be

5

employed and paid by the Medical Center while simultaneously holding an academic title — such as Assistant Professor, Associate Professor, or Professor — conferred by Penn State. *See id.* These faculty appointments are made without University employment for the purposes of compensation and benefits, yet they allegedly carry full Penn State faculty titles and enjoy the rights, privileges, and academic standing that accompany the designated rank. *See id.* at ¶ 13(a). Physicians at PSHMC may allegedly hold tenure-line appointments through the College of Medicine without being considered University employees in the traditional sense. *See id.* If a physician's employment at PSHMC ends for any reason, their Penn State faculty appointment is allegedly concurrently terminated; and conversely, if their academic appointment with the College of Medicine ends, their PSHMC employment is allegedly treated as terminated. *See id.*

As set forth in Plaintiff's Complaint, the College of Medicine recognizes several categories of faculty appointment. *See id.* at ¶ 13(b). Full-time clinical faculty are allegedly employed by the Medical Center and hold Penn State academic ranks on either tenure-line or non-tenure-line tracks. *See id.* Non-tenure-line appointments are allegedly term-based, ranging from six months to five years, and may be renewed at the University's discretion. *See id.* In 2024, the College of Medicine purportedly consisted of more than 1,500 faculty members across its 24 clinical and basic science departments. *See id.* A separate category of "Adjunct"

6

faculty allegedly covers individuals who provide educational or research services to the College of Medicine on a voluntary basis without remuneration from either Penn State or the Medical Center. *See id.* at ¶ 13(c).

In March of 2023, Plaintiff matched into the PSHMC Internal Medicine Residency Program (the "Program"). *See id.* at ¶ 14. Plaintiff alleges the Program is an extension of medical education, but the primary focus is education and every step in the life cycle of a resident, from selection to day-to-day experiences, is immersed in education and academics. *See id.* at ¶ 15. Plaintiff alleges the Program is distinct from other types of employment in that the resident's work is what is academically supervised and evaluated. *See id.* at ¶ 16. Plaintiff alleges the primary purpose of the PSHMC residency program is not employment or a stipend, but academic training and certification for successful completion of the program. *See id.* Plaintiff alleges the certificate, like the diploma, tells the world the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas. *See id.*

The Residency Program offered by PSHMC is described in Dr. Jacobs' contract as a "graduate medical education program" accredited by ACGME. *See id.* at ¶ 17. The Residency Program was for the initial period of July 1, 2023, through June 30, 2024, with the expectation that Dr. Jacobs would be renewed for two more years if he performed adequately. *See id.* at ¶ 17(a). Dr. Jacobs was subsequently

renewed for the 2024-2025 and 2025-2026 academic years. See *id.* Dr. Jacobs agreed to "perform such duties of [PSHMC] and its affiliated institutions which are part of the Residency Program conscientiously, to the best of Resident's ability, and under the highest standard of professional ethics." *Id.* at ¶ 17(b). Dr. Jacobs was expected to follow all "Penn State Health and Hospital Graduate Medical Education and Human Resources policies." *Id.* at ¶ 17(c).

The contract provided that "[i]n the event of an academic or disciplinary action that could result in suspension, dismissal, non-renewal of the Resident Agreement or non-promotion to the next year of the Residency Program, Residents may utilize the process outlined in the Graduate Medical Education Grievance and Due Process Policy, available on the Graduate Medical education website. https://residency.med.psu.edu/policies/." *Id.* at ¶ 17(d).

The Grievance and Due Process Policy referenced by Dr. Jacobs' contract is "utilized for academic or other disciplinary actions that could result in suspension, dismissal, non-renewal of contract, non-promotion to the next level of training or other action that could significantly affect a resident's intended career development." *Id.* at ¶ 19.

The Grievance and Due Process Policy states it is "designed to provide appropriate review of actions that may adversely affect a resident's or fellow's status while at the same time ensure patient safety, quality of care and the proper conduct

8

within the training programs." *Id*. at ¶ 19(a). The Grievance and Due Process Policy, in accordance with accreditation requirements, is designed to ensure that career-altering decisions affecting the resident are based on reliable evidence and that residents are not deprived of procedural fairness or access to information necessary to defend themselves. *See id.* at ¶ 19(b).

The Grievance and Due Process Policy provides that residents are "NOT entitled to legal representation at any point in the Grievance Review Process." (Emphasis in original.). *Id.* at ¶ 19(c). The Grievance and Due Process Policy provides that, following a decision resulting in the suspension or dismissal from the training program, non-promotion to the next level of training or the non-renewal of the Resident Agreement, the resident/fellow may request "Program Level Review." *See id*. at ¶ 19(d). Program Level Review allegedly includes the opportunity to present, in person, to the Clinical Competency Committee ("CCC"), their appeal of the decision. *See id*. at ¶ 19(d)(i).

If the CCC upholds the initial decision and the Program Director is not a member of the CCC, the resident/fellow will have the option of making an appeal to the Program Director for the respective Program. *See id*. at ¶ 19(d)(ii). If the Program Director is a member of the CCC or, upon review, the Program Director upholds the CCC decision, the resident/fellow will be given the opportunity to make the final Program Level Review appeal to the Department Chair. *See id*.

9

If the initial decision is upheld, the resident may request Graduate Medical Education (GME) Level Review. *See id.* at ¶ 19(e). Where the dismissal involves for cause or suspension from the Training Program, the resident will allegedly meet with a GME Appeals Board comprised of a senior resident/fellow, two senior faculty members, a program director, and a representative of the Dean's Office, including either the Vice Dean for Educational Affairs, Associate Dean for GME/DIO, or the Associate DIO, to hear the appeal. *See id.* at ¶ 19(e)(i). The resident is "afforded the opportunity to present any relevant information in reference to the dismissal or suspension during this time frame, including oral and written statements in support of the appeal." *Id.* at ¶ 19(e)(ii).

