# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN CONOR JACOBS, MD

PLAINTIFF,

v.

KARL T. CLEBAK, MD, ET AL

DEFENDANTS

Case No. 1:26-cv-01167

Judge: Wilson

BRIEF IN RESPONSE TO
MOTION TO DISMISS

Plaintiff Brian Conor Jacobs, MD, respectfully submits this Brief in Response to Defendants' Motion to Dismiss. (Doc#29, 30.)

**TABLE OF CONTENTS**

FACTS ...................................................................................................................................1

    A.    The PSHMC Disciplinary Process ...................................................................2

    B.    The Plot Against Dr. Jacobs ............................................................................3

    C.    The Flawed Appeal Process ............................................................................5

ARGUMENT ........................................................................................................................9

    A.    The Standard For Resolution Of This Motion ..............................................9

        1.    Analysis Of State Action For § 1983 Purposes ........................................9

        2.    The Alleged Infringement Of Dr. Jacobs' Constitutional
            Rights Is Fairly Attributable To The State Because PSHMC
            Is Created By And Controlled By Penn State ..........................................10

        3.    The *Kach-Brentwood* Test ......................................................................11

            a.    Defendants Are State Actors Under The Acting In
                Concert Test.....................................................................................12

            b.    Defendants Are State Actors Under The Symbiotic
                Relationship Test..............................................................................17

            c.    *Borrell* Does Not Require A Different Result.................................19

    C.    Dr. Jacobs Was Denied Adequate Procedural Due Process As
        Required By The Constitution .......................................................................22

        1.    Lack Of Cross Examination......................................................................25

        2.    Defendants Do Not Address The Allegations That They
            Relied On Secret, Undisclosed, And Redacted Evidence......................28

        3.    *Mathews* And The Sixth Circuit's Opinion In *Endres* Support
            Denial Of The Motion ...........................................................................30

    D.    Plaintiff Should Be Given Leave To Amend To Assert State Law
        Breach Of Contract Claims ..........................................................................33

CONCLUSION ..................................................................................................................35

CERTIFICATE OF COMPLIANCE................................................................................36

**TABLE OF AUTHORITIES**

Cases

*Anti-Fascist Committee v. McGrath*, 341 U.S. 123 (1951)........................................29

*Arnold v. Hauswirth*, No. 4:24CV0312, 2024 U.S. Dist. LEXIS 99566
(N.D.Ohio June 5, 2024)........................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................9

*Baucum v. Rutgers Univ.*, No. 23-20707, 2025 U.S. Dist. LEXIS 266466
(D.N.J. Dec. 29, 2025)........................................12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................................9

*Benner v. Oswald*, 444 F. Supp. 545 (M.D.Pa. 1978)........................................18

*Benner v. Oswald*, 592 F.2d 174 (3d Cir. 1979)........................................18

*Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F.Supp.2d 745 (M.D.Pa.
2012)........................................19

*Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978)..............25, 32

*Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418 (M.D.Pa. 2014)........................................20

*Borrell v. Bloomsburg Univ.*, 955 F.Supp.2d 390 (M.D.Pa. 2013)........................................21

*Borrell v. Bloomsburg University*, 870 F.3d 154 (3d Cir. 2017)........................................*passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)........................................11

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)........................................17

*Chrupcala v. Chester Cnty. Hosp.*, No. 00-6027, 2003 U.S. Dist. LEXIS 28727
(E.D. Pa. Jan. 29, 2003)........................................17

*Coronado v. Valleyview Pub. School Dist. 365-U*, 537 F.3d 791 (7th Cir. 2008)........................................23

*Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989)........................................16, 33

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)........................................27

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018)........................................29

*Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300 (M.D.Pa. 2017)........................................11, 26

*Doe v. Pennsylvania State Univ.*, 336 F. Supp. 3d 441 (M.D.Pa. 2018) ...............................27

*Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481 (D.Md. 2015) ....................................................29

*Doe v. University of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016) ...............................24

*Doe v. University of Sciences*, 961 F.3d 203 (3d Cir. 2020)..........................................26, 27

*Doe v. White*, 440 F. Supp. 3d 1074, 1087 (N.D.Cal. 2020) ................................................22

*Ekmark v. Matthews*, 524 F.App'x 62 (5th Cir. 2013) ........................................................17

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019)........................25, 31, 32

*Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775 (2d Cir. 1991) ...............17

*Flaim v. Med. College of Ohio*, 418 F.3d 629 (6th Cir. 2005) ...............................................30

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ......................................................9

*Furey v. Temple Univ.*, 884 F. Supp. 2d 223 (E.D. Pa. 2012) .............................................26

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................................28

*Goss v. Lopez*, 419 U.S. 565 (1975) .........................................................................23, 29, 32

*Groman v. Twp. of Manalapan*, 47 F.3d 628 (3d Cir. 1995).................................................12

*Henderson v. Pennsylvania State Univ.*, M.D.Pa. No. 4:21-CV-00872, 2022 U.S.
 Dist. LEXIS 50210 (Mar. 21, 2022)...........................................................................10

*Henson v. Honor Comm. of Univ. of Va.,* 719 F.2d 69 (4th Cir. 1983)..................................32

*Hernandez v. Overlook Hosp.*, 692 A.2d 971 (N.J. 1997) ....................................................32

*Heyne v. Metro. Nashville Pub. Schs*, 655 F.3d 556 (6th Cir. 2011) .....................................23

*Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250 (3d Cir. 1994) .................9

*Kach v. Hose*, 589 F.3d 626 (3d Cir. 2009).........................................................................12

*Keles v. Bender*, No. 21-1497, 2022 U.S. App. LEXIS 7373 (3d Cir. Mar. 18,
 2022) ...........................................................................................................................32

*Kentucky v. Stincer*, 482 U.S. 730 (1987) ............................................................................25

*Kostin v. Bucks Community College*, No. 21-850-KSM, 2022 U.S. Dist. LEXIS
 57931 (E.D.Pa. Mar. 30, 2022) ..................................................................................22

*Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir. 1984) ..........................................10

*Langston v. Hershey Med. Ctr.,* No. 1:15-CV-2027, 2016 U.S. Dist. LEXIS 158792, at *11 (M.D.Pa. Nov. 16, 2016) ....................................................19

*Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224 (5th Cir. 1985) .........................................24

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................................10

*Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976) ......................................................33

*Mares v. Mia. Valley Hosp.*, 96 F.4th 945 (6th Cir. 2024) ...............................................16

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ..................................................22

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978)................................................22

*Nkrumah v. Univ. of Pittsburgh,* No. 2:19-cv-1180, 2022 U.S. Dist. LEXIS 65941 (W.D.Pa. Apr. 8, 2022).................................................22

*Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 10-2042, 2011 U.S. Dist. LEXIS 113431 (E.D. Pa. Sept. 30, 2011) ....................................23

*Osei v. Temple Univ.,* 518 F. App'x 86 (3d Cir. 2013) ..................................................22

*Parker v. New Jersey Motor Vehicle Comm.*, 158 F.4th 470 (3d Cir. 2025).................................9

*Reed v. Goertz,* 598 U.S. 230 (2023) ..................................................9

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) .................................................10

*Robison v. Canterbury Vill., Inc.*, 848 F.2d 424 (3d Cir. 1988) ..........................................10

