IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN CONOR JACOBS,

      Plaintiff,

      v.

KARL T. CLEBAK, *et al.*,

      Defendants.

:   Civil No. 1:26-CV-01167
:
:
:
:
:
:
:
:
:
:   Judge Jennifer P. Wilson

**MEMORANDUM**

Plaintiff Brian Conor Jacobs ("Jacobs") was an internal medicine resident at the Penn State Health Milton S. Hershey Medical Center ("the Medical Center"). (Doc. 1, ¶¶ 1, 14.)  The Medical Center dismissed Jacobs from the residency program for hacking into his program director's email account, drafting a fake email revoking his pre-approved vacation time, and sending it to himself mere days before he was scheduled to attend his brother's wedding.  (*Id.* ¶¶ 22, 30.)  Jacobs claims his ex-girlfriend, a nurse manager at the Medical Center armed with his old cellphone and his email password, logged into his account and sent the fake email to stop Jacobs from attending the wedding with another resident as his date.  (*Id.* ¶¶ 21, 28.)

Jacobs's one-count complaint alleges that Defendants Karl T. Clebak, ("Clebak"), Kevin P. Black, ("Black"), and Nasrollah Ghahramani, ("Ghahramani") (collectively, "Defendants")–who are Medical Center physicians

1

and faculty members at the Pennsylvania State University College of Medicine–participated in the disciplinary process that led to Jacobs's ultimate dismissal and violated his Fourteenth Amendment due process rights by dismissing him from the residency program without a fair hearing. (*Id.* ¶¶ 52–64.)  Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  They argue they are not state actors and, even if they are state actors, Jacobs fails to state a due process claim against them.  (Doc. 29, p. 1; Doc. 30, pp. 32–45.)[1]  For the reasons explained herein, the court will deny Defendants' motion to dismiss, Doc. 29.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Jacobs is a licensed physician.  (Doc. 1, ¶ 4.)[2]  He graduated from medical school and entered the internal medicine residency program ("the residency program") in 2023.  (*Id.* ¶ 14.)  Jacobs's initial residency period extended from July 1, 2023, through June 30, 2024.  (*Id.* ¶ 17(a).)  The Medical Center renewed Jacobs's contract for the 2024–2025 and 2025–2026 academic years.  (*Id.*)

Clebak is the Associate Dean for Graduate Medical Education at the Medical Center and the Pennsylvania State University ("Penn State") College of Medicine

---

[1] For ease of reference, the court cites to the page numbers included in the CM/ECF header.

[2] The court draws these facts from Jacobs's complaint because, at the motion to dismiss stage, the court accepts the facts alleged in the complaint as true and construes them in Jacobs's favor. *In re BPS Direct, LLC; Cabela's, LLC Wiretapping Litig.*, 175 F.4th 423, 427 n.1 (3d Cir. 2026) (citing *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 141 (3d Cir. 2024)).

("Penn State College of Medicine").  (*Id.* ¶ 5.)  Clebak is also the "Designated Institutional Official" ("DIO") for the Medical Center and the Penn State College of Medicine.  (*Id.* ¶ 5(a).)  As the DIO, Clebak "is responsible for the oversight of all Graduate Medical Education programs," including Jacobs's residency program.  (*Id.*)  The DIO is also responsible for "ensuring all residency and fellowship programs follow the accreditation standards set by [the Accreditation Council for Graduate Medical Education ("ACGME")]."  (*Id.*)

Black is the Interim Vice Dean for Education Affairs at the Medical Center.  (*Id.* ¶ 6.)  Ghahramani is the Interim Chair of the Department of Medicine for the Penn State College of Medicine.  (*Id.* ¶ 7.)  Jacobs alleges that all three Defendants hold faculty appointments at Penn State.  (*Id.* ¶ 57.)

Defendants' motion to dismiss raises issues about the organizational structure of the Medical Center, Penn State College of Medicine, and their affiliates, the nature of Jacobs's residency program, and the disciplinary process the relevant institutions employed before dismissing Jacobs.  (*See* Doc. 30, pp. 33–34.)  Therefore, the court discusses each of those topics before recounting the events that led to Jacobs's dismissal and the instant suit.

**A. The Relationship Between the Medical Center, Penn State, Penn State College of Medicine, and Penn State Health**

Four institutions or entities—the Medical Center, Penn State, Penn State College of Medicine, and Penn State Health—and their relationships with each other are central to Jacobs's claims. Jacobs claims that "from its inception, [the Medical Center] has been inseparably linked to [Penn State]." (Doc. 1, ¶ 11.) Penn State's main campus is in State College, Pennsylvania, but both the Penn State College of Medicine and the Medical Center are based in Hershey, Pennsylvania. (*Id.* ¶ 11(a).) Jacobs avers that "the Medical Center functions as an employer and healthcare operation, while Penn State University provides academic credentials, titles, and scholarly standing." (*Id.* ¶ 10.) And in 2014, the Penn State Board of Trustees established Penn State Health, "a multi-facility health system" that "cement[ed] the institutional relationship" between Penn State and the Medical Center. (*Id.* ¶ 11(b); Doc. 36, p. 1.)

Jacobs recognizes that the Medical Center "operates as the flagship hospital of a legally distinct health system owned by [Penn State]," but he claims that it is closely tied to Penn State through the Penn State College of Medicine. (*Id.* ¶ 11(c).) The Medical Center shares an integrated strategic plan and joint operations with the Penn State College of Medicine, and it hosts students from Penn State's nursing and health-related programs. (*Id.* ¶ 11(b).) The Medical Center "holds

itself out as part of the Penn State system" through logo design and merchandising. (*Id.* ¶ 12.)

Medical Center physicians may serve as Penn State College of Medicine faculty, and there are multiple categories of faculty appointments available to these physicians. (*Id.* ¶ 13.) Therefore, "a clinician can be employed and paid by the Medical Center while simultaneously holding an academic title . . . conferred by Penn State." (*Id.*) Penn State does not pay the salaries of Medical Center physicians who serve on the Penn State College of Medicine faculty, but those faculty members have full Penn State faculty titles and "enjoy the rights, privileges, and academic standing that accompany the designated rank." (*Id.* ¶ 13(a).) Moreover, Medical Center physicians who are also faculty members may hold "tenure-line appointments." (*Id.*) If a physician's employment at the Medical Center ends, so does their Penn State College of Medicine faculty appointment. (*Id.*) And if their faculty appointment at the Penn State College of Medicine ends, so does their employment at the Medical Center. (*Id.*)

### B. The Residency Program

The Medical Center's Internal Medicine Residency Program ("the residency program") is an extension of medical education and is meant to provide an educational experience for its participants. (*Id.* ¶ 15.) Jacobs alleges that the residency program is "affiliated with Penn State University, rather than [the

Medical Center] as a private entity." (*Id.* ¶ 56.) Jacobs claims the "primary purpose" of the residency program is academic training and certification; "[t]he certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas." (*Id.* ¶ 16.)[3] Jacobs's residency contract describes the residency program as a "graduate medical education program" that is accredited by the Accreditation Council for Graduate Medical Education. (*Id.* ¶ 17.)

The contract also states that, as a resident, Jacobs had to follow all "Penn State Health and Hospital Graduate Medical Education and Human Resources policies." (*Id.* ¶ 17(c).) And it informed Jacobs that if he were dismissed or suspended from the program for an academic or disciplinary infraction, he could

---

[3] After Defendants' motion to dismiss became ripe, they filed a motion alleging that Jacobs submitted a complaint with the Pennsylvania Human Relations Commission ("PHRC") "arising out of events that occurred during the residency at issue" and requesting that the court consider that complaint in resolving the instant motion to dismiss. (Doc. 37, Doc. 40, pp. 3, 5.) In his PHRC complaint, Jacobs claims he was an employee of the Medical Center. (Doc. 40, pp. 3–4.) Defendants argue this "adm[ission]" demonstrates that Jacobs's "theory of state action is a sham, as he was employed by a distinct corporate entity separate and apart from Penn State University." (*Id.* at 3, 5.) In response, Jacobs claims the court should not consider the PHRC complaint at the motion to dismiss stage, and among other arguments, explains that he filed the complaint as a form of alternative pleading to "protect his rights in the event that the Court agrees with Defendants that PSHMC is not a state actor." (Doc. 41, p. 5.) Particularly at the motion to dismiss stage, and given Jacobs's alternative pleading explanation, the court places no weight on the PHRC complaint for the purpose of resolving this motion.

"utilize the process outlined in the Graduate Medical Education Grievance and Due Process Policy . . . ."  (*Id.* ¶ 17(d).)