The members of the Appeals Board will have access to all relevant documents, including formative and summative evaluations and other assessments of the trainee in question during their discussions and deliberations. *See id.* at ¶ 19(e)(iii). The Department Chair or designee shall be responsible for presenting evidence in support of the dismissal or suspension. *See id.* at ¶ 19(e)(iv). Allegedly, the Grievance and Due Process Policy does not provide, at any time, the resident with the opportunity to review all evidence considered by decision-makers or cross-examine adverse witnesses. *See id.* at ¶ 19(f).

Plaintiff has allegedly performed at a consistently strong level throughout his training. *See id.* at ¶ 20. As Plaintiff alleges in his Complaint, the Program's CCC

10

rated his overall clinical competence as "satisfactory," the second-highest possible category. *See id.* Plaintiff's evaluations allegedly describe him as a resident who demonstrates maturity, sound clinical reasoning, and patient-centered communication. *See id.* Faculty comments allegedly highlight Plaintiff as an efficient and supportive team leader who fosters a positive learning environment for interns and students, demonstrates empathy toward patients, and manages workflow effectively. *See id.* He was allegedly described as "reliable," "a joy to work with," and "an asset to any team." *Id.*

According to the Complaint, Plaintiff was terminated from PSHMC based on a claim he fabricated an email to make it appear to have been sent by his supervisor, Dr. Alia Chisty (the "Chisty Email"). *See id.* at ¶ 21. Plaintiff alleges he did not author or send the Chisty Email. *See id.* Instead, Plaintiff alleges his former girlfriend, a nurse manager at PSHMC, used his old cell phone and knowledge of his password to fabricate the Chisty Email in an effort to prevent Dr. Jacobs from attending his brother's wedding. *See id.*

On October 8, 2025, three days before Plaintiff was supposed to serve as best man at his brother's wedding, Dr. Jacobs received an email he initially believed was from his supervisor, Dr. Chisty. *See id.* at ¶ 22. The email was sent to Plaintiff's account stating he lost his paid time off and could not attend the upcoming wedding. *See id.* at ¶ 23. The Chisty Email indicates it was sent from and has the signature

11

block of Dr. Chisty. However, Dr. Chisty did not send the Chisty Email. *See id.* at ¶ 24. After he received this email, Plaintiff allegedly contacted the wedding participants. *See id.* at ¶ 24. He allegedly informed his brother that the hospital had attempted to revoke the leave he had scheduled and approved for approximately 6 months. *See id.* According to the Complaint, Plaintiff explained that he intended to resolve the matter and believed the hospital could not simply revoke his leave without justification. *See id.* After additional reflection and because of obvious errors in the email, Plaintiff believed it was a phishing email that could be ignored and therefore, attended the wedding as planned. *See id.*

The PSHMC Office of Cybersecurity reviewed the account of Dr. Chisty and confirmed the Chisty Email was not sent from Dr. Chisty's account. *See id.* at ¶ 26. The Office of Cybersecurity also did not observe any sign of compromise or unauthorized access to Dr. Chisty's account. *See id.* at ¶ 26(a). The Office of Cybersecurity reviewed logs for Plaintiff's email account and observed emails matching the email screenshots being created and forwarded to the email account of Plaintiff (and to an external email account "hrsolutions <conor@comcast.net>"). *See id.* Based on this review, and allegedly without the benefit of interviewing Dr. Jacobs, the Office of Cybersecurity purportedly concluded the email screenshots were fabricated by the account of Plaintiff. *See id.*

The Office of Cybersecurity allegedly created the following timeline: (i) October 8, 2025, 6:54 PM -- Message with Subject: "Urgent: Revocation of vacation Time" created by the account of Plaintiff; (ii) October 8, 2025, 7:01 PM -- Message Sent from account of Plaintiff with subject and email body contents that matches the suspected screenshot of the Chisty Email; (iii) October 8, 2025, 7:05 PM -- Two emails matching the screenshot of the Chisty Email were forwarded from the account of Plaintiff (bjacobs2) to Plaintiff's account and "hrsolutions" account. *See id.* at ¶ 26(b)(i)-(iii). The Cybersecurity Report allegedly did not conclude Plaintiff had written the fraudulent email, only that the emails had originated from Plaintiff's account. *See id.* at ¶ 26(b)(iv). The Cybersecurity Report allegedly did not consider the possibility that Plaintiff's account was hacked or that Plaintiff had no reason to create the email. *See id.*

Plaintiff alleges there are a number of flaws in the Cybersecurity Report, which he claims reached a pre-determined conclusion based on a minimal amount of investigative facts and lacked standard forensic steps, such as: analyzing Dr. Jacobs' email account for unauthorized access or intrusion; failing to analyze the full email header to extract the originating Internet Protocol (IP) number; failing to examine the Microsoft Outlook `.pst` backup file; failing to examine check system logons, user activity, running processes, or email artifacts on Dr. Jacobs' personal

13

and work computers; and failing to include any statements or interviews from the individuals involved. *See id.* at ¶ 26(b)(v).

The Chisty Email was allegedly part of a scheme by Plaintiff's ex-girlfriend, Heather Zayas, a nurse manager at PSHMC, and others, to harass and embarrass him. *See id.* at ¶ 27. According to Plaintiff, Ms. Zayas had Plaintiff's old iPhone, which she acquired allegedly without his permission and which she used to access Plaintiff's accounts because she remembered his password from when they were dating. *See id.*

Plaintiff claims Ms. Zayas, with the assistance of Cassandra Rodriguez, a PSHMC employee, then used the stolen iPhone to create fake conversations they could screenshot and send to others to misrepresent Plaintiff. *See id.* at ¶ 27(a). Someone also allegedly sent an email to Plaintiff's leasing office attempting to sever his lease, harassed his ex-girlfriends, created a fraudulent USPS account to send his family HIV and cremation kits and sent fake screenshots to Plaintiff's mother to make her think Plaintiff had taken his own life. *See id.*