*Seldomridge v. Penn State Hershey Med. Ctr.*, M.D.Pa. No. 13-CV-2897, 2014 U.S. Dist. LEXIS 80743 (June 12, 2014) ..................................................19

*Snyder v. Millersville Univ.*, No. CV 07-1660, 2008 U.S. Dist. LEXIS 134400, (E.D. Pa. Jan. 31, 2008) .................................................23

*Steppling v. Presbyterian Univ. Hosp.*, No. 94-401 (W.D. Pa. Nov. 14, 1995).....................15

*Taylor v. Bd. of Regents*, N.D.Ga. No. 1:20-CV-5048, 2022 U.S. Dist. LEXIS 180259 (Oct. 3, 2022)..................................................24

*Terzian v. Montclair Hosp.*, LLC, No. 22-4396, 2023 U.S. Dist. LEXIS 41562 (D.N.J. Mar. 10, 2023) ..................................................15, 16, 32

*Tufano v. Shopify (USA) Inc.,* No. 3:25-CV-1227, 2026 U.S. Dist. LEXIS 24188 (M.D.Pa. Feb. 5, 2026)..................................................9

*Unger v. Natl. Residents Matching Program*, 928 F.2d 1392 (3d Cir. 1991) ...........................15

*United States v. Price*, 383 U.S. 787 (1966).........................................................................10

*Untracht v. Fikri*, 454 F.Supp.2d 289 (W.D.Pa. 2006) ........................................................14

*Uzoechi v. Wilson*, No. 16-3975, 2018 U.S. Dist. LEXIS 88815 (D.Md. May 24, 2018)...........................................................................................................................29

*Van Overdam v. Texas A&M Univ.*, 43 F.4th 522 (5th Cir. 2022) ......................................33

*Walsh v. Hodge,* 975 F.3d 475 (5th Cir. 2020) ....................................................................33

*Wang v. Univ. of Pittsburgh,* No. 2:20-CV-01952, 2025 U.S. Dist. LEXIS 55849, at *19 (W.D.Pa. Mar. 26, 2025) ...........................................................................13

*Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2021 U.S. Dist. LEXIS 242822 (W.D.Pa. Dec. 21, 2021) .......................................................................................13

*West v. Atkins*, 487 U.S. 42 (1988) ....................................................................................10

*Williams v. Pennsylvania State Univ.*, 697 F. Supp. 3d 297 (M.D.Pa. 2023) .................27, 28

*Williams v. Pennsylvania State Univ.*, M.D.Pa. No. 4:20-CV-00298, 2020 U.S. Dist. LEXIS 161970 (Sep. 4, 2020)..............................................................................28

*Winnick v. Manning,* 460 F.2d 545 (2d Cir. 1972)...............................................................26

*Wright v. Texas Southern University*, 392 F.2d 728 (5th Cir. 1968) ......................................33

Statutes

42 U.S.C. § 1983 ....................................................................................................*passim*

Laurence H. Tribe, *American Constitutional Law* (2d ed. 1988)............................................31

J. Wigmore, *Evidence* (3d ed. 1940)...................................................................................25

## FACTS

Doctor Jacobs is a licensed physician and a graduate from Rutgers Robert Wood Johnson Medical School. (Complaint ¶ 4.) In March 2023, Dr. Jacobs matched into the PSHMC Internal Medicine Residency Program. The PSHMC internal medicine residency program is an extension of medical education. (Complaint ¶ 15.) The initial period for the Residency Program was through 2024. Dr. Jacobs performed well and was renewed for the 2024-2025 and 2025-2026 academic years. (Complaint ¶¶ 14, 17.) Dr. Jacobs has performed at a consistently strong level throughout his training. Evaluations described Dr. Jacobs as a resident who demonstrates maturity, sound clinical reasoning, and patient-centered communication.. He was described as "reliable," "a joy to work with," and "an asset to any team." (Complaint ¶ 20.)

Defendants are various administrators at PSHMC, including the Associate Dean for Graduate Medical Education, the Interim Vice Dean For Education Affairs, and the Interim Chair of the Department of Medicine. (Complaint ¶¶ 5-7.) PSHMC has a unique dual nature as an institution, as it functions as both an independent healthcare provider and educational institution affiliated with Penn State. The result is that full-time medical staff, including the parties in this case, serve patients and, at the same time, are integrated into Penn State's academic mission. (Complaint ¶¶ 10-13.)

**A.     The PSHMC Disciplinary Process**

According to his contract, Dr. Jacobs was expected to follow all "Penn State Health and Hospital Graduate Medical Education and Human Resources policies." (Complaint ¶ 17(c).) The contract provided that "In the event of an academic or disciplinary action that could result in suspension, dismissal, non-renewal of the Resident Agreement or non-promotion to the next year of the Residency Program, Resident may utilize the process outlined in the Graduate Medical Education Grievance and Due Process Policy. (Complaint ¶ 17(d).)

The Grievance and Due Process Policy contains two stages, a Program Review Level and a GME Review Level. (Complaint ¶ 19.) Throughout the process, residents are not permitted to be represented by counsel. The Program Level Review includes the opportunity to present, in person, an appeal to the Clinical Competency Committee. If the Clinical Competency Committee upholds the initial decision, a resident may pursue a further appeal with the Program Director or Department Chair. (Complaint ¶ 19(d).) The GME Level Review includes the opportunity to present and appeal to the Graduate Medical Education Appeals Board. While a resident is permitted to "present any relevant information in reference to the dismissal or suspension during this time frame, including oral and written statements in support of the appeal," the resident does not have the opportunity to review the presentation by the Department Chair of the case against the resident, view all evidence considered by decision-makers, or cross-examine adverse witnesses. (Complaint ¶¶ 19(e)-19(f).)

**B.    The Plot Against Dr. Jacobs**

Dr. Jacobs was terminated from PSHMC based on a claim that he fabricated an email to make it appear to have been sent by his supervisor.  Dr. Jacobs did not author or send the email.  Instead, his former girlfriend, a nurse manager at PSHMC, used his old cell phone and knowledge of his password to fabricate the email.  (Complaint ¶¶ 21-25; 27-29.)

Here is what happened.  Three days before Dr. Jacobs was supposed to serve as best man at his brother's wedding, Dr. Jacobs received an email that he initially believed was from his supervisor, Dr. Alia Chisty.  (The "Chisty Email.")  The Chisty Email was sent to Dr. Jacobs' account stating he lost his paid time off and could not attend the upcoming wedding.  Dr. Jacobs believed the Chisty Email was a phishing email that could be ignored and he attended his brother's wedding as planned.  (Complaint ¶¶ 22-25.)

Dr. Chisty did not send the Chisty Email.   This was confirmed by the PSHMC Office of Cybersecurity, which reviewed the accounts of Dr. Chisty and Dr. Jacobs.  Based on a review of account logs, the Cybersecurity Office believed that the Chisty email had been fabricated by the account of Dr. Jacobs.  (Complaint ¶ 26.)  The Cybersecurity Office did not consider whether Dr. Jacobs' account had been hacked.  (Complaint ¶ 26(b)(iv).)

The Chisty Email was created as part of a scheme by Dr. Jacobs' ex-girlfriend, Heather Zayas, a nurse manager at PSHMC and others, to harass and embarrass Dr.