### C. The Graduate Medical Education Grievance and Due Process Policy

Jacobs attaches a copy of the Graduate Medical Education Grievance and Due Process Policy ("Due Process Policy"), which lays out the appeals process for a resident who suffers an adverse disciplinary or academic action.[4]  (Doc. 1-1, pp. 3–4.)  When a resident suffers specific adverse consequences like dismissal from their program, the resident may request "Program-Level Review."[5]  (Doc. 1, ¶ 19(d); Doc. 1-1, p. 4.)  Program-Level Review gives the resident an opportunity to present their appeal in person to the Medical Center's Clinical Competency Committee ("CCC").  (Doc. 1-1, p. 4.)  The resident may present both written and oral statements in support of their appeal.  (*Id.* at 4–5.)

If the CCC upholds the initial disciplinary decision and the resident's program director is not a member of the CCC, the resident may appeal to their

---

[4] The court may consider exhibits attached to the complaint, matters of public record, and documents "*integral to to or explicitly relied* upon in the complaint . . ." when ruling on a motion to dismiss.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (first quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993); and then quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)).  Moreover, the court may consider any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *PBGC v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993).

[5] The Program-Level Review process applies to any decision "resulting in the suspension or dismissal from the training program, non-promotion to the next level of training, or the non-renewal of the Resident Agreement."  (Doc. 1-1, p. 4.)

program director.  (*Id.* at 5.)  If the resident's program director is a member of the CCC or the program director upholds the CCC's decision, the resident may appeal to their department chair.  (*Id.*)

If the department chair again upholds the original decision, Program-Level Review ends, and the resident has seven days to seek Graduate Medical Education-Level Review ("GME Review").  (*Id.*)   Under that process, a dismissed or suspended resident first meets with a Graduate Medical Education Appeals Board ("GME Board") that includes a senior resident or fellow, two senior faculty members, a program director, and a representative from the Dean's office: either the Vice Dean for Educational Affairs, the Associate Dean for Graduate Medical Education or DIO, or the Associate DIO.  (*Id.* at 6.)  The members of the GME Board are not members of the resident's department or program.  (*Id.*) The GME Review process proceeds as follows:

> The resident/fellow will be afforded the opportunity to present any relevant information in reference to the dismissal or suspension during this time frame, including oral and written statements in support of the appeal.  The members of the [GME Board] will have access to all relevant documents, including formative and summative evaluations and other assessments of the trainee in question during their discussions and deliberations.   The Department Chair or designee shall be responsible for presenting evidence in support of the dismissal or suspension.   Specific procedures applicable to the appeal may be adopted by the Appeal Board and furnished to the resident/fellow and Department Chair.  The decision of this GME Appeals Board will be presented, in writing, to the resident/fellow within (7) days of the meeting, concluding the GME Level Review and Grievance Review Process[.]

8

(Doc. 1-1, p. 6.) Jacobs notes that the Due Process Policy does not provide the resident an opportunity to "review all evidence considered by decision-makers or cross-examine adverse witnesses." (Doc. 1, ¶ 19(f).)

### D. Jacobs's Dismissal

With this background in place, the court turns to the events preceding Jacobs's dismissal from the residency program. Before the fall of 2025, Jacobs's residency program supervisors at the Medical Center rated his performance "satisfactory" and described him as "a resident who demonstrates maturity, sound clinical reasoning, and patient-centered communication." (Doc. 1, ¶ 20.) Faculty members called him a reliable and cooperative leader. (*Id.*)

### 1. On the Eve of His Brother's Wedding, Jacobs Receives a Suspicious Email.

Jacobs planned to serve as the best man at his brother's wedding. (Doc. 1, ¶ 22.) But three days before the wedding, on October 8, 2025, he received an email from his supervisor, Dr. Alia Chisty ("Chisty"), that purported to revoke the previously approved time off he had requested so he could attend the wedding. (*Id.* ¶¶ 22–23.) The email's subject line said "URGENT: REVOCATION OF VACATION TIME" and its body read:

> Dear Dr. Jacobs,
>
> We hope this email finds you well. In our ACGME this afternoon, you were found to be in violation of the number of work hours required of you for residency. As you know according to ACGME rule VD.6 . . .

you are required to work a certain number of days per year in order to be incompliance with residency requirements. Due to your EXCESSIVE use of vacation time to engage in fellowship interviews, you have fallen significantly below the required number of hours for this month. As a result, the Committee of Professional Development and Clinical Competence have no choice but to revoke the remainder of your vacation time from 10/9/2025 through 10/13/2025. We understand that this is a stressful time, but we encourage you to find other means of participating in fellowship interviews. You will be required to participate in night float during this time in order to cover for your colleagues who have been forced to cover for you during your excessive absences. If you have any questions or concerns about this policy please do not hesitate to reach out to the office of General Medical Education. Thank you for your attention to this matter.

Sincerely,

Dr. Chisty and Internal Medicine Chiefs

(*Id.* ¶ 23.)[6] Judging by its "obvious errors," Jacobs decided the email was a phishing attempt, ignored it, and went to the wedding. (*Id.* ¶ 25.)

Jacobs was partially correct; the Medical Center Office of Cybersecurity confirmed that Chisty did not send the fake email.[7] (*See id.* ¶¶ 26, 27.) Jacobs alleges that his ex-girlfriend Heather Zayas ("Zayas"), a nurse manager at the Medical Center, is responsible for sending the fake email. (*Id.* ¶ 27.) Zayas was

---

[6] The court refers to this email as the "fake email."

[7] The Office of Cybersecurity created a timeline demonstrating that Jacobs's email account drafted and sent the fake email to itself and then forwarded that email to Jacobs's other email accounts. (Doc. 1, ¶ 26(b).) Jacobs disputes the validity and comprehensiveness of this timeline and the Office of Cybersecurity's ultimate report on the fake email incident because the office did not adequately consider whether someone other than Jacobs could have written the email using his account. (*See id.* ¶ 26(b)(v).)

allegedly "upset" that Jacobs had invited Dr. Victoria Yin ("Yin"), a fellow resident, to the wedding as his guest.  (*Id.* ¶ 28.)  To stop Jacobs from attending the wedding, Zayas used his old iPhone without his permission, logged into his email account, and sent him the fake email.  (*Id.* ¶ 27.)[8]  Jacobs claims Zayas admitted that she wrote and sent the fake email on multiple occasions.  (*Id.* ¶¶ 29(b)–(d).)

### 2.  The Medical Center Dismisses Jacobs.

The Medical Center placed Jacobs on administrative leave and forced him to leave the ICU on October 21, 2025.  (Doc. 1, ¶ 30.)  The Medical Center alleged that he had hacked into Chisty's email account and sent himself the fake email.  (*Id.*)  A Medical Center human resources representative interviewed Jacobs twice the following week and told Jacobs the Medical Center had "conclusive evidence" that Jacobs sent the email.  (*Id.* ¶ 31.)

The Medical Center dismissed Jacobs from the residency program on October 30, 2025.  (*Id.* ¶ 32.)    Jacobs received a letter several days later explaining that he had "violated a policy about dishonesty in communication" by writing the fake email.  (*Id.* ¶ 32.)  The Medical Center did not share details about

---

[8] Jacobs alleges that Zayas wrote the email as part of a "scheme" to "harass and embarrass" him. (Doc. 1, ¶ 27.)  He claims the scheme involved, among other things, Zayas using Jacobs's old phone to gather the contact information of "other women at Penn State" and arranging to meet with those women "the week before the wedding to discuss a plan of action against" Jacobs.  (*Id.* ¶¶ 27–29.)  Jacobs also included screenshots in his complaint that purport to show Zayas and others forming a plan to mislead the Medical Center's investigation into the fake email incident. (*Id.* ¶ 29(d)(ii)–(v) (demonstrating that Zayas messaged "just so everyone's on the same page I'm chalking all of that up to pregnancy and my emotional state.  Our story is still good").)

its investigation of the fake email incident with Jacobs before it dismissed him. (*Id.* ¶ 33.)

### 3.  Program-Level Review Affirms Jacobs's Dismissal.

Jacobs appeared before the CCC for his Program-Level Review on November 11, 2025.  (Doc. 1, ¶ 34.)  The CCC denied Jacobs's requests to review the information and evidence provided to the CCC, hear the case presented against him by a Medical Center employee, and cross-examine the witnesses who testified against him.  (*Id.* ¶¶ 34(a)–(b).)  Jacobs had fifteen minutes to present to the CCC. (*Id.* ¶ 34(c).)