Plaintiff further contends Ms. Zayas also used his phone to make a fake Facebook post. *See id.* Ms. Zayas also allegedly used Plaintiff's phone to create the Chisty Email to prevent Plaintiff from attending his brother's wedding. *See id.* at ¶ 28. According to the Complaint, Ms. Zayas was upset Plaintiff had invited another resident as his guest to the wedding, Dr. Victoria Yin. *See id.*

Plaintiff contends he has evidence to support his belief that Ms. Zayas sent the Chisty Email. *See id.* at ¶ 29. Using the FindMyPhone App, Plaintiff was allegedly able to see that his old iPhone was active outside of Ms. Rodriguez's and Ms. Zayas' homes. *See id.* at ¶ 29(a). Following Plaintiff's termination, he claims Ms. Zayas admitted she sent the email because she did not want to him to go to his brother's wedding with someone else. *See id.* at ¶ 29(b). Ms. Zayas allegedly contacted Plaintiff's mother, a Philadelphia attorney, and admitted she had access to Plaintiff's old phone, remembered the password, and admitted that, in the week prior to the wedding, she accessed the old phone and retrieved the names and numbers of other women at Penn State. *See id.* at ¶ 29(c). Ms. Zayas also purportedly arranged to meet with these women before the wedding to discuss a "plan of action" against Plaintiff. *Id.*

After the wedding, Ms. Zayas allegedly reached out to Dr. Yin, a resident at another hospital who accompanied Plaintiff to the wedding, whose name and number she also retrieved from the stolen cell phone. *See id.* at ¶ 29(d). Ms. Zayas and Ms. Rodriguez allegedly admitted to the scheme in a series of text messages with Dr. Yin and another PSHMC employes, Cassandra Nichols. *See id.*

In a written statement, Dr. Yin indicated that she came to believe that Ms. Zayas and Ms. Nichols were seeking to "punish [Dr. Jacobs] for personal disputes independent of his professional duties." *Id.* at ¶ 29(i). Dr. Yin allegedly

15

indicated further that they sought to "manipulate testimony and shared knowledge of internal investigations" in order to improperly influence the investigation into the allegations against Plaintiff. *Id*. Dr. Yin allegedly indicated that after she came forward, she received a message from an unknown number which she perceived as a "threat" related to her willingness to provide information in this matter. *See id.*

Plaintiff then claims Ms. Zayas stated in the group chat that she had been contacted by someone in PSHMC HR about Plaintiff's stolen phone and Dr. Yin asked, "You still have his phone, why?" *Id.* at ¶ 29(ii).  Rodriguez responded she "gave it back to [Zayas] a few weeks ago..." *Id*. Ms. Zayas observed that "[Dr. Jacobs] has been keeping tabs on the phone apparently. I don't think they're [HR] taking him super serious." *Id.* at ¶ 29(iii). Dr. Yin then asked, "He's fired, that's it. What are you still trying to do?" *Id*. Rodriguez responded, "I think [Zayas's] just saying we have to make sure the story is straight." *Id*.

In text messages, Ms. Zayas and Ms. Rodriguez allegedly discussed being approached by HR investigators but indicated other PSHMC employees had "tried to keep them off their back." *Id*. at ¶ 29(iv). Ms. Zayas stated, "But just so everyone's on the same page I'm chalking all of that up to pregnancy and my emotional state. Our story is still good." *Id*. Ms. Rodriguez allegedly responded; "If I end up talking to them I'll keep with the same." *Id.* Dr. Yin purportedly urged Ms. Zayas and Ms. Rodriguez to come clean and stated, "Guys this is fucked. It's one email if you

16

just said you wrote it because you were emotionally distraught or pregnant or why ever I think it would be fine." *Id.* at ¶ 29(v). Zayas responded, "I think it's too late for that unfortunately." *Id.*

On October 21, 2025, Plaintiff was placed on administrative leave and required to leave the ICU. *See id*. at ¶ 30. Plaintiff was told he had been placed on administrative leave for allegedly hacking into his program director's e-mail account and sending himself an e-mail that purported to take away his vacation time. *See id.*

Over the following week, Plaintiff was interviewed twice, on the phone, by PSHMC HR Representative, Shane Ulrich. *See id*. at ¶ 31. During subsequent conversations with Mr. Ulrich, Plaintiff was allegedly told that PSHMC had "conclusive evidence" that showed they could prove the e-mail was sent from Dr. Jacobs' personal iPhone and within "feet of [his] apartment." *Id*. On October 21, 2025, Plaintiff was terminated. *See id*. at ¶ 32.

Plaintiff alleges he was never provided any written documentation substantiating the charges or evidence relied upon by PSHMC. *See id.* Plaintiff received a letter on November 6, 2025 (backdated to October 30, 2025) indicating he had violated a policy about dishonesty in communication and was told cybersecurity had concluded he had written the Chisty Email. *See id*. Per the Complaint, no investigative report, metadata, or record of the alleged cybersecurity findings was shared with Plaintiff before he was terminated and Plaintiff was

17

allegedly not informed of who conducted the technical analysis, what devices or logs were reviewed, or what methodology was used to conclude his account was uncompromised. *See id*. at ¶ 33. Plaintiff claims the entire process occurred within a little over two weeks, without allegedly affording Plaintiff any meaningful opportunity to respond before the decision to terminate him was finalized. *See id*. Plaintiff also was purportedly never told how PSHMC came into possession of, or first became aware of, the Chisty email. *See id.*

On November 11, 2025, Plaintiff appeared for his "Program Level Review" before the Clinical Competency Committee. *See id.* at ¶ 34. Prior to this, Plaintiff allegedly requested the opportunity to review the information and other evidence the CCC would be relying upon, including the Cybersecurity Report but these requests were purportedly denied. *See id.* at ¶ 34(a). Plaintiff was allegedly not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the CCC. *See id.* at ¶ 34(b). Plaintiff alleges he was given 15 minutes to state his case, without counsel, and, all he could say was that he did not write the email but had no other evidence to prove a negative. *See id.* at ¶ 34(c).