Jacobs. Zayas had Dr. Jacobs' old iPhone, which she acquired without Dr. Jacobs' permission. Zayas was able to use the iPhone to access Dr. Jacobs' accounts because she remembered his password form when they were dating. (Complaint ¶ 27.) Zayas, with the assistance of another PSHMC employee, Cassandra Rodriguez, used the stolen iPhone to create fake conversations that they could screenshot and send to others to misrepresent Dr. Jacobs. Examples include: sending an email to his leasing office attempting to sever his lease, harassing his ex-girlfriends, creating a fraudulent USPS account to send his family HIV and cremation kits, and, even, sending fake screenshots to Dr. Jacob's mother, to make her think Dr. Jacobs had killed himself. (Complaint ¶ 27(a).)

Zayas used Dr. Jacobs' phone to create the Chisty Email in an effort to prevent Dr. Jacobs from attending his brother's wedding. (Zayas supposedly was upset that Dr. Jacobs had invited another resident as his guest.) (Complaint ¶ 28.) How does Dr. Jacobs know this? Zayas admitted her actions to both Dr. Jacobs and Dr. Jacobs' mother, an attorney in Philadelphia. Dr. Jacobs was also able to obtain text messages from a group chat between Zayas and others in which Zayas admitted to creating the Chisty Email and attempting to manipulate the PSHMC investigation. In one message, Zayas was urged by another participant to come clean in no uncertain terms:

> Participant: Guys this is fucked. It's one email if you just said you wrote it because you were emotionally distraught or pregnant or whatever I think it would be fine
>
> Zayas: I think it's too late for that unfortunately.

(Complaint ¶ 29(d).) As a result of the Chisty Email, Dr. Jacobs was placed on administrative leave for allegedly hacking into his program director's e-mail account. (Complaint ¶ 30.) Dr. Jacobs fully cooperated with the investigation but was terminated less than two weeks later. No investigative report, metadata, or record of the alleged cybersecurity findings was shared with Dr. Jacobs before he was terminated. (Complaint ¶ 33.)

## C.     The Flawed Appeal Process

Dr. Jacobs initially appeared for his "Program Level Review" before the Clinical Competency Committee. Prior to this hearing, Dr. Jacobs had requested the opportunity to review the information and other evidence that the Clinical Competency Committee would be relying upon, including the Cybersecurity Report. These requests were denied. Dr. Jacobs was not permitted to view or listen to the case against him presented by a PSHMC employee or cross-examine any witnesses who had provided evidence relied upon by the Clinical Competency Committee. Dr. Jacobs was given 15 minutes to state his case without the assistance of counsel. All he could say at that time was that he did not write the Chisty Email and he had no evidence to prove a negative. The Clinical Competency Committee rejected Dr. Jacobs' appeal. (Complaint ¶ 35.)

The next step was an appeal to Dr. Ghahramani, the Department Chair. Similar to the prior hearing before the Clinical Competency Committee, Dr. Jacobs was not

permitted to view or listen to the case against him and was given a limited amount of time to present his case without the assistance of counsel. Dr. Ghahramani, in a series of communications before and after the appeal hearing, stated that the decision had been made based on two verbal assertions by PSHMC HR staff and counsel: (i) that Dr. Jacobs and his counsel had been given all the evidence in the case; and (ii) that the cybersecurity report shows that Dr. Jacobs used multi-factor authentication (including facial recognition), shortly before the Chisty was drafted. (Complaint ¶ 35(a).) Dr. Ghahramani also indicated that Dr. Jacobs' denials were not accepted because he appeared to have been assisted by an attorney instead of speaking extemporaneously:

> you did not provide any testimony or explanation in defense of the allegations against you, but rather, submitted an 11-page letter written by your attorneys which denied the allegations by stating that the fraudulent email at issue…was not drafted by you, and rather, an ex-girlfriend (who is also an employee).

(Complaint ¶ 35(b).) Dr. Ghahramani denied the appeal.[1]

Two notable things came out of the appeal to Dr. Ghahramani. First, the assertions by PSHMC HR staff and counsel proved to be false. Second, Dr. Ghahramani had written a letter indicating that PSHMC possessed additional evidence, including witness statements; text message screenshots from witnesses; pictures from Instagram; the Cybersecurity Incident Report, and work schedules. Dr. Jacobs

---

[1] Around this time, Dr. Ghahramani was informed by another faculty member about a severe pattern of unprofessional behavior and sexual harassment directed at Dr. Jacobs by another PSHMC employee. No action on this report was taken. (Complaint § 37.)

continued to request the opportunity to review these materials. These requests were refused. Other than a redacted copy of the Cybersecurity Report produced for the first time on December 27, 2025, none of this evidence had ever been provided to Dr. Jacobs. (Complaint ¶¶ 38-39.)

Dr. Jacobs again requested copies of witness statements, text messages, social media images, and other information that PSHMC had obtained; these requests were refused. (Complaint ¶ 40.) Dr. Jacobs continued to obtain exculpatory evidence. In January 2026, Dr. Jacobs obtained a written statement detailing a group chat between Zayas and others containing admissions of their misconduct. (Complaint ¶ 41.) In February, Dr. Jacobs took and passe a polygraph. (Complaint ¶ 43.) Dr. Jacobs also obtained a report from an expert specializing in computer and mobile forensics identifying several "investigative steps should have been conducted prior to arriving at the incident report conclusion" and concluding that the PSHMC investigator "failed to include basic necessary investigative and forensic steps to ensure a thorough and accurate investigation." (Complaint ¶ 46.)

The next step was to the Appeal Board. Prior to the Appeal Board hearing, Dr. Jacobs emailed the board's coordinator indicating that he objected to a number of "due process violations," including that the PSHMC representative would be allotted more time to present the evidence against him and that he had not been provided with all available evidence. (Complaint ¶ 45.) Similar to the prior hearings Dr. Jacobs was not permitted to view or listen to the case against him or cross-examine any witnesses. Dr.

Jacobs was given a limited amount of time to present his case without the assistance of counsel and was unable to call witnesses, including Zayas or his forensic experts. (Complaint ¶ 50.) His appeal was denied.

Dr. Jacobs now faces severe damage to his academic and professional reputations as well as his prospects of obtaining admission into another residency program. (Complaint ¶ 63.)

This litigation followed.

**ARGUMENT**

## A. The Standard For Resolution Of This Motion

In considering whether a complaint fails to state a claim upon which relief may be granted, "the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff." *Tufano v. Shopify (USA) Inc.,* No. 3:25-CV-1227, 2026 U.S. Dist. LEXIS 24188, at *3 (M.D.Pa. Feb. 5, 2026), *citing Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). In accordance with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), this Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-10 (3d Cir. 2009).

## B. Defendants Are State Actors Who Were Acting Under Color Of State Law When They Deprived Dr. Jacobs Of His Procedural Due Process Rights

### 1. Analysis Of State Action For § 1983 Purposes

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A Fourteenth Amendment procedural due process claim consists of three elements: (i) a deprivation of life, liberty, or property; (ii) by a state actor; (iii) without due process of law. *Parker v. New Jersey Motor Vehicle Comm.*, 158 F.4th 470, 481 (3d Cir. 2025), *citing inter alia Reed v. Goertz*, 598 U.S. 230, 236 (2023).