The CCC ultimately rejected Jacobs's Program-Level Review appeal.  (*Id.* ¶ 35.)  Ghahramani, who "oversaw . . . Jacobs's Program-Level Appeal," told Jacobs that the Committee reached its decision because of "two verbal assertions by [Medical Center] HR staff and counsel . . . ."  (*Id.* ¶ 35(a).)  The first assertion was that "Jacobs and his counsel had been given all the evidence in this case . . . ," and the second assertion was that the Medical Center Office of Cybersecurity's report ("cybersecurity report") about the fake email incident showed that Jacobs used multi-factor authentication, including facial recognition, "shortly before the fraudulent email was drafted."  (*Id.*)  Jacobs claims both assertions are false because counsel for the Medical Center "refused" to provide any evidence besides a redacted version of the cybersecurity report and because the cybersecurity report

12

does not mention multi-factor authentication. (*Id.*) Ghahramani later sent Jacobs a letter that "indicated [Jacobs's] denials were not accepted because he appeared to have been assisted by an attorney instead of speaking extemporaneously." (*Id.* ¶ 35(b).)[9]

In late December 2025, Ghahramani informed Jacobs that the Program-Level Review of his dismissal would continue; the next step was an appeal hearing before Ghahramani, who was Jacobs's department chair. (*Id.* ¶¶ 38, 42; *see* Doc. 1-1, p. 5.) Ghahramani told Jacobs that the Medical Center had "witness statements; text message screenshots from witnesses; pictures from Instagram; the Cybersecurity Incident Report, and work schedules." (Doc. 1, ¶ 38.) Jacobs requested that evidence, but the Medical Center only provided a redacted copy of the cybersecurity report. (*Id.* ¶¶ 39–40.)

---

[9] After Jacobs appeared for his Program-Level Review, his attorney contacted the Medical Center's attorney and told them Jacobs had new information from a Medical Center employee suggesting that "events relating to [Jacobs's] appeal may involve criminal behavior, possibly by multiple [Medical Center] employees." (Doc. 1, ¶ 36.) The Medical Center reiterated that Jacobs was not entitled to legal representation during the Program-Level Review process and "expressed frustration" that Jacobs's attorney only provided "selective screenshots of text messages" to prove Jacobs's innocence. (*Id.* ¶ 36(a).) Around the same time, Dr. Rebecca Bascom, Jacobs's academic mentor, wrote a letter to Ghahramani suggesting that Jacobs had been sexually harassed by another Medical Center employee whom Bascom believed suffered from "erotomanic psychotic delusion." (*Id.* ¶ 37(a).) Bascom also told Ghahramani that "identity theft is difficult to defend against" and "urged" the medical center to "ask tough questions and show flexibility in seeking solutions." (*Id.* ¶ 37(c).) Bascom later sent another letter to Ghahramani stating that she believed Jacobs had been "framed" and offering to appear before "the committee" in support of Jacobs. (*Id.* ¶ 47(a).) The Medical Center requested a meeting with Bascom, but when she asked about the purpose of the meeting, the Medical Center told her that it presumed she meant to withdraw her support of Jacobs because she refused to meet. (*Id.* ¶ 47(b).)

Jacobs's hearing before Ghahramani took place on January 22, 2026. (*Id.* ¶ 42.) Again, Jacobs alleges that the Medical Center's counsel told Ghahramani that Jacobs had all the evidence he requested and that he had used multifactor authentication shortly before the fake email was drafted. (*Id.* ¶ 42(a).) And again, the Medical Center prevented Jacobs from hearing the case presented against him or cross-examining witnesses, and he had only a limited amount of time to present. (*Id.* ¶ 42(b)–(c).)[10] Ghahramani denied Jacobs's appeal, and the Program-Level Review ended. (*Id.* ¶ 44.)

### 4. The GME Board Denies Jacobs's Appeal, and he Files Suit.

Jacobs's appeal progressed to the GME Board. (Doc. 1, ¶ 45.) When he received the GME Board's agenda, he emailed the GME Board coordinator and objected to "a number of 'due process violations.'" (*Id.*) First, he claimed he had been told that he could not present witness testimony and that he had no time to gather witnesses before the hearing even though the Medical Center's representative would present three witnesses. (*Id.* ¶ 45(a).) Second, he claimed that he lacked sufficient time to present his evidence. (*Id.* ¶ 45(b).) Third, he again objected to the fact that he had not seen the evidence that would be presented

---

[10] In February 2026, Jacobs participated in "a polygraph exam administered by licensed investigator." (Doc. 1, ¶ 43.) The investigator asked whether Jacobs "composed the October 8 email or accessed his supervisor's account." (*Id.*) The test recorded "[n]o reactions indicative of deception . . . ." (*Id.*)

against him.  (*Id.* ¶ 45(c).)  Fourth and finally, Jacobs objected that Clebak would speak on behalf of the Medical Center while simultaneously serving as a member of the GME Board.  (*Id.* ¶ 45(d).)

The hearing before the GME Board occurred on March 22, 2026.  (*Id.* ¶ 50.) Like before, Jacobs could neither be present to hear the case presented against him nor cross-examine any adverse witnesses, had a limited amount of time to present his case, and was not permitted to call witnesses.  (*Id.* ¶ 50(a)–(c).)  Two days later, Clebak told Jacobs that the GME Board had decided to uphold "the prior decision to terminate [Jacobs's] employment as a Resident" and that the decision "is final and concludes the GME Level Review and Grievance Review Process pursuant to the Penn State Milton S. Hershey Medical Center Graduate Medical Education Grievance and Due Process Policy."  (*Id.* ¶ 51.)

Jacobs sued Defendants on May 1, 2026.  (Doc. 1.)  He brings a single 42 U.S.C. § 1983 claim alleging that Defendants violated his Fourteenth Amendment right to due process by dismissing him from the residency program without a fair hearing and appeals process.  (*Id.* ¶¶ 52–64.)  He sues Clebak in his official capacity for injunctive relief and in his individual capacity for damages.  (*Id.* ¶ 5(c).)  He sues Black in his official capacity for injunctive relief.  (*Id.* ¶ 6(b).)  And he sues Ghahramani in his official capacity for injunctive relief and his individual capacity for damages.  (*Id.* ¶ 7(b).)

Defendants filed a motion to dismiss Jacobs's complaint and an accompanying brief in support on May 22, 2026.  (Docs. 29, 30.)  Jacobs filed a brief in opposition on June 5, 2026.  (Doc. 33.)  And Defendants filed a reply brief on June 12, 2026.  (Doc. 35.)  Therefore, the motion to dismiss, Doc. 29, is ripe for disposition.

## JURISDICTION AND VENUE

Jacobs brings a Fourteenth Amendment Due Process Clause claim against Defendants via 42 U.S.C. § 1983, so the court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  Venue is proper in the Middle District of Pennsylvania because Jacobs alleges that a substantial part of the events or omissions that give rise to his claim occurred in this district.  28 U.S.C. § 1391(b)(2).

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to

16

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3rd Cir. 2020).

**DISCUSSION**

Defendants argue that the court should dismiss Jacobs's due process claim for two reasons.  (*See* Doc. 30, pp. 31–32.)  First, they claim Jacobs has not sufficiently alleged that they are state actors, so they cannot be sued for violating his due process rights.  (*See id.* at 34–40.)  Second, they argue that Jacobs's complaint fails to state a procedural due process claim.  (*See id.* at 40–44.)  They also argue that the court should dismiss Jacobs's complaint with prejudice because any proposed amendment would be futile.  (*See id.* at 44–45.)  The court addresses each argument in turn.

### A. Defendants Acted Under State-Granted Authority When They Affirmed Jacobs's Dismissal From the Residency Program.

Jacobs brings a 42 U.S.C. § 1983 claim under the Due Process Clause of the Fourteenth Amendment.  (*See* Doc. 1, ¶¶ 52–64).  The Due Process Clause of

17

Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. To state a procedural due process claim, a plaintiff must plead the following three elements: (1) they were deprived of life, liberty, or property; (2) by a state actor; (3) without due process of law.  *Parker v. N.J. Motor Vehicle Comm'n*, 158 F.4th 470, 481 (3d Cir. 2025) (first citing *Reed v. Goertz*, 598 U.S. 230, 236 (2023); then citing *Blum v. Yaretsky*, 457 U.S. 991, 1002–03 (1982); and then citing U.S. Const. amend. XIV, § 1), *petition for cert. docketed*, No. 25-1351 (U.S. Jun. 4, 2026). The parties' first dispute relates to the second element—whether Defendants are state actors.  (*See* Doc. 30, pp. 34–40.)[11]

### 1.  State Action Standard

The Fourteenth Amendment applies to state actors, not private citizens. *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (quoting *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)), *cert. denied sub nom. Borrell v. Richer*, 584 U.S. 993 (2018).  And 42 U.S.C. § 1983 "holds wrongdoers liable for violating

---

[11] Defendants do not meaningfully dispute that Jacobs has a property or liberty interest in continuing the residency program.  (*See* Doc. 30, pp. 40–41 (arguing that, if the court finds that Defendants are state actors in this context, Jacobs's due process claim still fails because he has not sufficiently alleged he was denied "an owed form of process")).  Jacobs alleges that he has a protected "liberty or property interest in his continued enrollment in the residency program at [the Medical Center]," and that discipline from the Medical Center and Defendants, "implicates" his property interest in continuing his medical education and his liberty interest in his reputation and integrity.  (Doc. 1, ¶ 58(a)–(c).)  Because Defendants do not dispute those allegations or present argument suggesting that Jacobs lacks those interests, the court assumes Jacobs has properly pleaded that element of his due process claim.

plaintiffs' rights" when those wrongdoers act "under color of state law." *Boyd v. Shriners Hosps. for Child.*, No. 25-1183, 2026 WL 1005549, at *2 (3d Cir. Apr. 14, 2026) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)). A state actor and an individual acting under color of state law are the same. *See Borrell*, 870 F.3d at 160 (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)). So, to state a claim against defendants, Jacobs must sufficiently allege that they are state actors. *See id.* at 160; *Parker*, 158 F.4th at 481.