The CCC rejected Dr. Jacobs' appeal. *See id.* at ¶ 35. Dr. Ghahramani, the Department Chair who oversaw Plaintiff's Program-Level Appeal, allegedly stated the CCC had based the decision on two verbal assertions by PSHMC HR staff and

18

counsel: (i) that Plaintiff and his counsel had been given all the evidence in the case; and (ii) that the cybersecurity report shows Plaintiff used multi-factor authentication (including facial recognition) shortly before the fraudulent email was drafted. *See id.* at ¶ 35(a). Plaintiff alleges these assertions are false. *See id.* Plaintiff's counsel purportedly had tried to see the other evidence the hospital had to show the Department Chair but that counsel for PSHMC allegedly refused to provide any evidence in addition to the cybersecurity report, which does not mention the MFA. *See id.*

In a subsequent letter, Dr. Ghahramani allegedly indicated Plaintiff's denials were not accepted because he appeared to have been assisted by an attorney instead of speaking extemporaneously. *See id.* at ¶ 35(b). The letter stated, "you did not provide any testimony or explanation in defense of the allegations against you, but rather, submitted an 11-page letter written by your attorneys which denied the allegations by stating the fraudulent email at issue (the "Email") was not drafted by you, and rather, an ex-girlfriend (who is also an employee)." *Id.*

On November 21, 2025, Plaintiff's attorney emailed PSHMC's counsel, stating "We are in receipt of additional information from a [PSHMC] employee leading us to believe the events relating to Dr. Jacobs' appeal may involve criminal behavior, possibly by multiple [PSHMC] employees" and noted the Chisty Email

19

was "effectively incoherent, and written by someone who does not have a basic understanding of how programs operate." *Id.* at ¶ 36.

Plaintiff alleges PSHMC's counsel did not respond until a month later, stated "legal representation is not permitted in the appeal process", and expressed frustration that Plaintiff's counsel only provided "selected screenshots of text messages" to prove his innocence. *See id.* at ¶ 36(a). Plaintiff's counsel allegedly replied and objected to PSHMC's continued "reliance on undisclosed evidence in the appeal process." *See id.* at ¶ 36(b).

On November 26, 2025, Dr. Rebecca Bascom, Dr. Jacobs' academic mentor, wrote a letter to Dr. Ghahramani "to alert you to a breach in our ability to provide a safe and constructive learning environment for our residents." *Id.* at ¶ 37. She detailed a severe pattern of unprofessional behavior and sexual harassment directed at Plaintiff by another PSHMC employee. *See id.* at 37(a). Dr. Bascom purportedly described a conversation with Dr. Chisty about Plaintiff as "way above her paygrade" and advised Dr. Bascom not to continue to mentor Dr. Jacobs until the "situation was resolved." *Id.* at ¶ 37(b). She also noted "Identity theft is difficult to defend against" and urged PSHMC to "ask tough questions and show flexibility in seeking solutions." *Id.* at ¶ 37(c).

On December 22, 2025, Dr. Ghahramani wrote a letter to Plaintiff stating the appeal process would proceed and allegedly admitted PSHMC possessed the

20

following evidence: witness statements; text message screenshots from witnesses; pictures from Instagram; the Cybersecurity Incident Report, and work schedules. *See id.* at ¶ 38. On December 27, 2025, Plaintiff claims he received only a redacted copy of the Cybersecurity report but allegedly did not receive any other evidence stated in Dr. Ghahramani's letter. *See id.* at ¶¶ 38-39.

On January 8, 2026, Plaintiff, through counsel, requested copies of witness statements, text messages, social media images, and other information PSHMC had obtained but had not been provided. *See id.* at ¶ 40. This request was allegedly denied. *See id.*

On January 17, 2026, Plaintiff claims Dr. Yin provided a written statement detailing the group chat between herself, Ms. Rodriguez, and Ms. Zayas, writing, "I attest that the images are what they purport to be - screenshots of a text message conversation" showing an attempt to manipulate internal HR investigations. *Id.* at ¶ 41.

On January 22, 2026, Plaintiff had an appeal hearing with interim Department of Medicine Chair, Dr. Ghahramani. *See id.* at ¶ 42. According to the Complaint, PSHMC's counsel again allegedly falsely told Dr. Ghahramani that Plaintiff had been provided with all of the information he had requested and that there was evidence of use of multifactor authentication in the Cybersecurity report. *Id.* at ¶ 42(a). During this hearing, Plaintiff contends he was not permitted to view or listen

21

to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Committee and he was purportedly given a limited amount of time to present his case without counsel. *Id.* at ¶ 42(c)-(d).

On February 4, 2026, Plaintiff agreed to participate in a polygraph exam administered by licensed investigator, who tested whether Plaintiff composed the Chisty Email or accessed his supervisor's account. *See id.* at ¶ 43. The results allegedly showed, "No reactions indicative of deception were recorded." *Id.*

After the hearing, Dr. Ghahramani denied Plaintiff's appeal. *See id.* at ¶ 44. According to the Complaint, Plaintiff was provided a copy of the Appeal Board Agenda on February 8, 2026, and Plaintiff allegedly emailed the board's coordinator indicating he objected to a number of "due process violations." *See id.* at ¶ 45. Plaintiff claimed he had been told he could not bring witnesses but that the PSHMC representative would present three witnesses. *See id.* at ¶ 45(a). Plaintiff allegedly wrote, "after previously being told I could not bring witnesses, this schedule provides me with insufficient time to prepare and present my own or to otherwise arrange to bring forth witnesses whose testimony is material to this case - including Heather Zayas and Cassandra Rodriguez." *Id.*

Plaintiff also allegedly objected to the fact the PSHMC representative would be allotted 40 minutes to present the evidence against him, but he would be limited

22

to only 15 minutes as he wrote "15 minutes is insufficient to present all relevant information." *Id.* at ¶ 45(b). Plaintiff claims he objected that he had not been provided with all available evidence and objected that Dr. Clebak would be speaking on behalf of PSHMC "and yet will simultaneously function as a deciding member of the Appeal Board." *Id.* at ¶ 45(c)-(d).