To state claims under 42 U.S.C. § 1983, Dr. Jacobs must allege that Defendants were persons acting under color of state law when they deprived him of his constitutional rights. *West v. Atkins*, 487 U.S. 42, 48 (1988). "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n.7 (1966). *See also Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 427 n. 3 (3d Cir. 1988) ("'State action' for the purposes of the Fourteenth Amendment and 'color of state law' for the purposes of § 1983 are 'identical.'"), *citing Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  Thus, "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the State?"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

**2.  The Alleged Infringement Of Dr. Jacobs' Constitutional Rights Is Fairly Attributable To The State Because PSHMC Is Created By And Controlled By Penn State**

Defendants never explicitly argue that PHSMC is a private party.[2]  Instead, Defendants accept the allegations of the Complaint as true (for purposes of this

---

[2] Defendants state that Penn State "is not a 'state' university" but, instead, is a "'state related' university.  Def. Br. at 29 n.3.  This has not prevented this Court from observing that "It is… clear that Penn State is a state actor within the meaning of § 1983." *Henderson v. Pennsylvania State Univ.*, No. 4:21-CV-00872, 2022 U.S. Dist. LEXIS 50210, at *12 (M.D.Pa. Mar. 21, 2022).  *Cf. Krynicky v. University of Pittsburgh*, 742 F.2d 94, 103 (3d Cir. 1984) (University of Pittsburgh, as a "state-related university" was state actor under § 1983).

Motion) that PSHMC has a "dual nature" as an institution. They acknowledge this fact explicitly:

> The Medical Center purportedly functions as an employer and healthcare operation while Penn State provides academic credentials, titles, and scholarly standing. This allegedly ensures clinicians serving patients at the Medical Center are integrated into Penn State's academic mission (teaching students, conducting research, and advancing the frontiers of medicine).

Defendants' Memo. at 3. Dr. Jacobs's contract provides that he is not an employee of a private entity, but had been accepted into a "graduate medical education program." (Complaint ¶ 17.) This, alone, provides a basis to deny the Motion on State Action grounds. This Court has held that administrators at Penn State are required to comply with constitutional due process mandates – meaning, they are "state actors." *See e.g. Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300 (M.D.Pa. 2017) (granting preliminary injunction to Penn State student who had alleged that a school acted in violation of his due process right to confrontation in disciplinary proceedings).

### 3. The Kach-Brentwood Test

Assuming that PHSMC is not a public entity, that is not the end of any inquiry. There is no "simple line" between state and private actors. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). To answer that question, the Third Circuit does not rely on a single test — it applies a combination of three approaches.

> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with

the help of or in concert with state officials; and (3) whether 'the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). "Under any test, "'[t]he inquiry is fact-specific.'" *Id., quoting Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995).[3] Defendants may be considered state actors under either the second or third tests.

### a. Defendants Are State Actors Under The Acting In Concert Test

In *Borrell v. Bloomsburg University*, 870 F.3d 154 (3d Cir. 2017), the Third Circuit addressed the issue of determining when an individual, dually employed by both a private and public entity, acts under color of state law. *Borrell* concerned a former nurse anesthetist student who alleged that the Director of the Nurse Anesthetist Program violated § 1983 by dismissing her from the program for violating a drug policy. Id. at 157-59. The Nurse Anesthetist Program was operated under a collaboration agreement

---

[3] *Baucum v. Rutgers Univ.*, No. 23-20707, 2025 U.S. Dist. LEXIS 266466 (D.N.J. Dec. 29, 2025), is not to the contrary. In that case, the plaintiff was a Doctor of Osteopathic Medicine who was terminated from the Rutgers University's School of Health OBGYN Residency Program at Jersey City Medical Center, Inc. New Jersey Medical Center was a private entity. Plaintiff had been accused of inappropriately touching another employee. Plaintiff asserted various due process violations, including "that the investigation was vague, that he was denied the identity of any accuser, was given no written report, and received no opportunity for a meaningful hearing prior to termination." The *Baucum* court found that the plaintiff failed to sufficiently allege that the private hospital defendants acted under color of state law for purposes of 42 U.S.C. § 1983 because while Rutgers was responsible for academic coordination, clinical integration, and shared governance, the school had not "made or ratified the specific disciplinary decisions…" and that Jersey City Medical Center "retain[ed] authority over discipline and adverse actions."

between a private Hospital, Geisinger Medical Center, and Bloomsburg University, a public university. In determining whether the Director, a hospital employee who also worked for Bloomsburg University, was a state actor, the Third Circuit emphasized that it is important to consider what "hat" the Director was wearing when he made his decision. *Id.* at 160. The Third Circuit held that the hospital employee had not acted as a state actor because his decision was to enforce the private hospital's preexisting policy requiring employees to participate in drug tests. The court observed that the school had not "played any part in creating the policy enforced in this case" and that the private hospital had "exercised the authority to terminate" the nurse anesthetist for a violation of its policies. 870 F.3d at 161. *Compare Wang v. Univ. of Pittsburgh,* No. 2:20-CV-01952, 2025 U.S. Dist. LEXIS 55849, at *19 (W.D.Pa. Mar. 26, 2025) (hospital employee who acted independently of physicians in charge of university academic matters was not state actor).[4]

The *Borrell* court noted that the "seminal" question was whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself. In this case, the Complaint describes, in

---

[4] In *Wang,* the court found that alleged adverse employment actions for a physician involved decisions made by a private hospital, not the University of Pittsburgh. The doctor in that case was removed as the director of the clinical cardiac electrophysiology fellowship program. The court had previously noted that the fellowship program was affiliated with the private hospital, "rather than the University of Pittsburgh School of Medicine." *Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2021 U.S. Dist. LEXIS 242822 (W.D.Pa. Dec. 21, 2021).

detail, such a close nexus. The Complaint describes how Penn State faculty, acting in an academic capacity, directed, approved, and ratified the investigatory or disciplinary decisions at issue. Defendants, thus, not only acted with the help of or in concert with state officials, they *were* state officials. Dr. Clebak, holds an academic title, the Associate Dean for Graduate Medical Education at the Penn State Health Milton S. Hershey Medical Center and the Pennsylvania State University College of Medicine. He was clearly wearing his "faculty hat" when he acted in this case because, as the "Designated Institutional Official" for PSHMC and the Pennsylvania State University College of Medicine, he is responsible for the oversight and accreditation of all Graduate Medical Education programs, including Dr. Jacobs' residency program. Dr. Black and Dr. Ghahramani similarly wore Penn State faculty hats. Dr. Black is Vice Dean For Education Affairs at PSHMC and Dr. Ghahramani was the Chair of the Department of Medicine for Penn State College of Medicine.

Defendants claim that it is irrelevant that they are Penn State faculty who are overseeing an academic program, suggesting that "courts of this circuit explicitly reject[ed] this fact as relevant to the [state actor] analysis." Def. Br. at 34 *citing inter alia Untracht v. Fikri*, 454 F.Supp.2d 289, 324 (W.D.Pa. 2006). The cases cited by Defendants are easily distinguishable, however. None involved residents or medical students. Instead, they involved situations where faculty were wearing the "hats" of medical staff reviewing other physicians, not as educators disciplining students in residency programs. *Untracht*, for example, concerned the removal of a physician from

14

hospital staff, not a student from a residency program, and there was no evidence that the defendants were using "their positions as clinical professors" but, instead, were acting "as members of the medical staffs at their respective hospitals." 454 F.Supp.2d at 324.[5]

The conclusion that Defendants were acting as faculty at a state institution when deciding to terminate Dr. Jacobs is consistent with the view that residents are different from hospital staff or employees. Even though they receive payment to work in a clinical setting, they also receive instruction.[6] A number of courts have recognized that residents at public institutions have a protected property interest because the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. These courts have reasoned that the monetary benefits that individuals receive during their residency are conditioned on their continued enrollment in the academic program. In *Terzian v. Montclair Hosp.*, LLC, D.N.J. No. 22-4396, 2023 U.S. Dist. LEXIS 41562, at *17 (Mar. 10, 2023), for example, another court in this Circuit held that a resident

---

[5] Defendants also cite *Steppling v. Presbyterian Univ. Hosp.*, No. 94-401 (W.D. Pa. Nov. 14, 1995). *Steppling* appears to have also involved a physician on staff, not student in a residency program. But we are not certain of this because the case does not seem to be available on any public database or PACER to verify this fact.