To determine whether an individual or an entity is a state actor, the court looks beyond mere labels such as an individual's employment or an entity's partnerships or branding. *See Kach*, 589 F.3d at 646 (noting that the Supreme Court's tests for deciding whether state action exists are "fact-specific") (quoting *Groman*, 47 F.3d at 638); *Borrell*, 870 F.3d at 160–61 (holding that a defendant who was jointly employed by a private hospital and a public university was not automatically a state actor because of his position at the university). It asks whether the state "exercised control" over the specific conduct that gave rise to the plaintiff's constitutional claim. *Wang v. Univ. of Pittsburgh*, --- F.4th----, No. 25-1816, 2026 WL 1959171, at *13 (3d Cir. July 7, 2026) (quoting *Kach*, 589 F.3d at 649). "People and business[es] count as state actors when the state encourages or joins in the activity, or is 'integrally related' to the actor, so that the 'source fairly

can be said to be the state.'"  *Id.* (quoting *Leshko v. Servis*, 423 F.3d 337, 340 (3d

Cir. 2005)).

When the state's involvement in the challenged conduct or activity is not

clear, the court employs "three broad tests generated by Supreme Court

jurisprudence to determine whether state action exists."  *Borrell*, 870 F.3d at 160

(quoting *Kach*, 589 F.3d at 646).  They are:

> (1) [W]hether the private entity has exercised powers that are
> traditionally the exclusive prerogative of the state; (2) whether the
> private party has acted with the help of or in concert with state officials;
> and (3) whether the state has so far insinuated itself into a position of
> interdependence with the acting party that it must be recognized as a
> joint participant in the challenged activity.

*Kach*, 589 F.3d at 646 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142

(3d Cir. 1995)) (citation modified).  The United States Court of Appeals for the

Third Circuit used variations of these tests to determine whether individuals who

are simultaneously employed or appointed by both public universities and private

hospitals are state actors in at least two precedential decisions.  In *Borrell v.*

*Bloomsburg University*, the plaintiff was a graduate student in a nurse anesthetist

program at Bloomsburg University, a public university.  870 F.3d at 157.

Bloomsburg and Geisinger Medical Center, a private hospital, partnered to create

the program.  *Id.*  Geisinger ran the clinical training section of the program while

Bloomsburg offered students classroom instruction.  *Id.*  Both Geisinger and

Bloomsburg employed the director of the program and paid portions of his salary.

*Id.* at 158.  The plaintiff sued the director and other officials after the director dismissed her from the program for refusing to take a drug test.  *Id.* at 158–59. She alleged the director, Geisinger Medical Center, and others violated her due process rights for failing to offer her a pre-deprivation hearing before dismissing her from the program.  *Id.*  The director argued he was not a state actor, so the plaintiff could not state a § 1983 claim against him.  *See id.* at 160.

The court held that neither the existence of a partnership between Geisinger Medical Center and Bloomsburg University nor the director's dual employment for those entities made the director's decision to fire the plaintiff state action.  *Id.* at 160.[12]  Instead, it asked whether the director wore "his Geisinger hat or his Bloomsburg hat" when he dismissed the plaintiff.  *Id.*  The director decided to dismiss the plaintiff because she violated the hospital system's preexisting drug testing policy and because he sought to maintain nursing standards at the hospital, and the hospital had the unilateral authority to exclude a nurse anesthetist program student from participating in clinical training.  *Id.* at 161.  Thus, the director acted as Geisinger employee, not a state actor, and there was no evidence that Bloomsburg had exercised control over the plaintiff's dismissal.  *Id.* at 161–62.

---

[12] The fact that the plaintiff's dismissal notice was printed on joint Geisinger Medical Center and Bloomsburg University letterhead and featured a Bloomsburg official's signature did not change the court's analysis, either.  *Borrell*, 870 F.3d at 161.  And although the Chair of Nursing agreed with the director's decision and signed the dismissal letter, the court held that these facts did not make the director a state actor because "[a]ction taken by private entities with the *mere approval or acquiescence* of the State is not state action."  *Id.* (quoting *Kach*, 589 F.3d at 649).

In *Wang v. University of Pittsburgh*, the plaintiff was simultaneously a professor at the University of Pittsburgh's medical school and a cardiologist at the University of Pittsburgh Medical Center hospital system. *Wang*, 2026 WL 1959171, at *1. After he published an article criticizing race-based affirmative action in the medical school admissions process, his bosses demoted him. *Id.* at *2–3. Relevant here, he sued several defendants who were also medical school faculty members and hospital employees under 42 U.S.C. § 1983 alleging First Amendment retaliation. *Id.* at *2, *4, *13.

Like in *Borrell*, the court in *Wang* held that those defendants wore their "hospital-system hats" when they demoted the plaintiff. *Id.* at *13. It explained that the Defendants did not consult with the university before demoting the plaintiff, their public statements about the plaintiff's article were made on behalf of the hospital network, and any decisions they made barring the plaintiff from interacting with the university's medical school students were made without authority and therefore had no true effect. *Id.* at *13–14. And although one defendant who served as the chair of the medical school's Department of Medicine and the head of training at the hospital system defended the decision to demote the plaintiff, that defendant played no active role in depriving the plaintiff of his First Amendment rights through demotion. *Id.* at *14. Therefore, the court found the plaintiff failed to establish state action. *Id.*

22

The Third Circuit decided *Wang* after the parties in this case filed their briefing on the motion to dismiss. *See id.* at *1.  But Jacobs and Defendants vigorously disagree over how the court should apply *Borrell* to Defendants' motion to dismiss and whether Defendants qualify as state actors.  (*Compare* Doc. 30, p. 34 *with* Doc. 33, pp. 18, 25–28.)

### 2.  The Parties' State Action Arguments

Defendants argue that Jacobs merely alleges a "symbiotic relationship" between Penn State and the Medical Center, and under *Borrell*, that is not enough to properly plead that Defendants are state actors.  (Doc. 30, pp. 34–35.)

Defendants point to Jacobs's allegations that Penn State and the Medical Center were joint participants in managing Jacobs's residency program and that Defendants are state officials because of their Penn State College of Medicine faculty appointments.  (Doc. 1, ¶¶ 56–57; Doc. 30, pp. 37–38.)  Under *Borrell*, Defendants argue, that is not enough to establish state action.  (Doc. 30, p. 38.)  In fact, in *Borrell*, the Third Circuit found that the plaintiff failed to establish state action even though the facts of that case suggested a more extensive entanglement between the university and the hospital than Jacobs alleges here.  (*Id.* at 38 (citing *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418, 435 (M.D. Pa. 2014)) (arguing that, in *Borrell*, the plaintiff alleged that the hospital system and the university shared revenue and jointly drafted "literature, marketing materials, and codes of

23

conduct").)[13]  Defendants argue that their  faculty titles at the Penn State College of

Medicine and the Penn State merchandise on display in the Medical Center's gift

shop do not make them state actors.  (*Id.* at 38–40.)  This is because the Medical

Center's connection with Penn State does not automatically make Defendants state

actors in their role as Medical Center physicians.  (*Id.* at 39 (quoting *Untracht v.*

*Fikri*, 454 F. Supp. 2d 289, 324 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir.

2007)).

In response, Jacobs broadens the state action discussion beyond *Borrell*.

(*See* Doc. 33, p. 10.)   He argues that the Medical Center has a "dual nature" and is

not a purely private institution; it provides residents employment while Penn State

gives them academic credentials.  (Doc. 33, pp. 16–17.)  Moreover, his complaint

asserts that he is a member of a "graduate medical education program," not an

employee of a private entity.  (*Id.* at 17.)  Because Penn State's academic

administrators "are required to comply with constitutional due process mandates . .

."  and Defendants acted as those administrators in the graduate medical education

context, they are state actors, Jacobs argues.  (*Id.* at 17.)

---

[13] Defendants argue that, just as the plaintiff in *Borrell* was dismissed from her clinical program for violating Geisinger's drug testing policy, "Jacobs's dismissal was based on a violation of [the Medical Center's] 'Graduate Medical Education and Due Process Policy . . . .'" (Doc. 30, p. 38.) But the Due Process Policy outlined the procedure for Jacobs's Program-Level Review and GME Review; he was not dismissed from his residency program for violating it.  (Doc. 1, ¶¶ 32, 51.)