On February 5, 2026, Plaintiff allegedly received a report from an expert specializing in computer and mobile forensics. *See id.* at ¶ 46. Plaintiff claims a copy of this report was provided to PSHMC. *See id.* The expert purportedly had reviewed the Cybersecurity Report and identified several deficiencies, specifically that several "investigative steps should have been conducted prior to arriving at the incident report conclusion" and that the investigator "failed to include basic necessary investigative and forensic steps to ensure a thorough and accurate investigation." *Id.* These include: (a) the e-mail account of Dr. Jacobs should have been analyzed for possible intrusion or unauthorized access, not just the account of Dr. Alia Chisty; (b) the full E-mail header from the subject e-mail dated October 8, 2025 should have been analyzed for the extraction of the originating Internet Protocol Number (IP) to determine geographical location and possible identification of the Internet Service Provider at the time the E-mail was sent; (c) the .pst backup file created by Microsoft Outlook should have been analyzed for possible identification information; (d) the

23

personal/work computer of Dr. Jacobs should have been forensically examined for the possible recovery of pertinent information. *Id.* at ¶ 46(a)-(d).

On February 9, 2026, Dr. Bascom, who had allegedly been providing academic mentorship to Plaintiff, allegedly wrote a letter to Dr. Ghahramani stating, "My concern is that you, as well, have been provided with an incomplete understanding of the facts of his case … Put bluntly, I believe Dr. Jacobs has been framed…." *Id.* at ¶ 47. Dr. Bascom allegedly suggested PSHMC had failed to protect Dr. Jacobs from sexual harassment in a separate matter and offered to "appear before the committee and provide additional documentation." *Id.* at ¶ 47(a). Dr. Bascom allegedly subsequently received a letter from PSHMC requesting a meeting. *See id.* at ¶ 47(b). Her attorney allegedly responded by questioning the purpose of the meeting and a list of questions or concerns that would be addressed. *See id*. A PSHMC HR representative allegedly emailed Dr. Bascom, stating that due to her refusal to meet with them, "we presume you are withdrawing your letter and support for Dr. Jacobs in this matter . . . and it will not be included in the record evidence." *Id.* Dr. Bascom's attorney allegedly responded by expressing concerns that threatening to consider Dr. Bascom's report withdrawn "could be construed as a violation of Pennsylvania's Whistleblower Law." *Id*. Dr. Bascom allegedly later clarified, "First and foremost I am not withdrawing my letter. . . . " *Id.*

24

On February 9, 2026, fifteen minutes before the final appeal hearing was scheduled to begin, the hearing was allegedly cancelled. *See id.* at ¶ 48. On March 19, 2026, Plaintiff's counsel allegedly emailed the PSHMC General Counsel, claiming the matter is "spiraling out of control in a way I've not encountered before—now involving multiple criminal investigations and law firms." *Id.* at ¶ 49. Plaintiff's counsel purportedly detailed how Ms. Zayas and Ms. Rodriguez "stole Jacobs' old iPhone which they have been using to create fake conversations" and points out that "Zayas, has since confessed to drafting the email." *Id.*

On March 22, 2026, Plaintiff appeared for his rescheduled final appeal hearing before Dr. Clebak. *See id.* at ¶ 50. Plaintiff was allegedly not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Committee. *See id.* at ¶ 50(a). Plaintiff contends he was given a limited amount of time to present his case without counsel and was not permitted to call any witnesses. *See id.* at ¶ 50(b)-(c).

On March 24, 2026, Plaintiff was allegedly informed by Dr. Clebak that the Graduate Medical Education Appeals Board had upheld the prior decision to terminate his employment as a Resident. *See id.* at ¶ 51. Plaintiff was informed "This decision is final and concludes the GME Level Review and Grievance Review Process pursuant to the Penn State Milton S. Hershey Medical Center Graduate Medical Education Grievance and Due Process Policy." *Id*.

## II.    PROCEDURAL HISTORY

On May 1, 2026, Dr. Jacobs initiated this action by filing a Complaint in the United States District Court for the Middle District of Pennsylvania against the HMC Physicians, a Motion for a Preliminary Injunction, and a Motion for Expedited Discovery. *See generally* Complaint (Dkt. No. 1); *see generally Motions* (Dkt. Nos. 4-7).

This Court scheduled a conference to discuss the motions. *See* Order (Dkt. No. 8). Thereafter, the Court issued an Order requiring the parties to submit a proposed scheduling order. *See* Order (Dkt. No. 20). The parties met and conferred and, on May 14, 2026, submitted a joint Proposed Case Management Order. *See* Proposed CMO (Dkt. No. 22). After holding another conference with the Parties, this Court issued a Case Management and Date Certain Trial Scheduling Order on May 18, 2026. *See* Order (Dkt. No. 25). Subsequently, Dr. Jacobs withdrew his motions. *See* Notice of Withdrawal (Dkt. No. 26).

In compliance with the May 18th Order, the HMC moves for dismissal of the Complaint with prejudice based on Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF QUESTIONS INVOLVED

Question: Should the Complaint be dismissed with prejudice when the procedural due process claim fails to and Dr. Jacobs cannot allege the HMC Physicians were state actors with respect to the conduct at issue?

26

Suggested Answer:        Yes

Question: Should the Complaint be dismissed when the due process claim is based – not on an allegation that owed process was not provided – but on a claim that the provided process should have been more comprehensive?

Suggested Answer:        Yes.

Question: Should Dr. Jacobs be denied leave to amend on grounds of futility because it is impossible for him to allege the necessary element of state action and he cannot allege that he was not afforded all process owed to him?

Suggested Answer:        Yes.

## LEGAL ARGUMENT

### I.    APPLICABLE STANDARDS

#### A.    Motion to Dismiss under Federal Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a litigant to move for dismissal of allegations that fail "to state a claim upon which relief can be granted." For a complaint to survive a 12(b)(6) motion, it must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a court must accept the allegations of a pleading as true for purposes of the motion, "it is not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *See LifeMD, Inc. v. Lamarco,* Civil Action No. 2:21-cv-1273, 2022 WL 2118367, *4 (W.D. Pa. June 13, 2022), *citing Baraka v.*

27

*McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotations omitted).