[6] In *Unger v. Natl. Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991), the Third Circuit rejected a claim that a resident, whose program was discontinued before entry, had a property interest in the pursuit and continuance of her graduate medical education. The Third Circuit distinguished cases, like this case, where "universities that took academic or disciplinary action against currently attending students."

15

was entitled to constitutional due process before dismissal – an analysis that, by definition, required a conclusion that the individuals running the program were state actors.[7]  Courts in other Circuits have also found that residents have a constitutional right to procedural due process, a conclusion that necessarily requires state action.  In *Mares v. Mia. Valley Hosp.*, 96 F.4th 945, 951-952 (6th Cir. 2024), for example, the Sixth Circuit held that a "medical residency program is an extension of medical education and that its residents are owed the amount of due process required for students."  The *Mares* court reasoned that "the primary focus of [the school's] residency program is education," noting that "every step in the life cycle of a… resident—from selection to day-to-day experiences—is immersed in education and academics."  The Fifth Circuit reached a similar conclusion in *Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989).  The *Davis* court said:

> The residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas.

---

[7] The amount of due process protections available for the resident in *Terzian* case was more limited because the dismissal was for academic reasons, so the school only needed to provide an informal-give-and-take between the student and the administrative body. 2023 U.S. Dist. LEXIS 41562, at *17.

882 F.2d at 974.[8] *Cf. Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 783 (2d Cir. 1991) (resident had contractually created property interest in the position of chief resident).

### b. Defendants Are State Actors Under The Symbiotic Relationship Test

The "symbiotic relationship test" deems a private party a state actor if "the state has so far insinuated itself into a position of interdependence [with the private party] that it must be recognized as a joint participant in the challenged activity, which on that account, cannot be considered to have been so purely private as to fall without the scope of the Fourteenth Amendment." *Chrupcala v. Chester Cnty. Hosp.*, No. 00-6027, 2003 U.S. Dist. LEXIS 28727, at *3 (E.D. Pa. Jan. 29, 2003), *citing Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961). "Determining state action in this category of cases consists of asking whether the actor is so integrally related to the state that it is fair to impute to the state responsibility for the action." *Leshko v. Servis*, 423 F.3d 337, 339- 340 (3d Cir. 2005). The relevant inquiry here is "whether the state so identifies with the individual who took the challenged action that it can be deemed that the state's fingerprints to have been on the action." *Id.*

---

[8] Defendants cite *Davis* for the proposition that students "are not entitled to as much procedural protection under the Fourteenth Amendment as employees." Def. Br. at 37. *Davis*, and other decisions, however make it clear that medical residents are better viewed as "students," and not "employees," for procedural due process purposes. *Ekmark v. Matthews*, 524 F.App'x 62, 63 (5th Cir. 2013) ("In the context of due process, medical residents are students rather than employees of the hospital.")

This Court held in *Benner v. Oswald*, 444 F. Supp. 545 (M.D.Pa. 1978), that the actions of Penn State were state actions. This Court said, "the Commonwealth of Pennsylvania and Penn State bear such a close and substantial relationship to each other that the actions of the latter are substantially intertwined with the actions of the former." 444 F.Supp. at 556-557. That decision was affirmed by the Third Circuit. *Benner v. Oswald*, 592 F.2d 174 (3d Cir. 1979). In this case, the Complaint describes a similar close and substantial relationship between Penn State and PSHMC. The Complaint describes how "From its inception PSHMC has been inseparably linked to Penn State University." (Complaint ¶ 11.) Penn State Health, which operates PSHMC was established by Penn State and "share[s] an integrated strategic plan and joint operations, ensuring that research discoveries, educational programs, and patient care remain unified under a single academic mission." (Complaint ¶ 11(b).) Penn State and PSHMC also "maintain a carefully structured governance relationship" and have "joint leadership." (Complaint ¶ 11(c).) This is where the logo and bookstore are important, as PSHMC holds itself out as having a symbiotic relationship with Penn State, ranging from branding to the sale of football-related merchandise.[9] (Complaint ¶ 12.)

---

[9] Defendants correctly suggest that "the branding of t-shirts and stuffed animals" does not "transform[] decisions of private physicians into actions made under color of state law." Def. Br. at 35. But that is not why this is included in the Complaint. Instead, the co-branding is evidence of the symbiotic relationship between PSHMC and Penn State. A privately owned business "selling officially licensed Penn State gear" is not subject to § 1983 liability because PSHMC, unlike the business, "holds itself out as part of the Penn State system." (*Compare* Complaint ¶ 12).

However the separate nature of PSHMC may be described, this has not prevented this Court, in other contexts, from finding that PSHMC is a "state actor" for § 1983 purposes. In other cases, this Court has concluded that PSHMC is a state actor for purposes of § 1983. In *Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F.Supp.2d 745 (M.D.Pa. 2012), for example, this Court found state actions where plaintiffs alleged that employees of PSH violated their constitutional rights when they assisted in a child abuse investigation. 910 F.Supp.2d at 757. This Court reached the same conclusion in another case involving the investigation of child abuse allegations. *Seldomridge v. Penn State Hershey Med. Ctr.*, No. 13-CV-2897, 2014 U.S. Dist. LEXIS 80743, at *10-11 (M.D.Pa. June 12, 2014). *See also Langston v. Hershey Med. Ctr.,* No. 1:15-CV-2027, 2016 U.S. Dist. LEXIS 158792, at *11 (M.D.Pa. Nov. 16, 2016) (no state action where plaintiff claimed that that doctor "violated her constitutional rights when he provided inadequate treatment during her hospitalization").

### c. *Borrell* Does Not Require A Different Result

Defendants rely primarily on *Borrell*, *supra*. There are two problems with this reliance.

First, *Borrell* does not even address the question before this Court: whether the academic officers at Penn State who oversaw the residency program are state actors. *Borrell,* instead, addressed the question of whether a private hospital and its employees

could be considered state actors for purposes of § 1983. In *Borrell* there were three defendants: the private hospital, a hospital nurse anesthetist who managed the clinical component program,[10] and the university's Chair of Nursing who oversaw the program's academic component. Only the hospital and the hospital employee contended that they were entitled to summary judgment because they were not acting under color of state law. There was never any question that the university's Department Chair – who is essentially in the same position as Defendants in this case – was a state actor.[11] *See Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418, 433 (M.D.Pa. 2014); 870 F.3d at 158. The *Borrell* court, thus, only considered whether the hospital employee who managed the clinical component of the program was a state actor and never considered that the employee who held an identical position as Defendants was not a state actor.