Next, Jacobs argues that Defendants are state actors under the "acting in concert" test described in *Kach*, 589 F.3d at 646.  (Doc. 33, pp. 18–23.)  Invoking *Borrell*, he argues the complaint demonstrates that Defendants were state actors because they, as "Penn State faculty, acting in an academic capacity, directed, approved, and ratified the investigatory or disciplinary decisions at issue."  (*Id.* at 19–20.)  He claims Clebak, Black, and Ghahramani each wore their "Penn State faculty hats" when they affirmed the dismissal of Jacobs because of their academic positions.  (*Id.* at 20.)  He argues that many of the cases Defendants cite in which physicians with faculty appointments were not considered state actors are distinguishable because they dealt with "situations where faculty were wearing the 'hats' of medical staff reviewing other physicians, not as educators disciplining students in residency programs."  (*Id.*)  Moreover, Jacobs claims his acting-in-concert argument is bolstered by the fact that "residents are different from hospital staff or employees."  (*Id.* at 21.)  Although hospitals pay residents for their work, Jacobs argues that residents have a protected interest in their status as a resident because a residency is merely an extension of graduate medical education.  (*Id.* at 21–22.)

Moving on from his acting-in-concert discussion, Jacobs claims application of the "symbiotic relationship test" also proves Defendants are state actors.  (*Id.* at 23); *see Kach*, 589 F.3d at 646.  He argues that, in *Benner v. Oswald*, this court

held that "the actions of Penn State were state actions" because "the Commonwealth of Pennsylvania and Penn State bear such a close and substantial relationship to each other that the actions of the latter are substantially intertwined with the actions of the former."  444 F. Supp. 545, 556–57 (M.D. Pa. 1978), *aff'd*, 592 F.2d 174 (3d Cir. 1979); (Doc. 33, p. 24.).  A similar closeness exists between Penn State and the Medical Center, he claims, so the Medical Center is, like Penn State, a state actor.  (Doc. 33, p. 24.)  Jacobs points to his allegation that Penn State Health and the Medical Center share an "integrated strategic plan and joint operations," and that Penn State and the Medical Center share leadership and a "carefully structured governance relationship."  (Doc. 1, ¶ 11(b)–(c); Doc. 33, p. 24.)  Through branding and merchandising, the Medical Center "holds itself out as having a symbiotic relationship with Penn State . . . ."  (Doc. 33, p. 24.)  Moreover, this court has held that Medical Center physicians were state actors in other contexts, so it should do the same here.  (*Id.* at 25); *See Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F. Supp. 2d 745, 757–58 (M.D. Pa. 2012) (finding that a plaintiff adequately alleged that Medical Center physicians were state actors because they assisted authorities conducting a child abuse investigation).

Finally, Jacobs argues that *Borrell* does not prevent the court from finding that Defendants qualify as state actors in this context for two reasons.  (Doc. 33, p.

26

25.)  First, he notes that in *Borrell*, there was "never any question" that Bloomsburg University's Chair of Nursing qualified as a state actor, and the Third Circuit held she was entitled to qualified immunity against the plaintiff's due process claim.  (*Id.* at 26.)  He argues Defendants occupy a role similar to that of the Chair of Nursing, so they too qualify as state actors.  (*Id.*)  Second, he argues the complaint's allegations demonstrate that Penn State and the Medical Center "are essentially the same entity."  (*Id.* at 25–26; Doc. 1, ¶ 56.)  Thus, he claims his case is different from the nurse anesthetist program in *Borrell* because Geisinger Medical Center and Bloomsburg University operated that program under a collaboration agreement.  (Doc. 33, pp. 26–27.)

In reply, Defendants urge the court to take judicial notice of the Medical Center's status as a "domestic, nonprofit corporation" and that it is owned by Penn State Health, which is also a nonprofit corporation.  (Doc. 35, pp. 6–7.)  They also point to a series of documents they read as refuting Jacobs's claim that he was "a resident with a public institution."  (*Id.* at 7.)  First, they attach Jacobs's resident agreement, which lists the resident and "Penn State Health Milton S. Hershey Medical Center, a Pennsylvania nonprofit corporation," as the parties to the agreement.  (*Id.* (citing Doc. 35-1, p. 2).)  Second, they highlight Jacobs's original dismissal letter and post-appeal dismissal letter, which they claim were from Penn

State Health and, in the case of the original letter, referenced Penn State Health policy. (*Id.* at 7–8 (citing Doc. 35-1, pp. 10–12).)

Defendants then turn back to *Borrell*. (Doc. 35, pp. 8–9.) They argue that they have a more attenuated connection to the state than the director of the nurse anesthetist program in *Borrell* because the program director defendant was paid by both Bloomsburg University and Geisinger Medical Center. (*Id.* at 9.) Here, the Medical Center pays Defendants and they hold only uncompensated faculty appointments with the Penn State College of Medicine. (*Id.*) Moreover, Jacobs signed his residency agreement with the Medical Center and was dismissed from his position by the Medical Center after violating Penn State Health policy. (*Id.* at 9–10.) Defendants claim the *Borrell* plaintiff, on the other hand, participated in a university program. (*Id.*)

On top of these distinctions, Defendants claim that *Borrell* involved a greater connection between university and hospital system because the two entities shared things like revenue, governance, and a code of conduct, and they dismissed the plaintiff from their program on joint letterhead. (*Id.* at 10.) Defendants argue "[t]hese allegations are similar to, but greater in quantity and quality than Dr. Jacobs' allegations of a joint Penn State/[Medical Center] program." (*Id.*) Finally, Defendants reiterate their argument that their dual appointment as Medical Center physicians and Penn State School of Medicine faculty is insufficient to find that

28

they are state actors, and they explain why the cases Jacobs cites do not compel the opposite finding.  (*Id.* at 10–13.)

### 3.  State Action Analysis

The court acknowledges the three state action tests set forth in *Kach*, 589 F.3d at 646.  But in both *Borrell* and *Wang*, cases that analyzed state action in the context of a hospital-university relationship, the Third Circuit distilled its state action analysis into one question: was the dually-appointed decisionmaker wearing their hospital hat or their university hat when they made the challenged decision? *See Borrell*, 870 F.3d at 160 (discussing the three state action tests summarized in *Kach* but ultimately holding that "the pertinent question is whether [the defendant] was wearing his Geisinger hat or his Bloomsburg hat when he decided to terminate [the plaintiff]"); *Wang*, 2026 WL 1959171, at *13 (quoting *Borrell*, 870 F.3d at 160) ("The key question is whether each employee 'was wearing his hospital system hat or his university hat when he decided to' take adverse action.") (applying the "hat" analysis without citing *Kach*) (citation modified).  Therefore, to determine whether Defendants are state actors in this context, the court analyzes whether they wore their Medical Center hats or their Penn State College of

Medicine hats when they affirmed the dismissal of Jacobs from the residency program.[14]

Defendants correctly argue that their Penn State College of Medicine faculty appointments do not automatically make them state actors. *See Borrell*, 870 F.3d at 160. Neither does the residency program's alleged status as a joint operation run by both the Medical Center and Penn State nor the complaint's other allegations regarding superficial connections between the two entities. *See id.*; (Doc. 1, ¶¶ 12, 56; Doc. 33, p. 26.) As the Third Circuit noted in *Borrell*, those appointments, labels, and relationships mark the beginning of the state action analysis, not its end. 870 F.3d at 160.

---

[14] Defendants do not offer a meaningful rebuttal to the proposition that Penn State College of Medicine faculty members are state actors when they act in their faculty capacity. (Doc. 30, pp. 33–45; Doc. 35, pp. 6–20.) They argue that Penn State is a "state-related" university and, as such, is not always a state actor. (Doc. 30, p. 34 n.3 (citing *Gati* v. *Univ. of Pittsburgh of Com. System of Higher Educ.*, 91 A.3d 723, 730 (Pa. Super. 2014).) But in *Gati*, the Superior Court of Pennsylvania merely declined to decide whether the University of Pittsburgh was a public or private school and warned the university that it "should not expect to use its unique state-related status to avoid any obligation to its students under either due process or contract law." 91 A.3d at 730 n.12. Moreover, the Third Circuit has recognized that Penn State is a state actor. *Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984); *Henderson v. Pa. State Univ.*, No. 4:21-CV-00872, 2022 WL 838119, at *4 (M.D. Pa. Mar. 21, 2022) (collecting cases). And because Penn State College of Medicine "operates as Penn State's sole medical school," Doc. 1, ¶ 11(a), the court assumes for the purpose of deciding this motion that the college's faculty members are state actors when acting in that capacity as well. *See Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 173 (3d Cir. 2013) (holding that the chair of a graduate program at Penn State was a state actor because he worked for Penn State and had supervisory authority over the Plaintiff); *Williams v. Pa. State Univ.*, No. 4:20-CV-00298, 2020 WL 5291985, at *9 (M.D. Pa. Sept. 4, 2020) (finding that the plaintiff adequately stated a due process claim against Penn State officials).