### B.   Fourteenth Amendment Procedural Due Process Claim

The Fourteenth Amendment's due process clause forbids the state from "depriv[ing] any person life, liberty, or property, without due process of law." *See* U.S. Const. Amend. XIV, § 1. Because the Constitution "offers no shield against private conduct...," a necessary, threshold element of a procedural due process claim is state action. *Klavan v. Crozer-Chester Medical Center*, 60 F. Supp. 2d 436 (1999). If the complaint does not reflect the defendant acted under color of state law when they engaged in the alleged misconduct, the "claim for violation of civil rights under § 1983 must fail as a matter of jurisdiction and there is no need for the court then to determine whether a federal right has been violated." *Id.* To satisfy the state action requirement, a plaintiff must prove the alleged violations are "fairly attributable to the state" and this requirement is critical as it "preserves an area of individual freedom by limiting the reach of federal law and federal judicial powers." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982).

The Supreme Court has suggested three tests to determine if the actions of a private party can be fairly attributable to the state: (i) the "close nexus" test, under which the state is deemed responsible for the conduct at issue; (ii) the "symbiotic relationship" test, in which the court examines an existing relationship to determine

28

whether the state has "insinuated itself into a position of interdependence" with the private actor so as to be considered a joint participant; and (iii) the "public function" test, in which the state is using a private party to engage in activities that are the exclusive prerogative of the state. *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351 (1974); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *Rendell-Baker v. Kohm*, 457 U.S. 830, 841 (1982).

The question is not whether the private actor and the state have a close relationship, generally, but whether there is such a nexus between the state and the at-issue action that the action may be fairly treated as an action by the state. *See Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017), *cert denied* 584 U.S. 993 (2018). Here, the Complaint fails to adequately plead both state action and a denial of an owed level process and, thus, it should be dismissed with prejudice.

## II.    THE COMPLAINT'S PROCEDURAL DUE PROCESS CLAIM FAILS DUE TO A LACK OF STATE ACTION

Dr. Jacobs seeks to hold the HMC Physicians liable for an alleged deprivation of procedural due process by claiming there is a symbiotic relationship between Penn State and the HMC Physicians' employer, The Milton S. Hershey Medical Center ("MSHMC").[3] This same argument has been made to and rejected by multiple courts

---

[3] Penn State is not a "state" university operated by the Commonwealth of Pennsylvania. To the contrary Penn State is one of four "state-related" universities in the Commonwealth along with Temple University, University of Pittsburgh, and Lincoln University. As the Pennsylvania state and federal courts have recognized,

29

in this circuit faced with even stronger allegations as to a hospital-university relationship than the superficial allegations made herein.

Dr. Jacobs' claim of state action begins and ends with an overruled case cited in his now-withdrawn Motion for a Preliminary Injunction. In that motion, Dr. Jacobs cites this Court's holding in *Borrell v. Bloomsburg University* for the proposition that "[c]ourts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study…" *See Borrell v. Bloomsburg Univ.*, 955 F.Supp.2d 390, 402 (M.D. Pa. 2013). **The more important holding of this case, however, comes from its subsequent Third Circuit reversal, which Dr. Jacobs *does not* provide to this Court, likely because it invalidates his claim**.

In *Borrell*, this Court permitted the plaintiff's procedural due process claims against Geisinger Medical Center to survive, finding state action was properly pled. The plaintiff was a student in Bloomsburg's (a "state" university operated by the Commonwealth) nurse anesthetist program, which was run through Geisinger. *Borrell*, 955 F.Supp.2d at 395-396. While the plaintiff was enrolled, the program's director met with her and requested she take a drug test. *Id.* at 396. The plaintiff initially refused to do so. *Id.* While the plaintiff later agreed to take the test, the

---

there is a distinction between purely public (or "state") universities and state-related universities, as the latter is not always a state actor. *See Gati v. University of Pittsburgh of Com. System of Higher Educ.*, 91 A.3d 723 (Pa. Super. 2014).

director expelled her for her initial refusal. *Id.* The plaintiff filed suit, asserting, *inter alia*, a procedural due process claim against both Geisinger and the director. *Id.* at 400. Both entities moved to dismiss for a lack of state action. *Id.*

This Court denied the motion, citing the complaint's allegation that Geisinger and Bloomsburg had a close relationship with respect to the program and the conferral of certifications/degrees. *Id.* at 401-402. In addition, the plaintiff was dismissed from the program via joint correspondence from Geisinger and Bloomsburg. *Id.* at 401.

Thereafter, Geisinger and the director moved for summary judgment, again arguing a lack of state action. *Borrell v. Bloomsburg Univ.*, 63 F.Supp.3d 418 (M.D. Pa. 2014). In denying the motion, this Court noted the program was a "collaboration between Bloomsburg and Geisinger" wherein "Bloomsburg provided the academic education, while Geisinger provided the clinical education…" *Borrell*, 63 F.Supp.3d at 435. Students needed to fulfill both academic and clinical requirements to complete the program. *Id.* In addition, both entities jointly established accreditation standards, admissions criteria, the content of the student handbook, and class sizes. *Id.* Both entities also promoted the program by jointly creating promotional materials and sharing their cost. *Id.* Geisinger also shared in the program's revenue and received payment of fifty percent of all tuition and fees. *Id.* Joint employees of both

31

entities – such as the director – oversaw the program and each entity paid a portion of their salaries. *Id.*

Following a jury verdict for the plaintiff, Geisinger and the director appealed to the Third Circuit. *See Borrell v. Bloomsburg Univ.*, 870 F.3d 154 (3d Cir. 2017). That court reversed the jury verdict, recognizing a purportedly "close relationship" between a private hospital and public university is not enough to show state action and there must be a showing of a "close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 160. The Court found unpersuasive the plaintiff's allegations of Geisinger's "willful participation in a joint activity, the [nurse anesthetist program], with Bloomsburg" and held this relationship was "the beginning of the inquiry, not the end of it" as "the government must have also been closely involved with the decision to terminate" plaintiff. *Id.* Because the director terminated the plaintiff due to violation of a Geisinger policy and because "the authority of state officials . . . was wholly unnecessary to effectuate Borrell's dismissal from the [program]", the individual defendant was not a state actor. *Id.* at 161-162. Thereafter, the Supreme Court denied certiorari. *Borrell v. Richer*, 584 U.S. 993 (2018).