Second, the most important fact in *Borrell*, and what ultimately distinguishes *Borrell* from this case, is that the nurse anesthetist program in *Borrell* was operated under a collaboration agreement between a private Hospital, Geisinger Medical Center, and Bloomsburg University, a public university. In this case, the residency program is operated by Penn State, in no small part because PSHMC and Penn State are essentially the same entity. Dr. Jacobs entered the residency program to obtain academic training

---

[10] The university paid a portion of the hospital nurse anesthetist's salary.

[11] The Department Chair was entitled to qualified immunity. Since Defendants do not raise qualified immunity in this Motion, this will not be addressed.

and the academic certification from Penn State for successful completion of its

residency program.  The Complaint alleges that

> The residency program is affiliated with Penn State University, rather than
> PSHMC as a private entity.   Penn State University remains responsible
> for academic coordination, clinical integration, and shared governance.

(Complaint ¶ 56.)  The Residency Program offered by PSHMC is described in Dr.

Jacobs' contract as an accredited "graduate medical education program."  (Complaint ¶

17.)  And, notably, while in Borrell the nurse violated hospital private rules, the rules

that governed Dr. Jacobs' dismissal from the program – described as "due process"

rights – are even housed on the "psu.edu" web site.[12]  (Complaint ¶ 17(d).)

One other important point about *Borrell*:  Defendants breathlessly suggest that

Dr. Jacobs' "claim of state action begins and ends with an overruled case cited in his

now-withdrawn Motion for a Preliminary Injunction."  Def. Br. at 30 *citing Borrell v.*

*Bloomsburg Univ.*, 955 F.Supp.2d 390, 402 (M.D.Pa. 2013).  This statement does not

accurately represent Plaintiff's briefing.  Dr. Jacobs originally cited *Borrell* for the

proposition that Courts in the Third Circuit "have repeatedly recognized that a graduate

student has a property interest protected by procedural due process in the continuation

---

[12] The Court may take notice that in publicly available documents, Penn State admits, "the Health System is controlled by the University."  Penn State University Audited Financial       Statement       (2025),       available       at: https://budgetandfinance.psu.edu/sites/budgetandfinance/files/psu-fy25-audited-financial-statements-final.pdf

of his or her course of study under Pennsylvania law." Plaintiff's Br. in Support of

Motion for Preliminary Injunction at 11.[13]

## C. Dr. Jacobs Was Denied Adequate Procedural Due Process As Required By The Constitution

In determining whether Defendants provided constitutionally adequate due

process, the competing interests of the governmental institution and the individual must

be balanced. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See als*o *Osei v. Temple Univ.,*

518 F. App'x 86, 88 (3d Cir. 2013). The *Mathews* test requires courts to weigh the

following factors: "the private interest that will be affected by the official action"; "the

risk of an erroneous deprivation of such interest through the procedures used, and the

---

[13] Defendants further assert that "The more important holding of this case, however, comes from its subsequent Third Circuit reversal, which Dr. Jacobs does not provide to this Court…" Def. Br. at 30 (double emphasis removed). Defendants use bold, underlined, type to suggest (presumably) that Plaintiff failed to disclose contrary authority. Not so; the "state action" and "property interest" questions are distinct inquiries. *Cf. Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 7 (1978) (whether termination of utility service was state action and question of whether service was property interest are distinct issues). The Third Circuit in *Borrell* never directly addressed the issue for which the case was cited by Plaintiff: whether a resident had a constitutionally protected property interest in continued enrollment in the program. The court only held, on a qualified immunity review (which is different form the 12(b)(6) standard in this Motion), that "Although many cases have concluded that graduate students at public universities have property interests in continuing their education… the district court cases cited cannot clearly establish law for qualified immunity purposes in any event." 870 F.3d at 162. Indeed, subsequent to the Third Circuit decision, courts have continued to rely on *Borrell* for the proposition cited in Plaintiff's Memorandum: graduate student have a constitutionally property interest in the continuation of their course of study. *See e.g. Nkrumah v. Univ. of Pittsburgh,* No. 2:19-cv-1180, 2022 U.S. Dist. LEXIS 65941, at *27 (W.D.Pa. Apr. 8, 2022); *Kostin v. Bucks Community College*, No. 21-850-KSM, 2022 U.S. Dist. LEXIS 57931, at *23 (E.D.Pa. Mar. 30, 2022); *Doe v. White*, 440 F. Supp. 3d 1074, 1087 fn. 11 (N.D.Cal. 2020).

probable value, if any, of additional or substitute procedural safeguards"; and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

The basic elements of due process in the school disciplinary setting require that a student be given some type of notice and an opportunity to be heard by a fair and impartial tribunal. *Goss v. Lopez*, 419 U.S. 565, 579(1975); *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 10-2042, 2011 U.S. Dist. LEXIS 113431, at *8 (E.D. Pa. Sept. 30, 2011); *Snyder v. Millersville Univ.*, No. CV 07-1660, 2008 U.S. Dist. LEXIS 134400, at *3 (E.D. Pa. Jan. 31, 2008). Dr. Jacobs received a hearing and was permitted to explain his conduct. Dr. Jacobs thus, was, as the Supreme Court in *Goss* required, "given some kind of notice and afforded some kind of hearing." *Goss*, 419 U.S. at 579.

*Goss*, however, establishes a generalized bare minimum and is merely the "starting point for analyzing alleged violations of students' procedural due process rights…" *Heyne v. Metro. Nashville Pub. Schs*, 655 F.3d 556, 564 (6th Cir. 2011); *Coronado v. Valleyview Pub. School Dist. 365-U*, 537 F.3d 791, 796 (7th Cir. 2008) ("Other circuits have accepted… that *Goss* provides merely a starting point for due-process analysis in the expulsion context.") (collecting cases).

Defendants misunderstand the nature of a procedural due process challenge. Defendants characterize the claim in this case as follows: Plaintiff "does not allege a

deprivation of process; rather, he alleges he was entitled to different process." Def. Br. at 35. This is true, as far as it goes – Plaintiff in this Complaint does not base his due process claim on an allegation that Defendants failed to follow their own procedures. "The relevant constitutional question is not whether the… Policy was followed to the letter, but whether the process that Plaintiff actually received comported with the requirements of the Due Process Clause." *Taylor v. Bd. of Regents*, No. 1:20-CV-5048, 2022 U.S. Dist. LEXIS 180259, at *24 (N.D.Ga. Oct. 3, 2022), *citing inter alia Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1229-30 (5th Cir. 1985) (noting that due process claims arises when "the constitutional minimum is itself denied or an independent constitutional deprivation is effected").[14] *Cf. Arnold v. Hauswirth*, No. 4:24CV0312, 2024 U.S. Dist. LEXIS 99566, at *20 (N.D.Ohio June 5, 2024) ("The question therefore is not whether the [state agency] is perfectly following its policies, but whether Plaintiff was provided with due process.").

The Complaint alleges that while Dr. Jacobs was provided "a number of 'hearings' and 'appeals'… none of them were fair." (Complaint ¶ 61(b).) The Complaint further alleges that the process provided to Dr. Jacobs was deficient in several ways.[15]

---

[14] Similarly, simply because a school violated its own policies and procedures does not state a claim for a due process violation. *Doe v. University of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016).