The court must narrow its focus to Defendants' participation in the challenged action. *Id.* at 161; *see Wang*, 2026 WL 1959171, at *13–14. Jacobs does not challenge his initial dismissal from the residency program as outlined in the letter he received on November 6, 2025; instead, he challenges Defendants' handling of his appeal through the Due Process Policy and their affirmance of his initial dismissal. (Doc. 1, ¶¶ 32, 62.) He specifically contests Defendants' execution of the Due Process Policy in his case. (*See id.* ¶¶ 61–62 (alleging that Defendants violated Jacobs's due process rights by denying him a fair hearing and noting that "Defendants have a duty to enforce the provisions of the [Due Process Policy] and have actually enforced those provisions against Dr. Jacobs").) Thus, the court examines the procedure laid out by the Due Process Policy and how Defendants were involved in carrying out that procedure.

Several aspects of the Due Process Policy demonstrate that Defendants wore their Penn State College of Medicine hats when they executed the Due Process Policy and reviewed Jacobs's dismissal. First, the webpage Jacobs attached to his complaint shows that the policy can be found on a Penn State College of Medicine webpage, and it is listed as one of the "Graduate and Medical Education Policies" applicable to residents and fellows. (Doc. 1-1, pp. 1–7.)[15] Second, the policy was

---

[15] Defendants note that "the section of the website containing [the Due Process Policy] notes that [the Medical Center] (not Penn State University) is the 'ACGME-accredited Sponsoring Institution' for the medical residency program." (Doc. 35, p. 10, n.4.) But they do not explain

approved by the "[Graduate Medical Education] Committee," and it applies to academic and disciplinary actions as well as "resident complaints related to the clinical learning environment, the program or faculty . . . ." (*Id.* at 3–7.)  These characteristics suggest that the Due Process Policy governs matters related to the academic mission of the Penn State College of Medicine, not just the employment concerns of the Medical Center.  *Contra Borrell*, 870 F.3d at 161 (recognizing that the drug testing policy plaintiff violated was a preexisting hospital policy and that "[n]either Bloomsburg nor its agreement with Geisinger played any part in creating . . ." that policy, and holding this detail weighed against a finding of state action).

The third and most relevant aspect of the Due Process Policy is that it sets forth the membership of its various appeal bodies according to Penn State College of Medicine faculty titles.  (Doc. 1-1, pp. 3–7.)  Jacobs argues that Clebak's relevant title—Associate Dean for Graduate Medical Education at the Penn State Health Milton S. Hershey Medical Center and the Pennsylvania State University College of Medicine—is an "academic title" conferred through his role as a Penn State faculty member.  (Doc. 33, p. 20.)  He also argues that Black, as Vice Dean for Education Affairs at the Medical Center, and Ghahramani, as Interim Chair of

---

how that designation confirms that the Penn State College of Medicine had no part in running the residency program, and the webpage also expresses that "Penn State Health Milton S. Hershey Medical Center, as the ACGME-accredited Sponsoring Institution, together with Penn State Health *and Penn State College of Medicine*, affirms a shared commitment to excellence in graduate medical education (GME)."  (Doc. 1-1, p. 1 (emphasis added).)

the Department of Medicine for Penn State College of Medicine, earned those titles because of their status as Penn State faculty members. (*Id.*; *see* Doc. 1 ¶¶ 4–7.) Defendants do not rebut this or explain that these titles refer only to Medical Center-conferred roles. (*See* Doc. 35, pp. 6–15.) Moreover, Jacobs alleges that his residency program "is affiliated with Penn State University, rather than [the Medical Center] as a private entity," and Penn State College of Medicine "remains responsible for academic coordination, clinical integration, and shared governance" related to Jacobs's residency program. (Doc. 1, ¶ 56.) Drawing all reasonable inferences in Jacobs's favor, the court finds these are academic titles related to Defendants' appointments with the Penn State College of Medicine. Therefore, defendants gained their authority, as members of the disciplinary appeal bodies, due to their Penn State College of Medicine faculty appointment, not their Medical Center employment.[16]

Those titles appear in the Due Process Policy. Specifically, the Due Process Policy involves a resident's program director and "department chair" in the Program-Level Review process. (Doc. 1-1, pp. 4–5.) The Due Process Policy therefore gave Ghahramani the authority to hear Jacobs's Program Level Review

---

[16] Defendants note that Medical Center physicians' faculty appointments are not compensated by Penn State. (Doc. 35, p. 9.) But they offer no argument, other than to distinguish Defendants from the officials sued in *Borrell*, as to why that lack of compensation matters for state action purposes. *See id.* The analysis focuses on how the state controlled the challenged action, not whether the state directly pays the actor in question. *See Borrell*, 870 F.3d at 160.

appeal because Ghahramani serves as the "Interim Chair, Department of Medicine for Penn State College of Medicine." (Doc. 1, ¶¶ 7, 35(a).) A similar analysis applies to Black and Clebak. Jacobs alleges that Clebak was a member of the GME Board, Doc. 1, ¶ 45(d), and construing all reasonable inferences in Jacobs's favor, it appears that Black, as the Interim Vice Dean for Education Affairs and one of the Defendants Jacobs alleges violated his due process rights through the disciplinary process, was a member of that Board as well. (Doc. 1, ¶¶ 6, 62(a) ("Defendants . . . have actually enforced [the Due Process Policy] against [Jacobs].").) The Due Process Policy defines the members of the GME Board as "a senior resident/fellow, two senior faculty members, a program director, and a representative of the Dean's office (Vice Dean for Educational Affairs, Associate Dean for GME/DIO, Associate DIO)." (Doc. 1-1, p. 6.) Thus, the GME Board members are appointed based on what Jacobs alleges are their Penn State College of Medicine faculty appointments, not their status as Medical Center physicians. (*See id.*) Black and Clebak had authority to hear Jacobs's appeal, affirm his dismissal, and issue a final decision dismissing him from the program because of their positions at Penn State College of Medicine, not their employment at the Medical Center.

*Borrell* and *Wang* both explain that an individual's status as a state actor depends in part on which entity gave that individual authority to engage in the

34

challenged activity.  In *Borrell*, the court held the program director was not a state

actor in part because the director's actions "were authorized by [the hospital] to

enforce its drug and alcohol policy, and not pursued under any authority granted

him by the state . . . [He] did not need permission from [the university] to fire a

[hospital] worker who violated a hospital policy."  870 F.3d at 160–61.  And in

*Wang*, the court held that one defendant lacked the authority to discipline the

plaintiff in the university setting, so his attempts to do so were not state action.

*Wang*, 2026 WL 1959171, at *14.  The court held that the same defendant's

enforceable ban on the professor interacting with residents and fellows at the

hospital, not students at the medical school, was different in part because that

defendant "never purported to bar him on behalf of the university."  *Id.*

Unlike the defendants in those cases, Defendants here had authority to

review Jacobs's dismissal only because of their Penn State College of Medicine

faculty appointments according to the plain terms of the Due Process Policy and

Jacobs's allegations.  (*See* Doc. 1-1, pp. 4–7; Doc. 33, p. 20.)  Accordingly, the

court finds that Jacobs has sufficiently alleged that Defendants qualified as state

actors when they reviewed and affirmed his dismissal.  The court will deny

Defendants' motion to dismiss Jacobs's due process claim based on a failure to allege state action.[17]

### B. Jacobs Sufficiently Alleges Defendants Denied Him Due Process.

The parties next dispute whether Jacobs sufficiently pleads the third element of his due process claim: that Defendants deprived him of his property interest in the continuation of his graduate medical education or his liberty interest in his reputation without due process of law.  *See Parker*, 158 F.4th at 481; (Doc. 1, ¶ 58(b)–(c); Doc. 30, p. 40.)  Both parties argue that Jacobs, as a medical resident, is entitled to the same due process as a student facing disciplinary or academic sanctions.  (Doc. 30, p. 41; Doc. 33, p. 29.)[18]  Although the parties did not present, and the court did not find, a Third Circuit opinion deciding whether residents are entitled to the same level of due process students enjoy, the court finds that they are for purpose of deciding this motion.[19]

---

[17] Because the court finds that Jacobs adequately alleged that Defendants are state actors on these grounds, it does not address his additional state action argument relating to the institutional relationship between Penn State and the Medical Center.  (*See* Doc. 33, pp. 23–25.)

[18] Defendants argue that Jacobs is a Medical Center employee and not a student in their reply brief.  (Doc. 35, p. 13.)  But in their discussion of whether Jacobs received due process in their brief in support of their motion to dismiss, they note that residents are usually entitled to the same level of due process protection as students.  (Doc. 30, p. 41.) Thus, based on Defendants' reliance on those cases, their engagement with the student-afforded due process requirements, and the accordant caselaw discussed herein, the court finds Jacobs is entitled to the due process afforded a student.