In support of a claim of state action, Plaintiff's Complaint matter-of-factly alleges MSHMC was:

> ….a joint participant in the challenged activity. The residency program is affiliated with Penn State University,

> rather than [MSHMC] as a private entity. Penn State University remains responsible for academic coordination, clinical integration, and shared governance.
>
> Defendants are state officials due to their faculty appointments at Penn State.

Dkt. No. 1 at ¶¶ 56-57.

These allegations are akin to yet much weaker and fewer in number than those the Third Circuit rejected. Like in *Borrell*, it is alleged Penn State and MSHMC jointly run the residency program, sharing oversight and jointly operating the academic and clinical aspects. *See id.* at ¶ 56; *Borrell*, 63 F.Supp.3d at 435. These facts were insufficient to show state action in *Borrell* even though the plaintiff in that case also alleged additional facts – not alleged here – pertaining to shared revenue and dual drafting of literature, marketing materials, and codes of conduct.[4] *See Borrell*, 63 F.Supp.3d at 435. Moreover, like in *Borrell*, Dr. Jacobs's dismissal was based on a violation of MSHMC's "Graduate Medical Education and Due Process Policy" – Dkt. No. 1 at ¶ 51; *Borrell*, 63 F.Supp.3d at 397 (noting dismissal under Geisinger policy). When comparing Dr. Jacobs' allegations to those made in *Borrell*, it is beyond question that the former are insufficient to show state action.

---

[4] Unlike here, the *Borrell* plaintiff was dismissed via a joint letter from the university and the hospital. The 2025 dismissal letter issued to Dr. Jacobs was drafted on Penn State Health letterhead.

33

Dr. Jacobs attempts to bolster his claim by highlighting two additional but inconsequential facts. He first points to the HMC Physicians holding faculty appointments at Penn State, despite courts of this circuit explicitly rejecting this fact as relevant to the analysis. *See Untracht v. Fikri*, 454 F.Supp.2d 289 (W.D. Pa. 2006). In *Untracht*, the plaintiff brought a §1983 substantive due process claim, alleging several physicians were "state actors because some of these individuals also held faculty appointments at Temple." *Id.* at 324. The court rejected this argument, noting a claim of state actors status on the part of physicians employed by a private hospital who hold professorships with a state-<u>related</u> university was "far too attenuated to hold state action" on the part of the physicians.[5] *Id.*, citing *Steppling v. Presbyterian Univ. Hosp.*, No. 94-401 (W.D. Pa. 1995) ("[N]o court appears willing to extend the applicability of § 1983 claims to cover situations where the symbiotic relationship is not between a private entity that has been deemed a state actor for purposes of 42 U.S.C. §1983 [University of Pittsburgh] because of its relationship to a state and another private entity [Presbyterian University Hospital]."). Dr. Jacobs' allegation regarding the HMC Physicians academic appointments is, therefore, meaningless for purposes of state action.

---

[5] The defendant director in *Borrell* was a dual employee of both Bloomsburg and Geisinger. *See Borrell*, 63 F.Supp.3d at 435. As Dr. Jacobs concedes, the HMC Physicians are not dual employees, but, rather, hold uncompensated academic appointments with PSCOM. *See* Dkt. No. 1 at ¶ 13. This distances this matter even further from *Borrell* and its already-insufficient facts.

Second, Dr. Jacobs points to the existence of Penn State-branded merchandise in MSHMC's gift shop. *See* Dkt. No. 1 at ¶ 12(a)-(b). No attempt is made to argue how the branding of t-shirts and stuffed animals transforms decisions of private physicians into actions made under color of state law. Indeed, were this the case, every privately-owned business in the borough of State College selling officially licensed Penn State gear would be subject to § 1983 liability.[6]

*Borrell* teaches that merely pointing to the relationship between a university and a private hospital formed for purposes of administering a program is insufficient to deem employees state actors. Because this matter involves facts of lesser quality and quantity than those already rejected by the Third Circuit, state action does not exist, and, therefore, the Complaint should be dismissed with prejudice.

### III.    THE COMPLAINT'S PROCEDURAL DUE PROCESS CLAIM IS INVALID

Even if this Court were to determine, contrary to the Third Circuit's holding in *Borrell*, that the Complaint has pled state action, Dr. Jacobs' claim still fails because he does not allege a deprivation of process; rather, he alleges he was entitled to different process. In other words, the Complaint does not allege Dr. Jacobs was not provided with an owed form of process, it alleges Dr. Jacobs' belief that the in-

---

[6] MSHMC, like Lion's Pride in State College (https://www.lions-pride.com) sells officially-licensed Penn State-branded products.

place processes could have been, in his view, more comprehensive. This is not basis for a claim for procedural due process, and the Complaint should be dismissed.

Dr. Jacobs' request that this court find that procedural due process has not been met is contrary to established case law. In *Terzian v. Montclair Hosp., LLC*, No. 22-4396, 2024 U.S. Dist. LEXIS 41562, at 17 (D.N.J. Mar. 10, 2023), the District Court of New Jersey recognized that "Residents, unlike licensed physicians, are generally considered students subject to the academic requirements of a residency program." *See also Hernandez v. Overlook Hospital*, 692 A.2d 971, 973 (N.J. 1997) (collecting cases). "And, in academic settings, more informal forms of notice and hearings suffice." *Keles v. Bender*, No. 21-1497, 2022 WL 840311 (3d Cir. Mar. 18, 2022) (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90 (1978)). The Court further noted that "[b]efore a university dismisses a student for disciplinary reasons, due process requires that it afford "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion." (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). In the context of residency programs, courts recognize that imposing stricter procedural measures could discourage candid reporting of physician incompetence and threaten the health and safety of patients. *Hernandez*, 692 A.2d at 976.