[15] Defendants do not suggest that the decision to terminate Dr. Jacobs from the residency program was an academic, as opposed to a disciplinary, decision. This is

### 1. Lack of Cross Examination

"[C]ross-examination is the greatest legal engine ever invented for the discovery of truth." *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987), *quoting* 5 J. Wigmore, Evidence § 1367 at 29 (3d ed. 1940). Dr. Jacobs was never provided the opportunity to cross-examine key witnesses, including the PSHMC employees who drafted the Cybersecurity Report. (Complaint ¶¶ 34(b), 61(b)(iv).)

In the student disciplinary context, a meaningful hearing includes the ability to confront adverse witnesses when the information supplied by those witnesses is the reason for the adverse action and there is a question of credibility to be resolved by the finder of facts. "Accused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'" *University of Cincinnati*, 872 F.3d at 401, 403 ("if a university's procedures are insufficient to make 'issues of credibility and truthfulness… clear to the decision makers,' that institution risks removing the wrong

---

significant because in the case of an academic, rather than a disciplinary, issue, far less stringent procedural requirements need be observed because "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information…" *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 90 (1978). The allegations against Dr. Jacobs are clearly disciplinary because they involve the violation of rules of conduct. *Id.* *Horowitz,* 435 U.S. at 86, 90. The Sixth Circuit has described the following test to distinguish academic and disciplinary decisions: "A decision is disciplinary when the university engages in first-level factfinding to resolve a disputed, objective question about the student's conduct—and the outcome of that inquiry could lead to the student's dismissal or a long suspension." *Endres v. Northeast Ohio Med. University*, 938 F.3d 281, 300 (6th Cir. 2019). Under that test, Dr. Jacobs' dismissal is clearly "disciplinary" because it involved a question about whether he, in fact, sent the Chisty Email.

students, while overlooking those it should be removing."), *quoting Furey v. Temple Univ.,* 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012).  *See also Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir. 1972) ("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing.").  The Third Circuit, in *Doe v. University of Sciences*, 961 F.3d 203 (3d Cir. 2020), held that "the basic elements of federal procedural fairness" includes "a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for  cross-examination of witnesses."[16]

This Court has had a number of opportunities to address this issue.  In *Doe v. Pennsylvania State Univ.*, this Court noted "the importance of cross—examination when the outcome of a disciplinary is ultimately dependent on credibility-based determinations" and held that Penn State's failure to ask questions submitted by a student "may contribute to a violation of [the student's] right to due process.  276 F. Supp. 3d at 309.[17]  In another case, this Court observed that an "embargo on" a hearing

---

[16] *University of Sciences* was a private university and the case involved allegations of sexual misconduct, but the Third Circuit still relied on the constitutional due process requirements described in *Goss.  Id.* at 214-15, *citing Goss*, 419 U.S. at 581.

[17] Defendants suggest that many of the cases cited by Dr. Jacobs in his Motion for Preliminary Injunction briefing "dealt with situations where the university failed to provide a set procedure."  Def. Br. at 37, *citing Doe v. Pennsylvania State Univ.*, *supra; Doe v. Miami Univ.*, 882 F.3d 579, 587 (6th Cir. 2018).  In doing so, Defendants ignore the later decisions from this Court making it clear that cross-examination is constitutionally required where there is an issue of credibility, regardless of whether it is included in a policy.  For example, in *Doe v. Pennsylvania State University*, the school's failure to follow its policy allowing for cross-examination was only important because such a policy –

panel's ability to assess credibility through cross-examination "raises constitutional concerns." *Doe v. Pennsylvania State Univ.*, 336 F. Supp. 3d 441, 450 (M.D.Pa. 2018). More recently, in *Williams v. Pennsylvania State Univ.*, 697 F. Supp. 3d 297, 337-338 (M.D.Pa. 2023), this Court extended the reasoning in *Univ. of the Sciences* to Penn State., observing that "where the university's determination turns on the credibility of witnesses not subject to cross-examination due process issues can arise."

Defendants seek to distinguish these cases by suggesting that cross-examination is "only potentially required if the sole evidence against the accused is in the form of the accuser's testimony – a key distinction not present here." Def. Br. at 38. But that is not the holding of these cases. Instead, these cases stand for the proposition that "if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).[18] This holding is consistent with the Supreme Court's observation that "In almost every setting where important

---

which is not present in this case -- is required by the Constitution. 276 F. Supp. 3d at 310. The other case cited on this issue for Defendants, *Doe v. Miami University,* re-affirmed the Sixth Circuit's prior jurisprudence on cross-examination, but otherwise does not address this issue.

[18] If anything, cross-examination is broader when there is not an allegation by a single accuser, which commonly arises in the context of a sexual assault. In *University of Cincinnati*, the court considered limits on cross-examination because of the potential harm that unfettered cross-examination could pose to victims of sexual assault. 872 F.3d at 403. This concern is not present in this case.

decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). This includes cross-examination not merely of the accuser, but all witnesses. This Court in *Williams v. Pennsylvania State Univ.*, No. 4:20-CV-00298, 2020 U.S. Dist. LEXIS 161970, at *21 (M.D.Pa. Sep. 4, 2020), found a constitutional violation where the decision to suspend a student was founded on evidence from "witnesses who submitted written statements, who did not attend the hearing, and who [the student] could not cross examine." This Court, in later opinion in the same case, essentially rejected the efforts by Penn State to limit cross-examination to certain types of school disciplinary matters, saying "if due process requires that [students] have an opportunity to cross-examine witnesses, then Penn State must provide some mechanism affording [them] the opportunity to do so." *Williams*, 697 F. Supp. 3d at 340.

2. **Defendants Do Not Address The Allegations That They Relied On Secret, Undisclosed, And Redacted Evidence**

Several other due process violations described in the Complaint are not addressed by Defendants.

Dr. Jacobs was not permitted to view all of the evidence in PSHMC's possession or be present when PSHMC employees presented the case against him to the Hearing Panels. The Complaint alleges how, on numerous occasions, Dr. Jacobs requested copies of witness statements, text messages, social media images, and other information that PSHMC had obtained but had not been provided. These requests were refused.

(*See, e.g.,* Complaint ¶ 35(a), 40.)  These, combined and individually, violate his due process rights.  The Supreme Court observed in *Goss* that "'Secrecy is not congenial to truth-seeking…'"  419 U.S. at 580, *quoting Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 168-169 (1951) (Frankfurter, J., concurring).  Courts have been clear that Constitution requires that a student be provided the evidence against him.  *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018).

Dr. Jacobs was also not permitted to present witnesses and evidence, including testimony from the PSHMC employees and his own forensic expert.  (Complaint ¶ 50(c).)  It is not even clear that he was meaningfully permitted to present his own side of the story -- Dr. Ghahramani indicated that Dr. Jacobs' denials before the Clinical Competency Committee were not accepted because he appeared to have been assisted by an attorney instead of speaking extemporaneously; Dr. Ghahramani wrote, "you did not _provide any testimony or explanation in defense of the allegations against you, but rather, submitted an 11-page letter written by your attorneys…"  (Complaint ¶ 35(b).)  Courts have also held that a student "has a right to be heard in his own defense and to be present and present evidence on his behalf."  *Uzoechi v. Wilson*, No. 16-3975, 2018 U.S. Dist. LEXIS 88815, at *26 n.6 (D.Md. May 24, 2018).  *See also Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 491 (D.Md. 2015) (describing this right as one of the "procedural elements [viewed] to determine whether an academic disciplinary proceeding is consistent with due process"); *Flaim,* 418 F.3d at 636 (student has the right to "respond

and defend, which will generally include the opportunity to make a statement and present evidence" and "call exculpatory witnesses").