[19] In deciding whether a radiology resident could properly raise a Title IX claim against the hospital that offered the clinical portion of her residency program, the Third Circuit noted that "courts have repeatedly recognized the educational qualities of residency *programs* in other contexts, even where ultimately deeming *residents* nonstudents."  *Doe v. Mercy Cath. Med. Ctr.*,

The United States Court of Appeals for the Sixth Circuit recently recognized that "every circuit to address the question agrees that medical residents receive the due process protections of students." *Mares v. Miami Valley Hosp.*, 96 F.4th 945, 952 (6th Cir. 2024) (first citing *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989); then citing *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 784–86 (2d Cir. 1991); and then citing *Fenje v. Feld*, 398 F.3d 620, 624–27 (7th Cir. 2005)). At least one other district court in the Third Circuit has analyzed a medical resident's due process claims under the student standard. *Terzian v. Montclair Hosp., LLC*, No. CV 224396, 2023 WL 2473454, at *6 (D.N.J. Mar. 10, 2023) (quoting *Hernandez v. Overlook Hosp.*, 692 A.2d 971, 973 (N.J. 1997)). Moreover, Jacobs alleges in his complaint that the "primary purpose of the [Medical Center] residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program." (Doc. 1, ¶ 16); *see Mares,* 96 F.4th at 952 ("[T]he factual record demonstrates that the primary focus of [the university's] residency program is education."). The court finds that Jacobs has sufficiently alleged that the residency

850 F.3d 545, 557–58 (3d Cir. 2017) (collecting cases). And although the court recognized that it was plausible the resident qualified as the hospital's employee under Title VII, it did so "notwithstanding any other status the law may or may not have reposed on her (for example, a 'student')." *Id.* at 559; *see also Wang*, 2026 WL 1959171, at *13 (citing *Doe*, 850 F.3d at 556, 559) ("Medical residency straddles the line between education and employment.")

37

program is a form of graduate medical education and follows the courts that have held that residents are owed the same level of due process as students.

Having determined that due process applies to Jacobs's dismissal and that he is afforded the general due process protections of a student, "the question remains what process is due." *Goss v. Lopez*, 419 U.S. 565, 577 (1975) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Generally, "[p]rocedural due process requires 'that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Keles v. Bender*, No. 21-1497, 2022 WL 840311, at *3 (3d Cir. Mar. 18, 2022) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985), *judgment entered*, No. 21-1497, 2022 WL 816492 (3d Cir. Mar. 18, 2022). And "in academic settings, more informal forms of notice and hearings suffice." *Id.*

Beyond those basic standards, determining the specific due process a school owes a student depends on context, specifically whether the school dismissed the student for academic or disciplinary reasons. *See id.* A student dismissed for academic reasons is only entitled to an "informal faculty evaluation." *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 51 (3d Cir. 1986), *cert. denied*, 479 U.S. 818 (1986). Students dismissed for disciplinary reasons get more; specifically, they are entitled to "rudimentary precautions against unfair or

38

mistaken findings of misconduct and arbitrary exclusion." *Keles*, 2022 WL 840311, at *3 (quoting *Goss*, 419 U.S. at 581).

Jacobs argues his dismissal from the residency program is a disciplinary, not an academic, sanction. (Doc. 33, p. 30 n.15.) Construing his allegations in the light most favorable to him, the court agrees. The Medical Center did not dismiss Jacobs from the residency program due to poor performance. (Doc. 1, ¶ 32.) Instead, it dismissed him because he violated a specific policy about "dishonesty in communication" by allegedly sending the fake email. (*Id.* ¶ 32.) Moreover, Defendants do not meaningfully dispute that Jacobs was dismissed for disciplinary reasons. (*See* Doc. 35, p. 15 (citing *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 398 (E.D. Pa. 2010)); *see J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 300 (6th Cir. 2019) ("A decision is disciplinary when the university engages in first-level factfinding to resolve a disputed, objective question about the student's conduct— and the outcome of that inquiry could lead to the student's dismissal or a long suspension."). Therefore, the court finds that Jacobs was entitled to the level of due process described in *Goss*: "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion . . . ." 419 U.S. at 581.

*Goss* outlined the process due to a public high school student who faced a ten-day disciplinary suspension; the court held that the school needed to give the student notice of the charges against him "and, if he denies them, an explanation of

39

the evidence the authorities have and an opportunity to present his side of the story."  419 U.S. at 581.  But it also recognized that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."  *Id.* at 584.

Since *Goss*, courts have often examined the three factors listed in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to determine what process is due to students facing more extensive discipline than mere suspension in a variety of settings.[20]  Those factors are: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function

---

[20] *See Osei v. Temple Univ.*, 518 F. App'x 86, 88 (3d Cir. 2013) (citing *Goss*, 419 U.S. at 581, and examining the *Mathews* factors to determine whether an undergraduate student received due process after being suspended for multiple months for sending threatening emails); *Phat Van Le v. Univ. of Med. & Dentistry of N.J.*, 379 F. App'x 171, 174–75 (3d Cir. 2010) (applying the *Mathews* factors to a graduate student's due process claim after the student was expelled from dental school); *Palmer v. Merluzzi*, 868 F.2d 90, 91, 95 (3d Cir. 1989) (discussing both *Mathews* and *Goss* in determining whether a high school student suspended from school for ten days and suspended from the football team for sixty days received due process from his school); *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir. 1991) (applying the *Mathews* factors to determine whether a medical resident was afforded due process after her hospital denied her the position of chief resident), *cert. denied sub nom.*, *N.Y.C. Health & Hosps. Corp. v. Ezekwo*, 502 U.S. 1013 (1991); *Simms v. Pa. State Univ.-Altoona*, No. 3:17-CV-201, 2018 WL 1413098, at *4–7 (W.D. Pa. Mar. 20, 2018) (applying *Goss* and *Mathews* to a suspended undergraduate's claim after she incurred a multi-month suspension) (collecting cases); *Doe v. Pa. State Univ.*, 336 F. Supp. 3d 441, 447–48 (M.D. Pa. 2018) (applying *Goss* and the *Mathews* factors to an undergraduate's due process claim arising from his suspension for allegations of sexual assault).

involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

*Goss* outlines the basic level of due process owed to a student for a modest suspension: notice and an opportunity to be heard. 419 U.S. at 579. *Mathews* fleshes out the procedural parameters a school must implement to protect a student's due process rights; its factors allow courts to determine whether a school's procedures meet due process standards after considering the context of the student's disciplinary sanction. *See Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989) (first citing *Goss*, 419 U.S. at 584; and then citing *Mathews*, 424 U.S. at 334–35) (noting that in *Goss*, the Supreme Court addressed only the due process protections owed to a student who suffered a short suspension). This approach is necessary because due process is a "flexible concept . . . ." *Fraser v. Pa. State Univ.*, 654 F. Supp. 3d 443, 458 (M.D. Pa. 2023) (quoting *Palmer*, 868 F.2d at 95).

The parties' arguments weigh the concepts and factors discussed in *Matthews* and *Goss*. Defendants argue that Jacobs's due process claim fails "because he does not allege a deprivation of process; rather, he alleges he was entitled to different process." (Doc. 30, p. 40.) They recognize that as a resident, Jacobs was entitled to the same due process protections as a student, and students are only entitled to "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion." (*Id.* at 41–42 (quoting *Keles*, 2022 WL

41

840311, at *3.) Jacobs's review process met this standard, they argue, because he was permitted, on multiple levels of review and appeal, to appear and present his case. (*Id.*)

Defendants also seek to distinguish Jacobs's allegations from those presented in the cases he cited in the briefing in support of his now-withdrawn motion for a preliminary injunction. (*Id.* at 42–44.) First, they note that in several of the cases Jacobs cites, the court found due process violations where a university failed to provide or adhere to a clear disciplinary procedure. (*Id.* at 42–43.) Here, Defendants followed their disciplinary process. (*Id.*) Second, they argue that students are not always entitled to cross-examine witnesses before facing disciplinary action. (*Id.* at 43.) Cross-examination is only necessary "if the sole evidence against the accused is in the form of the accuser's testimony . . . ," and here, the various disciplinary decision makers in Jacobs's case relied on additional evidence besides witness statements, like the cybersecurity report. (*Id.* at 43–44.)

In response, Jacobs urges the court to weigh his interest in a fair outcome and the potential benefits of additional procedural safeguards against Defendants' need for disciplinary efficiency. (Doc. 33, pp. 28–29 (quoting *Mathews*, 424 U.S. at 335).) He accepts that Defendants afforded him the "bare minimum" due

process protections of notice and a hearing but argues that due process requires more than what he received. (*Id.* at 29–30 (discussing *Goss*, 419 U.S. at 579).)[21]

Jacobs begins with cross-examination. (*Id.* at 31.) He argues that, to provide a fair hearing, a school must give a student subject to discipline an opportunity to cross-examine witnesses against them any time the school must decide between competing narratives of misconduct. (*Id.* at 31–34.) This requirement is not limited to situations where the school makes its decision based on testimony alone; the trigger for cross examination is competing narratives, not the absence of non-testamentary evidence. (*Id.*) Therefore, Defendants did not provide Jacobs a fair hearing because he was not permitted to cross-examine any of the witnesses who testified against him before the various committees and appeal boards or present testimony from the Medical Center employees who drafted the cybersecurity report. (*Id.* at 31–34.)

Jacobs then argues Defendants violated his due process rights by relying on undisclosed evidence to make their disciplinary decision and failing to provide him a fair opportunity to be heard. (*Id.* at 34.) He reiterates that he was not permitted to be present when Medical Center employees "presented the case against him to the Hearing Panels," and that Defendants or the Medical Center refused to provide

---

[21] Jacobs concedes that he does not base his due process claim "on an allegation that Defendants failed to follow their own procedures." (Doc. 33, p. 30.)

him with "copies of witness statements, text messages, social media images, and other information . . ." they had obtained regarding the fake email. (*Id.* at 34–35.) Moreover, Jacobs was not allowed to present witnesses, such as Medical Center employees and his "forensic expert," or offer specific evidence before the disciplinary boards. (*Id.* at 35.) And when he submitted a letter to the CCC, Ghahramani appeared to give the letter less persuasive weight because Jacobs's attorneys wrote it. (*Id.*)

Bringing these points together, Jacobs argues that, had Defendants afforded him the minimal procedural protections he requested, the result of his disciplinary proceedings would have been different and based on more reliable evidence. (*Id.* at 36.) He offers the cybersecurity report as a specific example. (*Id.*) Jacobs identifies several purported flaws in the cybersecurity report and notes that Defendants relied on that report without affording him a fair opportunity to identify those flaws. (*Id.* at 36–37.)

Jacobs analogizes his case to *J. Endres v. Northeast Ohio Medical University*, in which the United States Court of Appeals for the Sixth Circuit held that the plaintiff properly stated a due process claim against a medical school that dismissed him for cheating on a test. 938 F.3d at 301–302. In that case, the court held the school violated the plaintiff's due process rights by preventing him from hearing university officials present their case against him and failing to provide

him with an explanation of the evidence against him before the hearing. *Id.* Jacobs claims his claim is like the one presented in *Endres* and different from those cited by Defendants because dismissal from the residency program is a disciplinary, not an academic, sanction. (Doc. 33, pp. 37–38.) Therefore, he is entitled to a higher level of due process protection. (*Id.* at 38–39.)

In reply, Defendants argue that Jacobs had no right to review all the evidence presented against him before his appeal hearings. (Doc. 35, pp. 15–16.) They or the Medical Center gave him the redacted cybersecurity report, which they call the "primary piece of evidence," allowed him to address that evidence through his own expert report which he then submitted for consideration, and informed him of the other types of evidence before them even though they did not share that evidence with him directly. (*Id.*) That, they claim, was enough. (*Id.* at 15–16.)

Moreover, Defendants claim cross examination is not always required in the student disciplinary context, but it "may *potentially* be required in cases hinging on issues of credibility and cases where a defendant's policies provided for cross-examination." (*Id.* at 16–17.) Defendants claim Jacobs did not allege that "credibility was the sole factor here . . . ," that cross examination of the Medical Center employees who drafted the cybersecurity report would not have been helpful to Jacobs's case, that Defendants considered evidence beyond the cybersecurity report, and that Jacobs only presented a "position letter prepared by

45

counsel" in support of his case, "declining to provide an explanation in his own words." (*Id.* at 18.) *Endres* does not support Jacobs's claim, they argue, because the school policies in that case guaranteed students a right to an adversarial hearing. (*Id.* at 17); *see Endres*, 938 F.3d at 287. Thus, because Defendants' disciplinary decision did not hinge on a credibility issue, Jacobs was not entitled to cross-examine witnesses at his disciplinary hearings. (Doc. 35, p. 18.)

The court finds Jacobs has adequately pleaded that Defendants violated his due process rights when they refused, at multiple levels of his disciplinary appeal, to provide him with the evidence upon which they relied in affirming his dismissal. (*See* Doc. 1, ¶ 61(b)(i).) In *Goss*, the Supreme Court specifically held that a high school student facing a ten-day suspension must be "given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581.

The United States Court of Appeals for the Seventh Circuit relied on that specific language from the Supreme Court's *Goss* opinion in a student discipline case. *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.). In that case, a university suspended the plaintiff, an undergraduate student, for an academic year after another student accused him of sexual violence. *Id.* Due to the severity of the charge and the potential disciplinary sanction, the Seventh

46

Circuit held that he was entitled to "relatively formal procedures . . . ." *Id.* Even though the plaintiff received notice of the allegations against him and denied them, the university "did not disclose its evidence" to him. *Id.* The court held that "withholding the evidence on which [university officials] relied in adjudicating [the plaintiff's] guilt was itself sufficient to render the process fundamentally unfair." *Id.* Thus, the university's process "fell short of what even a high school must provide to a student facing a days-long suspension." *Id.*; *see Doe v. Univ. of Scis.*, 961 F.3d 203, 215 (3d Cir. 2020) (citing *Purdue Univ.*, F.3d at 663–64) (discussing the Seventh Circuit's due process analysis in evaluating a plaintiff's claim alleging a lack of fundamental fairness in a sexual-misconduct disciplinary hearing against a private school).

Similarly, in *Endres*, the Sixth Circuit held the defendant university "repeatedly failed" to provide the student facing expulsion an explanation of the evidence against him. 938 F.3d at 301. Without learning about that evidence, the court held, the plaintiff could not fully respond to the accusations presented against him at his disciplinary hearing. *Id.*[22] And in a nonprecedential decision, a Third Circuit panel recognized that:

---

[22] Defendants argue *Endres* holds little weight in this context because the school's policies allowed the accused student to learn the evidence against him and provided other due process protections. (Doc. 35, p. 17.) Thus, "[i]t is not surprising the Sixth Circuit held that denying the plaintiff a form of process expressly provided for in the defendant's policy was a due process violation." (*Id.*) However, even if that is true, the Sixth Circuit recognized less than two years earlier in *Doe v. Miami University* that a failure to follow internal guidelines alone does not

> Procedural due process requires school authorities to provide students facing temporary suspensions with rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school. This includes notice of the charges, *an explanation of the evidence against the student*, and an opportunity to present his side of the story.

*Osei v. Temple Univ.*, 518 F. App'x 86, 88 (3d Cir. 2013) (quoting *Goss*, 419 U.S. at 581) (internal quotation marks and citations omitted) (emphasis added) (unpublished table decision). Moreover, courts in this circuit have cited a university's effort to share the evidence it plans to present against a student at a disciplinary hearing as a sign of adequate due process. *See, e.g., Simms*, 2018 WL 1413098, at *6 (noting, in finding that a university afforded a student proper due process protections, that the university told the student of "her right to review documentation and evidence against her prior to the hearing . . .").

Defendants admitted that they possessed evidence including "witness statements; text message screenshots from witnesses; pictures from Instagram; the Cybersecurity Incident Report, and work schedules." (Doc. 1, ¶ 38.) Yet they only provided Jacobs with a redacted copy of the cybersecurity report and none of the other forms of evidence on which they relied in reaching a decision on his appeal. (*Id.*) Moreover, Jacobs was not permitted to hear the case presented against him at

---

establish a due process violation, but that the "Constitution does require, however, that the student be provided the evidence against him." 882 F.3d 579, 603 (6th Cir. 2018) (citing *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399–400 (6th Cir. 2017)).

48

his various appeal hearings.  (*Id.* ¶ 50(a).)  Jacobs could not meaningfully respond to evidence he neither reviewed nor heard during his appeal hearings.  Thus, Defendants did not provide him the necessary explanation of the evidence against him.  *See Goss,* 419 U.S. at 581.

Defendants' arguments that they did not need to disclose all the evidence before them to Jacobs, and that he knew that evidence existed, so they did not act in "secret," are unavailing.  (*See* Doc. 35, pp. 15–16.)  *Goss* requires that a school give a student facing disciplinary action an *explanation* of the evidence against them.  419 U.S. at 581.  That requirement would be rendered meaningless if the school could pick and choose which evidence it explained.  And simply telling Jacobs that witness statements and other forms of evidence exist would offer little procedural and truth-seeking value if the content of that evidence remains hidden.

Accordingly, the court finds Jacobs has adequately pleaded that Defendants violated his right to due process by withholding the evidence they relied upon in affirming his dismissal.  This is sufficient for the purpose of deciding this motion; the court will not analyze the other due process violations Jacobs alleges now.  The court will deny Defendants' motion to dismiss Jacobs's complaint on this basis.[23]

---

[23] Because the court will deny Defendants' motion to dismiss Jacobs's claims in its entirety, it does not address the parties' arguments regarding amendment of the complaint.  (*See* Doc. 30, pp. 44–47.)

## CONCLUSION

For the reasons explained herein, the court will deny Defendants' motion to dismiss Jacobs's complaint, Doc. 29.  An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: July 20, 2026