Here, Dr. Jacobs' own allegations illustrate he was afforded well beyond "rudimentary precautions against unfair or mistaken findings of misconduct and

arbitrary exclusion", as he was able to (i) appear for his "Program Level Review" before the CCC, (ii) state his case before the Committee, (iii) appeal the Committee decision, (iv) attend an appeal hearing and present his case, and (v) appear for a final appeal hearing and present his case again. Accordingly, based on the foregoing – all stated in the Complaint – Dr. Jacobs was indisputably afforded procedural due process and his claim that the due process afforded was insufficient.

Additionally, the Fifth Circuit, in *Davis v. Mann*, noted "Courts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." 882 F.2d 967, 973 (5th Cir. 1989),; *see also Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975); *Mahavongsanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir.1976) (quoting *Wright v. Texas Southern University*, 392 F.2d 728, 729 (5th Cir. 1968)).

Many of the cases cited by Dr. Jacobs dealt with situations where the university failed to provide a set procedure. *See e.g.*, *Doe v. Pennsylvania State Univ.*, 276 F.Supp.3d 300, 310 (M.D. Pa. 2017) (stating a school's procedures permitted a student to submit written questions to the panel, however, the panel rejected nearly all of the questions); *Doe v. Miami Univ.*, 882 F.3d 579, 587 (6th Cir. 2018) (holding a student denied right to unbiased decision-maker as panelist

37

repeatedly claimed "I'll bet you do this [i.e., sexually assault women] all the time.") Such an allegation is not present here.

Moreover, each of the cited cases referencing cross-examination as part of the process qualified their holdings by stating this is not always required and is only potentially required if the sole evidence against the accused is in the form of the accuser's testimony – a key distinction not present here. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 405 (6th Cir. 2017) (cross-examination *may* be necessary when accusations are based solely on accuser's testimonial statements); *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) (cross-examination *may* be necessary in some cases but holding it was not necessary because this "was not a case where the decision maker had to choose to believe the accused or his accuser."); *Doe v. Pennsylvania State Univ.*, 336 F.Supp.3d 441, 450 (M.D. Pa. 2018) (noting courts do not require "trial-type procedures" such and cross-examination and they are only potentially required in situations involving credibility of competing witnesses); *Williams v. Pennsylvania State Univ.*, 697 F.Supp.3d 297, 337-338 (M.D. Pa. 2023) (no due process violation for failure to allow cross-examination when case was not based *solely* on complainant's allegations); *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (student not denied due process when unable to cross-examine witness).

38

Unlike the cases outlined above, this matter does not involve accusations based solely on an accuser's testimonial statements; rather, it admittedly involves an investigation including a review of technology, interviews of Dr. Jacobs, a cybersecurity report showing the use of multi-factor authentication before the email was sent, text message screenshots, pictures from Instagram, and work schedules. As such, the sole evidence in this case was not witness testimony requiring the need for cross examination or trial-like procedures. As alleged, Dr. Jacobs was afforded due process in accordance with MSHMC's policies and procedures. A claim based on dissatisfaction with the extent of this process is not a claim for procedural due process and, as such, the Complaint should be dismissed with prejudice.

## IV.    GRANTING LEAVE TO AMEND WOULD BE FUTILE

It is anticipated leave to amend will be sought in an effort to cure the deficiencies outlined above. However, this request should be denied as futile. *See Philips v. Cnty. Of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008). Pennsylvania federal courts have held that state action does not (and should not) exist on the facts alleged and, therefore, there is no possibility to cure this defect by amendment. In addition, Dr. Jacobs' criticisms of the process afforded to him stems from his perception of the *quality* of the process; he fails to allege (nor could he allege) he was not provided with process owed him. There are no amendments that would

39

rectify either deficiency and, thus, the Complaint should be dismissed without leave to amend.

## V.    CONCLUSION

Defendants, Karl T. Clebak, M.D., Kevin P. Black, M.D., and Nasrollah Ghahramani, M.D., M.S., F.A.C.P., respectfully request that this Honorable Court grant their Motion to Dismiss.

Respectfully Submitted,

Dated: May 22, 2026          **BUCHANAN    INGERSOLL    &
ROONEY PC**

_/s/ Geoffrey F. Sasso_____
Geoffrey F. Sasso, Esq. (Pa. ID 202936)
Anthony (T.J.) Andrisano, Esq. (Pa ID 201231)
Makenzie P. Leh, Esq. (PA. ID. 333895)
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
T: 215-665-8700
F: 215-665-8760
geoffrey.sasso@bipc.com
anthony.andrisano@bipc.com
makenzie.leh@bipc.com

_Attorneys for Defendants, Karl T.
Clebak, MD, Kevin P. Black, MD, and
Nasrollah Ghahramani MD, MS,
FACP_

40

## CERTIFICATE OF COMPLIANCE
## IN ACCORDANCE WITH LOCAL RULE 7.8(B)(2)

I hereby certify that the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss contains 9,485 words (exclusive of tables of contents and authorities, signatures, and this certificate), according to the word processing system used to prepare it, and that the brief therefore complies with the Local Rule.

Dated: May 22, 2026

*/s/ Geoffrey F. Sasso*
Geoffrey F. Sasso, Esquire
*Attorney for Defendants, Karl T. Clebak, M.D., Kevin P. Black, M.D., and Nasrollah Ghahramani, M.D., M.S., F.A.C.P.*

41

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing document was filed through the CM/ECF system and will be served electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: May 22, 2026          */s/ Geoffrey F. Sasso*
Geoffrey F. Sasso, Esquire
*Attorney for Defendants, Karl T. Clebak, M.D., Kevin P. Black, M.D., and Nasrollah Ghahramani, M.D., M.S., F.A.C.P.*

42