### 3. *Mathews* And The Sixth Circuit's Opinion In *Endres* Support Denial Of The Motion

The *Mathews* balancing test to determine what procedures due process is required for students leads to the same result.[19]  In this case, Dr. Jacobs alleges that "The decision-makers relied on forensic evidence that was not reliable and supported by sufficient expert testimony."  (Complaint ¶ 61(B)(ii).) The Complaint also alleges that "Dr. Jacobs was not permitted the opportunity to review all of the evidence used against him" including the presentations by PSHMC employees.  Cross-examination and disclosure of evidence, considering Dr. Jacobs' significant interest and the limited burden on Defendants of allowing the extra procedural protections at hearings, would lead to a more reliable outcome.  To pick one example: Dr. Jacobs has established that Defendants' ultimate determination turned on the credibility of the Cybersecurity Report – not merely the truthfulness of the author but also the author's competence. In this case, the Complaint lists "a number of flaws in the Cybersecurity Report" which were apparent even though Dr. Jacobs only received a redacted copy of the report. (Complaint ¶ 26(b)(v).)   "Credibility" typically refers to whether a witness is someone who should be trusted or believed, and a witness's credibility can be attacked in multiple

---

[19] It is often observed that school disciplinary hearings are not criminal trials.  This is a "generalized, though unhelpful observation…" *Flaim v. Med. College of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005).

ways beyond truthfulness. Dr. Jacobs would have had the opportunity to challenge the reliability of the forensic work, as well as the weight and sufficiency of the evidence underlying these opinions on cross-examination. The failure of Defendants to provide this opportunity violates his procedural due process rights and increased the likelihood of an erroneous result. *See* Laurence H. Tribe, *American Constitutional Law*, § 10-13, at 714 (2d ed. 1988) (noting that the "value [of] procedural safeguards" is primarily determined by their potential to minimize "factual error in the application of the relevant substantive rules").

The Sixth Circuit recently addressed a strikingly similar scenario where a student contested his dismissal from medical school. *Endres, supra.* . Following an investigation, the student appeared before the school's professionalism and promotions committees to contest a cheating allegation. A number of problems with the school's hearing process were identified by the student: he was not permitted to view the presentation of the investigator; he was not permitted to cross-examine the investigator; and the committees allegedly relied on evidence from an expert report that was not disclosed to the student. In addressing the claim that the student was not allowed in the room while the investigator presented her allegations to the hearing pane, the court said, "That alone establishes a due process violation…" 938 F.3d at 301. But the Sixth Circuit went further, holding that the medical student's due process rights were also violated when he was initially unable to review and expert report and the school "failed to inform [the student] of the key evidence against him." Without access to this evidence, the

court reasoned, the student could not effectively "present his side of the story" and "could not have responded to what seemed like incontrovertible proof that he was a cheater." 938 F.3d at 302.

Defendants, instead, rely on a number of decisions suggesting that residents who are dismissed for academic reasons are entitled to only "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary conclusion." *Goss,* 419 U.S. at 581. Defendants fail to take into account that while Courts have been appropriately deferential to schools in disciplinary matters, this deference is not without limits, particularly when the alleged misconduct is better characterized as "disciplinary" and not "academic."[20] *Horowitz,* 435 U.S. at 87. *See also Henson v. Honor Comm. of Univ. of Va.,* 719 F.2d 69, 74 (4th Cir. 1983) ("[D]isciplinary proceedings require more stringent procedural protection than academic evaluations, even though the effects of an adverse decision on the student may be the same."); *Endres,* 938 F.3d at 297 (noting the "critical

---

[20] The cases relied upon by Defendants for the claim that Dr. Jacobs' claim "is contrary to established case law" all involved academic, not disciplinary dismissals of residents. *Terzian,* 2023 U.S. Dist. LEXIS 41562, at *3 (resident was terminated for "performance issues relating to medical knowledge, systems-based practice, and interpersonal communication skills"); *Hernandez v. Overlook Hosp.,* 692 A.2d 971, 973 (N.J. 1997) (resident terminated for "academic reasons" including "the Chief Resident's opinion that [resident] lacked the clinical judgment necessary for a second-year resident…"). *Keles v. Bender,* 3d Cir. No. 21-1497, 2022 U.S. App. LEXIS 7373, at *6 (Mar. 18, 2022), also cited by Defendants, involved neither academic *or* disciplinary issues, but arose because the student "never submitted a completed application" to continue his education.

distinction between dismissals for disciplinary misconduct and dismissals for academic underperformance"). [21]

**D.  Plaintiff Should Be Given Leave To Amend To Assert State Law Breach Of Contract Claims**

There is diversity for jurisdiction purpose, even if no federal claims survive. (Complaint ¶ 4(b) (noting that Plaintiff is a New Jersey resident). In the event that the Court determines that there is no viable § 1983 claim, depending on the Court's reasoning, Plaintiff may have viable state law claims consistent with *University of the Sciences, supra* (student alleged a viable breach of contract claim in that contractual promises of fair and equitable treatment to those accused of misconduct required at least an adversarial hearing and the opportunity for the accused to cross-examine witnesses).

---

[21] Defendants cite to several old Fifth Circuit opinions that purport to limit the due process rights of student. Def. Br. at 37, citing *Davis supra; Mahavongsanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir. 1976); *Wright v. Texas Southern University*, 392 F.2d 728, 729 (5th Cir. 1968). The Fifth Circuit has subsequently taken a broader approach to the due process rights in a university setting. In *Walsh v. Hodge,* 975 F.3d 475, 483 (5th Cir. 2020), for example, the Fifth Circuit found a university had violated a professor's due process rights by adjudicating sexual harassment allegations against him without hearing live testimony from the accusing student. In *Van Overdam v. Texas A&M Univ.*, 43 F.4th 522, 530 (5th Cir. 2022), the Fifth Circuit held that a university did not violate the due process rights of a student who was permitted to call witnesses, submit relevant evidence to a neutral panel of administrators, be represented by counsel, and had the opportunity to submit questions to adverse witnesses.

*Doe v. Univ. of the Sciences,* 961 F.3d 203, 205 (3d Cir.2020). Accordingly, in that circumstance, Plaintiff should be granted leave to amend to assert claims consistent with any opinion granting the Motion to Dismiss.

# CONCLUSION

The Motion should be denied.

Respectfully submitted,

FOR PLAINTIFF:

    /s/ Joshua A. Engel
Joshua Adam Engel (Ohio 0075769)
*pro hac vice*
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

    /s/ Daniel Brier
Daniel T. Brier (PA 53248)
Frank J. Brier (PA 73044)
Richard L. Armezzani (PA 322804)
MYERS, BRIER & KELLY, LLP
425 Biden Street, Suite 200
Scranton, PA 18503
(570) 342-6100
dbrier@mbklaw.com
fbrier@mbklaw.com
rarmezzani@mbklaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.8(b)(2), I hereby certify that this document complies with the type-volume limitation. This document contains 8947 words, excluding the table of contents, table of authorities, signature block and caption.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's electronic filing system this June 5, 2026 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel